IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEMEX EXPLORACIÓN Y PRODUCCIÓN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BASF CORPORATION; BASF FINA | § | |
| PETROCHEMICALS LIMITED | § | |
| PARTNERSHIP; MURPHY ENERGY | § | |
| CORPORATION; BIO-NU SOUTHWEST, | § | CIVIL ACTION NO. H-10-1997 |
| INC. d/b/a VALLEY FUELS; US | § | |
| PETROLEUM DEPOT, INC.; ARNOLDO | § | |
| MALDONADO; JONATHAN DAPPEN; | § | |
| STEPHEN PECHENIK; TIMOTHY L. | § | |
| BRINK; CONTINENTAL FUELS, INC.; | § | |
| and HIGH SIERRA CRUDE OIL & | § | |
| MARKETING, LLC, Successor to | § | |
| PETRO SOURCE PARTNERS, LP, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| PEMEX EXPLORACIÓN Y PRODUCCIÓN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BIG STAR GATHERING LTD L.L.P.; | § | |
| F&M TRANSPORTATION, INC.; | § | |
| JAMES JENSEN; JOPLIN ENERGY, | § | |
| LLC f/k/a HUTCHISON HAYES | § | CIVIL ACTION NO. H-11-2019 |
| ENERGY, LLC; JEFF KIRBY; | § | |
| PLAINS ALL-AMERICAN PIPELINE, | § | |
| L.P.; SAINT JAMES OIL, INC.; | § | |
| SUPERIOR CRUDE GATHERING, INC.; | § | |
| TRANSMONTAIGNE PARTNERS, L.P.; | § | |
| and WESTERN REFINING COMPANY, | § | |
| L.P., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, PEMEX Exploración y Producción ("PEP"), has brought suit against multiple defendants in two separate — but now

consolidated — actions for claims arising from sales in the
United States of natural gas condensate allegedly stolen from PEP
in Mexico.[1]   Pending before the court are five categories of
motions:

(1)   motions for summary judgment filed by defendants
      (a) Plains Marketing, L.P. (Docket Entry No. 475);
      (b) Murphy Energy Corp. (Docket Entry No. 479);
      (c) Superior Crude Gathering, Inc. and Jeff Kirby
      (Docket Entry No. 486); (d) BASF Corp. and BASF
      FINA Petrochemicals, L.P. (Docket Entry No. 489);
      and  (e)  RGV  Energy  Partners,  LLC  and  F&M
      Transportation, Inc. (Docket Entry No. 517);

(2)   third-party defendant Donald Schroeder's motion for
      partial summary judgment on cross-claims asserted
      against him by Murphy Energy and by BASF FINA
      Petrochemical Limited Partnership (Docket Entry
      No. 481);

(3)   PEP's Dispositive Motion (Docket Entry No. 492);

(4)   motions to exclude and/or strike experts' testimony
      and/or reports, including,

      (a) motions to exclude expert testimony of Joseph
      Wilkinson and Brent Bersin filed by Plains All-
      American Pipeline, L.P. and Plains Marketing, L.P.
      (Docket Entry No. 473); by High Sierra Crude Oil &
      Marketing, LLC, Jeff Kirby, and Superior Crude
      Gathering,, Inc. (Docket Entry No. 477); and by
      BASF Corp., BASF FINA Petrochemicals, L.P., and
      Murphy Energy Corp. (Docket Entry No. 478);

      (b) motion to strike expert report and testimony of
      Alejandro Valle Corona filed by BASF Corp., BASF
      FINA Petrochemicals, L.P., Murphy Energy Corp.,
      Plains All-American Pipeline, L.P., Plains Marking,
      L.P., Superior Crude Gathering, Inc., and Jeff
      Kirby (Docket Entry No. 476);

      (c) motion to exclude expert testimony of Ana Maria
      Salazar  Slack  filed  by  BASF  Corp.,  BASF  FINA

_____

[1]Civil Action No. H-10-1997.

-2-

Petrochemicals, L.P., High Sierra Crude Oil & Marketing, LLC, Jeff Kirby, Murphy Energy Corp., Plains All-American Pipeline, L.P., Plains Marketing, L.P., and Superior Crude Gathering, Inc. (Docket Entry No. 482);

(d) motion to join all defendants, motions to strike experts' reports and exclude experts' testimony filed by RGV Energy Partners and F&M Transportation (Docket Entry No. 485);

(e) PEP's motions to exclude expert testimony of K. Scott Van Meter, CPA (Docket Entry No. 483), David G. Ownby (Docket Entry No. 495), and Frank L. Holder (Docket Entry No. 496); and

(5) motions to designate responsible third-parties filed by defendants BASF Corp. and BASF FINA Petrochemicals, L.P. (Docket Entry No. 426), and by defendant Superior Crude Gathering, Inc. (Docket Entry No. 442).

In addition, most parties have submitted objections to the evidence cited in support of the various dispositive motions. See e.g., Defendants Plains Marketing L.P., Superior Crude Gathering, Jeff Kirby, Murphy Energy Corporation, BASF Corporation, and BASF FINA Petrochemicals Limited Partnership's Objections to Plaintiff PEP's Summary Judgment Evidence (Docket Entry No. 537); The Objections of PEP to the Summary Judgment Evidence of Plains Marketing, L.P. (Dkt. 475), Murphy Energy Corporation (Dkt. 479), Superior Crude Gathering, Inc. and Jeff Kirby (Dkt. 486), BASF Corporation and BASF FINA Petrochemicals, LP (Dkt. 489), and RGV Energy Partners, LLC and F&M Transportation, Inc. (Dkt. 517) (Docket Entry No. 548); Defendant Plains Marketing L.P.'s Objections to Evidence Submitted in Support of Plaintiff [Docket Entry No. 545] PEP's Opposition to Defendants' Dispositive Motions

-3-

(Docket Entry No. 565); Superior Crude Gathering, Inc. and Jeff
Kirby's Objections to Evidence Submitted in Support of [Docket
Entry No. 545] PEP's Opposition to Defendants' Dispositive Motions
(Docket Entry No. 566); The Objections of Plaintiff PEP to the
Summary Judgment Evidence Submitted by Superior Crude Gathering,
Jeff Kirby, BASF Corporation, and BASF FINA Petrochemicals Limited
Partnership With Their Joint Response to Plaintiff's Dispositive
Motion (Dkt. 542) and Plains Marketing, Inc. With Its Response to
Plaintiff's Dispositive Motion (Dkt. 536) and Murphy Energy
Corporation With Its Response to Plaintiff's Dispositive Motion
(Dkt. 541) (Docket Entry No. 575); Defendants BASF Corporation and
BASF FINA Petrochemicals Limited Partnership's Objections to
Evidence Submitted in Support of [Docket Entry No. 545] Plaintiff
PEP's Opposition to Defendants' Dispositive Motions (Docket Entry
No. 583); and Defendant Murphy Energy Corporation's Objections to
Evidence Submitted in Support of [Docket Entry No. 545] Plaintiff
PEP's Opposition to Defendants' Dispositive Motions (Docket Entry
No. 585).

## I.  **Background**

There are two live complaints in this consolidated action:
PEP's Third Amended Complaint (Docket Entry No. 220) filed in Civil
Action No. H-10-1997 (the "BASF Action"); and PEP's First Amended
Complaint (Docket Entry No. 378) filed in Civil Action No. H-11-
2019 (the "Big Star Action").  Each of the two live complaints

-4-

asserts claims against different defendants for conversion arising from the use of stolen property, for equitable relief (unjust enrichment, money had and received, and constructive trust), violation of the Texas Theft Liability Act, and civil conspiracy. The Third Amended Complaint filed in the BASF Action also asserts claims for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)-(d) against a group of defendants referred to as the "Conspiring Defendants." On October 20, 2011, the court issued a Memorandum Opinion and Order (Docket Entry No. 292) denying PEP's Motion for Determination of Foreign Law (Docket Entry No. 236), and granting the motions of Murphy Energy Corporation (Docket Entry No. 221), BASF Corporation (Docket Entry No. 253), and BASF FINA (Docket Entry No. 261) for leave to designate responsible third parties. On April 10, 2012, the court issued a Memorandum Opinion and Order (Docket Entry No. 377) denying PEP's Motion for Leave to File Fourth Amended Complaint in the BASF Action (Docket Entry No. 338) and granting in part PEP's Motion to File First Amended Complaint (Docket Entry No. 339) in the Big Star Action to allow Plains Marketing, St. James Energy Operation, and RGV Energy Partners to be added as defendants. The pleading history and the live claims asserted against the remaining defendants are summarized below.

## A. The BASF Action

PEP initially filed suit on June 7, 2010, alleging conversion and related equitable claims under Texas law against eleven

defendants: BASF Corp.; Murphy Energy Corp.; Trammo Petroleum, Inc.; Bio-NU Southwest, Inc. d/b/a Valley Fuels; US Petroleum Depot, Inc.; Donald P. Schroeder, Jr.; Arnoldo Maldonado; Jonathan Dappen; Stephen Pechenik; Timothy L. Brink; and Joshua Crescenzi (the "BASF Action").[2] On September 15, 2011, PEP filed its First Amended Complaint (Docket Entry No. 59), which added two additional defendants: Continental Fuels, Inc. and High Sierra Crude Oil& Marketing (successor to Petro Source Partners, L.P.). On November 5, 2010, the court issued an Order Dismissing Defendant Trammo Petroleum, Inc. With Prejudice (Docket Entry No. 95). On June 6, 2011, the court issued orders instructing the Clerk to enter default judgments against defendants US Petroleum Depot, Inc. (Docket Entry No. 198) and Timothy L. Brink (Docket Entry No. 199). On November 24, 2010, PEP filed its Second Amended Complaint (Docket Entry No. 108). On June 17, 2011, PEP filed its Third Amended Complaint (Docket Entry No. 220), which added defendant BASF FINA Petrochemicals, L.P. and Continental Fuels, Inc. On March 14, 2013, the court entered an Agreed Stipulation and Order of Dismissal of Claims Against High Sierra Crude Oil & Marketing, LLC (Docket Entry No. 527) dismissing with prejudice "all claims [that PEP] asserted, or could have [] asserted" against High Sierra Crude Oil & Marketing, LLC. The defendants remaining in the BASF

---

[2]See Plaintiff PEP's Original Complaint ("Original Complaint"), Docket Entry No. 1; Plaintiff PEP's Amended Complaint ("Amended Complaint"), Docket Entry No. 59; and Plaintiff PEP's Second Amended Complaint ("Second Amended Complaint"), Docket Entry No. 108.

Action are: BASF Corp., BASF FINA Petrochemical L.P., Murphy Energy, Bio-NU Southwest, Inc., Donald P. Schroeder, Jr., Arnoldo Maldonado, Jonathan Dappen, Stephen Pechenik, Joshua Crescenzi, and Continental Fuels, Inc.

## B. The Big Star Action

On May 29, 2011, PEP filed a second suit against eleven defendants: Big Star Gathering, Ltd. L.L.P.; F&M Transportation, Inc.; James Jensen; Joplin Energy, LLC (f/k/a Hutchison Hayes Energy); Jeff Kirby; Plains All-American Pipeline, L.P.; SemCrude, L.P.; Saint James Oil, Inc.; Superior Crude Gathering; TransMontaigne Partners, L.P.; and Western Refining Co., L.P. (the "Big Star Action"). On April 20, 2012, PEP filed its First Amended Complaint (Docket Entry No. 378) in the Big Star Action, which added two additional defendants: Plains Marketing, L.P. and RGV Energy Partners, LLC. The claims that PEP has asserted against the following defendants have since been dismissed with prejudice pursuant to agreed stipulations and orders of dismissal entered by the court: Western Refining Co., L.P. (Docket Entry No. 398 dated July 17, 2012); TransMontaigne Partners, L.P. (Docket Entry No. 463 dated January 22, 2013); Plains All-American Pipeline, L.P. (Docket Entry No. 533 dated March 15, 2013); and Big Star Gathering, Ltd., L.L.P., James Jensen, and St. James Energy Operating, Inc. (Docket Entry No. 603 dated May 30, 2013). The defendants remaining in the Big Star Action are: F&M Transportation, Inc.; Joplin Energy, LLC

-7-

(f/k/a Hutchison Hayes Energy); Jeff Kirby; SemCrude, L.P.; Superior Crude Gathering, Inc.; Plains Marketing, L.P.; and RGV Energy Partners, LLC.

## II.  **Factual Allegations**[3]

This action addresses trade in the United States of natural gas condensate stolen in Mexico, transported to Texas, and sold to end-users. The defendants are individuals and entities alleged to have traded stolen Mexican condensate within the United States from August of 2006 to at least mid-2011.[4]  PEP alleges that most of the defendants knew they were trading in stolen condensate, but acknowledges that a few did not know that the condensate they bought and sold was stolen. Nevertheless, PEP alleges that even absent knowledge or intent, the defendants' use, purchase, and sale of stolen Mexican condensate in the United States was without right or title from the Mexican government and, therefore, wrongful under the laws of Mexico and the United States.[5]  Asserting that large petrochemical companies that use condensate will not knowingly purchase stolen products, PEP alleges that selling the stolen

---

[3]See Third Amended Complaint, Docket Entry No. 220, pp. 5-10, and First Amended Complaint (Big Star Action), Docket Entry No. 378, pp. 5-11.

[4]First Amended Complaint (Big Star Action), Docket Entry No. 378, p. 7 ¶ 30.

[5]See Third Amended Complaint, Docket Entry No. 220, p. 10 ¶ 55, and First Amended Complaint (Big Star Action), Docket Entry No. 378, p. 10 ¶ 51.

condensate required a coordinated conspiracy in the United States to pass the stolen condensate across the border, launder its source, and distribute and sell the stolen condensate to end-users. PEP alleges that this conspiracy was managed and operated by "Conspiring Defendants" who were (1) all of the defendants named in the BASF Action except BASF and BASF FINA,[6] and (2) Big Star, Jensen, St. James, Superior Crude, Kirby, RGV, and F&M Transportation named in the Big Star Action.[7]

PEP alleges that the existence of the marketing scheme in the United States is well established and well known to United States law enforcement agencies, including the Immigration and Customs Enforcement Agency ("ICE"), and the Department of Homeland Security ("DHS"). PEP alleges that both ICE and the DHS have been investigating the transport and sale of stolen Mexican condensate in Texas, and that their investigations have resulted in criminal convictions in this court against defendants Schroeder, Maldonado, Dappen, Pechenik, and Brink. PEP alleges that these defendants have been convicted of receiving and selling, or conspiring to receive and sell, stolen PEP condensate knowing the condensate to have been stolen or unlawfully converted in violation of 18 U.S.C. §§ 371 and 2315.

---

[6]Third Amended Complaint, Docket Entry No. 220, p. 12 ¶ 68.

[7]First Amended Complaint (Big Star Action), Docket Entry No. 378, p. 20 ¶ 108. Note, however, that at p. 10 ¶¶ 51 and 53, PEP identifies only Big Star, Superior Crude, and F&M as "Conspiring Defendants."

### III. Applicable Law for Claims Asserted and Limitations Defense

### A. Claims Asserted

PEP's complaints assert claims for conversion, equitable relief (for unjust enrichment, money had and received, and constructive trust), violation of the Texas Theft Liability Act, and civil conspiracy. PEP's Third Amended Complaint filed in the BASF Action also asserts claims for violation of RICO, 18 U.S.C. § 1962(c)-(d), against the "Conspiring Defendants." PEP's complaints also assert claims for unlawful possession and use of Mexican sovereign property in violation of Mexican law. But on October 20, 2011, the court entered a Memorandum Opinion and Order (Docket Entry No. 292) denying Plaintiff PEP's Motion for Determination of Foreign Law (Docket Entry No. 236) after concluding that Mexican law does not apply to this action.

### 1. Conversion

PEP alleges that

120. All Defendants took possession of and utilized sovereign property of the United Mexican States, without title or right. According to Mexican law, the stolen property was the sole and exclusive property of PEP.

121. All Defendants have refused to return Mexico's property or to reimburse Mexico for its use.

122. The Defendants' improper assumption and exercise of dominion and control over PEP's property has and will continue to interfere with and diminish PEP's rights in that property.

-10-

123. PEP is entitled to recover its actual
     damages. . . .[8]

"Conversion is the wrongful exercise of dominion and control
over another's property in denial of or inconsistent with his
rights." Mayo v. Hartford Life Ins. Co., 354 F.3d 400, 410 (5th
Cir. 2004) (quoting Green International Inc. v. Solis, 951 S.W.2d
384, 391 (Tex. 1997)). See also Waisath v. Lack's Stores, Inc.,
474 S.W.2d 444, 447 (Tex. 1971). "Texas cases require ownership,
possession, or the right of immediate possession to prevail on a
conversion claim." United States v. Boardwalk Motor Sports, Ltd.,
692 F.3d 378, 381-82 (5th Cir. 2012), cert. denied sub nom, Plains
Capital Corp. v. United States, 133 S.Ct. 2854 (2013) (citing City
of Wichita Falls v. ITT Commercial Finance Corp., 827 S.W.2d 6, 8
(Tex.App.—Fort Worth 1992), rev'd in part on other grounds, 835
S.W.2d 65 (Tex. 1992) ("Either ownership, possession, or the right
of immediate possession of the property to the party aggrieved is
a requirement for an action in conversion."). The plaintiff in a
conversion case also bears the burden of establishing the identity
of the property converted, Hughs Blanton, Inc. v. Shannon, 581
S.W.2d 538, 539 (Tex.App.—Dallas 1979, no writ), and damages.
United Mobile Networks, L.P. v. Deaton, 939 S.W.2d 146, 147 (Tex.
1997 (citing Prewitt v. Branham, 643 S.W.2d 122, 123 (Tex. 1982)).
"Generally, the measure of damages for conversion is the fair

---

[8]First Amended Complaint (Big Star Action), Docket Entry
No. 378, pp. 21-22 ¶¶ 120-123. See also Third Amended Complaint,
Docket Entry No. 220, pp. 33-34 ¶¶ 188-191.

market value of the property at the time and place of conversion. . . . However, damages are limited to the amount necessary to compensate the plaintiff for the actual losses or injuries sustained as a natural and proximate result of the defendant's conversion." Id. at 148. "A conversion should not unjustly enrich either the wrongdoer or the complaining party." Id.

Minerals already severed from the ground are considered personal property, not realty. See Humble Oil & Refining Co. v. West, 508 S.W.2d 812, 817 (Tex. 1974) (citing Lone Star Gas Co. v. Murchison, 353 S.W.2d 870 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r.e.). See also Phillips Petroleum Co. v. Adams, 513 F.2d 355, 363 (5th Cir.), cert. denied, 96 S.Ct. 281 (1975). PEP may, thus, establish that the defendants converted its natural gas condensate under Texas law by proving: (1) the defendant wrongfully exercised dominion or control over property to the exclusion of, or inconsistent with PEP's rights; (2) the identity of the property converted; and (3) damages. See In re Moody, 899 F.2d 383, 385 (5th Cir. 1990) (citing Bishop v. Geno Designs, Inc., 631 S.W.2d 581, 584 (Tex.App.—Tyler 1982, no writ)).

"Demand" and "refusal" are sometimes identified as additional elements of a conversion claim. See, e.g., Khorshid, Inc. v. Christian, 257 S.W.3d 748, 759 (Tex.App.—Dallas 2008, no pet.) (identifying two additional elements of a conversion claim as "the plaintiff demanded return of the property; and . . . the defendant

refused to return the property"). <u>See also</u> <u>Permian Petroleum Co.</u> <u>v. Petroleos Mexicanos</u>, 934 F.2d 635, 651 (5th Cir. 1991) ("Under Texas law, when a party lawfully acquires possession of personalty, conversion generally occurs upon a demand for return of the property and a refusal.") (citing <u>Loomis v. Sharp</u>, 519 S.W.2d 955, 958 (Tex.Civ.App.—Texarkana 1975, writ dism'd)). However, when a possessor's acts manifest a clear repudiation of the plaintiff's rights, the demand and refusal elements need not be met. <u>Presley</u> <u>v. Cooper</u>, 284 S.W.2d 138, 141 (Tex. 1955) ("Such a demand and refusal are merely evidence of a conversion, and where a conversion by the bailee cannot otherwise be shown than by his refusal to comply with the demand for possession, such a demand and refusal are necessary. But they are not necessary if the other evidence establishes an act of conversion."). <u>See also</u> <u>National Union Fire</u> <u>Ins. Co. of Pittsburgh, Pa. v. Care Flight Air Ambulance Service,</u> <u>Inc.</u>, 18 F.3d 323, 328 (5th Cir. 1994) (demand and refusal are not necessary if demand would be useless, or if the possessor's acts amount to clear repudiation of the owner's rights).

Wrongful intent to convert another's property is not an essential element; the defendant need only intend to do an act amounting to conversion. <u>McVea v. Verkins</u>, 587 S.W.2d 526, 531 (Tex.Civ.App.—Corpus Christi 1979, no writ). "[A] good faith but unauthorized retention of property can be a conversion." <u>Geders v.</u> <u>Aircraft Engine & Accessory Co.</u>, 599 S.W.2d 646, 651 (Tex.Civ.App.— Dallas 1980, no writ). If a defendant is a bona fide purchaser for

value, he has an affirmative defense against a conversion claim.

Carter v. Cookie Coleman Cattle Company, Inc., 271 S.W.3d 856,

858 & n.3 (Tex.App.—Amarillo 2008, no pet.).  It is the burden of

a party asserting an affirmative defense to sufficiently plead and

prove the defense.  Quantum Chemical Corp. v. Toennies, 47 S.W.3d

473, 478 (Tex. 2001).

> ### 2.   Equitable Relief: Unjust Enrichment, Money Had and Received, and Constructive Trust

PEP alleges that

103. All Defendants utilized the sovereign property of
Mexico without right or title.  As a result, all
Defendants were unjustly enriched by any profits,
commissions, or other benefits received by the use
of PEP's condensate.  This is true even if the
Defendants did not know the condensate was stolen.[9]

. . .

125. All Defendants profited from their improper
dominion of PEP's property, and therefore, they
hold money that in equity and good conscience
belongs to PEP.

126. Allowing the Defendants to retain the benefits
received as a result of their acts would unjustly
benefit the Defendants at PEP's expense.

127. PEP is entitled to a recovery of all money from
all Defendants that in equity and good conscience
belongs to PEP.

128. As to the Conspiring Defendants, PEP seeks
imposition of a constructive trust over all
property deriving from the use of such monies in
order to maintain and remit to PEP the monies

---

[9]First Amended Complaint (Big Star Action), Docket Entry
No. 378, p. 19 ¶¶ 103, 125-28.  See also Third Amended Complaint,
Docket Entry No. 220, p. 31 ¶ 172.

> improperly collected by and maintained by the
> Conspiring Defendants through their wrongful trade
> in stolen PEP condensate.[10]

"A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." Heldenfels Brothers, Inc. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992) (citing Pope v. Garrett, 211 S.W.2d 559, 562 (Tex. 1948), and Austin v. Duval, 735 S.W.2d 647, 649 (Tex.App.—Austin 1987, writ denied)).

> Unjust enrichment is an equitable principle holding that
> one who receives benefits unjustly should make
> restitution for those benefits. . .
>
> "Unjust enrichment" occurs when the person sought to be
> charged has wrongfully secured a benefit or has passively
> received one which it would be unconscionable to
> retain. . . . "Unjust enrichment" characterizes the
> result o[f] failure to make restitution of benefits
> received under such circumstances as to give rise to
> implied or quasi-contract to repay. . . It has also been
> said that recovery under unjust enrichment is an
> equitable right and is not dependent on the existence of
> a wrong.

Villarreal v. Grant Geophysical, Inc., 136 S.W.3d 265, 270 (Tex.App.—San Antonio 2004, pet. denied) (citations omitted). When unjust enrichment is proved, defendants must make restitution of benefits wrongfully received. Id.

> A claim for money had and received
>
> belongs conceptually to the doctrine of unjust
> enrichment. . . .

---

[10]First Amended Complaint (Big Star Action), Docket Entry No. 378, pp. 22-23 ¶¶ 125-128. See also Third Amended Complaint, Docket Entry No. 220, p. 34 ¶¶ 193-196.

The doctrine of unjust enrichment applies the principles of restitution to disputes that are not governed by a contract between the parties. . . . It characterizes the result of a failure to make restitution under circumstances that give rise to an implied or quasi-contractual obligation to return those benefits.

Edwards v. Mid-Continent Office Distributors, L.P., 252 S.W.3d 833, 837 (Tex.App.—Dallas 2008, pet. denied) (citations omitted). An action for restitution for money had and received "seeks to restore money where equity and good conscience require restitution. . . it is not premised on wrongdoing, but seeks to determine to which party, in equity, justice, and law, the money belongs." Id. (citing Staats v. Miller, 243 S.W.2d 686, 687 (Tex. 1951)). Such claims seek "to prevent unconscionable loss to the payor and unjust enrichment to the payee." Id. at 837 (citing Bryan v. Citizens National Bank in Abilene, 628 S.W.2d 761, 763 (Tex. 1982)).

As these broad and general descriptions demonstrate, a cause of action for money had and received is "less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which . . . belongs to the plaintiff."

Id. (quoting Staats, 243 S.W.2d at 687-88). See also United States v. Jefferson Electric Manufacturing Co., 54 S.Ct. 443, 449 (1934) (describing action "for money had and received" as "an equitable action . . . [that] is less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which ex aequo et bono belongs

-16-

to the plaintiff."). Thus, to prove a claim for money had and received "a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him." Edwards, 252 S.W.3d at 837 (citing Best Buy Co. v. Barrera, 248 S.W.3d 160, 162-63 (Tex. 2007) (per curiam), and Staats, 243 S.W.3d at 687).

A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment and may be imposed based on a fiduciary or confidential relationship or when there has been actual fraud. Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., 48 S.W.3d 865, 878 (Tex.App.—Houston [14th Dist.] 2001, pet. denied) (citing Meadows v. Bierschwale, 516 S.W.2d 125, 128 (Tex. 1974)). To establish a constructive trust the proponent must prove (1) the breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) the unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. Hubbard v. Shankle, 138 S.W.3d 474, 485 (Tex.App.—Fort Worth 2004, pet. denied). See also American Cancer Society v. Cook, 675 F.3d 524, 529 (5th Cir. 2012). The Texas Supreme Court has held that "the policy against unjust enrichment mandates that [a third party] not be allowed to retain property he received as a beneficiary of [another party's] fraud." Ginther v. Taub, 675 S.W.2d 724, 728 (Tex. 1984) (citing Pope v. Garrett, 211 S.W.2d 559, 561-62 (Tex. 1948)). The decision to impose a constructive trust is entrusted to the courts' discretion. Cook, 675 F.3d at 529.

-17-

3.    Texas Theft Liability Act

PEP alleges that the "Conspiring Defendants" named in each action violated the Texas Theft Liability Act ("TTLA"), Tex. Civ. Prac. & Rem. Code §§ 134.001-.005.  PEP alleges that

198.  The TTLA prohibits unlawfully appropriating property as defined in the Texas Penal Code. Pursuant to the Texas Penal Code appropriation of property is unlawful if "the property is stolen and the actor appropriates the property knowing it was stolen by another."

199.  The Conspiring Defendants repeatedly violated the provisions of the TTLA.

200.  PEP is entitled to recover its actual damages, up to $1,000 in additional damages assessed by the trier of fact as to each Conspiring Defendant[], and its attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code § 134.005.[11]

The Texas Theft Liability Act ("TTLA") provides a civil cause of action to victims of theft, as defined by the Texas Penal Code. See Tex. Civ. Prac. & Rem. Code §§ 134.001-.005.  The TTLA allows for the recovery from a person who commits "theft" actual damages, up to $1000 in additional damages, court costs, and reasonable and necessary attorney's fees. Tex. Civ. Prac. & Rem. Code § 134.005. The TTLA defines "theft" as "unlawfully appropriating property or unlawfully obtaining services as described by Section 31.03, 31.04, 31.06, 31.07, 31.11, 31.12, 31.13 or 31.14, Penal Code." Tex. Civ. Prac. & Rem. Code § 134.002(2). The penal provision implicated

---

[11]Third Amended Complaint, Docket Entry No. 220, pp. 34-35 ¶¶ 198-200.  TTLA is also asserted in the Big Star Action. See First Amended Complaint, Docket Entry No. 38, p. 23 ¶¶ 129-31.

here is § 31.03, which provides that "[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code § 31.03(a). The Penal Code defines "appropriate" as "to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or to acquire or otherwise exercise control over property other than real property." Tex. Penal Code § 31.01(4). "Appropriation of property is unlawful if: (1) it is without owner's effective consent; (2) the property is stolen and the actor appropriates the property knowing it was stolen by another." Tex. Penal Code § 31.03(b)(1)-(2).

The elements of a cause of action under the TTLA are: (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft. Tex. Civ. Prac. & Rem. Code §§ 134.002(2), 134.003; Tex. Penal Code § 31.03(a). The plaintiff must also prove that the defendant possessed an intent to deprive the plaintiff of the property permanently or for an extended period of time. Tex. Penal Code § 31.03. Deprive means "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." Tex. Penal Code § 31.01. See Olufemi-Jones v. Bank of America, N.A., 2013 WL 1482544, *3 (N.D. Tex. 2013).

4.    Civil Conspiracy

PEP alleges:

201.    The Conspiring Defendants conspired to accomplish
        unlawful purposes in relation to condensate stolen
        from PEP.  These Defendants had the objective of
        committing common law conversion of PEP's
        condensate and the defrauding of end-users which
        would not have knowingly purchased stolen product.
        The Conspiring Defendants had a meeting of the
        minds on those objectives, committed unlawful,
        overt acts in furtherance of their objectives and
        proximately caused PEP to suffer damages as a
        result.

202.    PEP is, therefore, entitled to recover from the
        Conspiring Defendants, jointly and severally,
        PEP's actual and exemplary damages resulting from
        the conspiracy.[12]

"An actionable civil conspiracy is a combination of two or

more persons to accomplish an unlawful purpose or to accomplish a

lawful purpose by unlawful means."  Massey v. Armco Steel Co., 652

S.W.2d 932, 934 (Tex. 1983).  The essential elements of a civil

conspiracy claim are:  "(1) two or more persons; (2) an object to

be accomplished; (3) a meeting of minds on the object or course of

action; (4) one or more unlawful, overt acts; and (5) damages as a

proximate result."  Id.  See also M-I LLC v. Stelly, 733 F.Supp.2d

759, 791 (S.D. Tex. 2010) (citing Insurance Co. of North America v.

Morris, 981 S.W.2d 667, 675 (Tex. 1998)).  It is not the agreement

itself, but an injury to the plaintiff resulting from the

---

[12]Third Amended Complaint, Docket Entry No. 220, p. 35, ¶¶ 201-
202.  See also First Amended Complaint (Big Star Action), Docket
Entry No. 378, pp. 22-23, ¶¶ 132-133.

underlying tort, that gives rise to a cause of action for civil conspiracy. Carroll v. Timmers Chevrolet, Inc., 592 S.W.2d 922, 925 (Tex. 1979). Since conspiracy is a derivative tort, the plaintiff must plead facts supporting a claim that at least one of the defendants is also liable for an underlying tort. Id. at 925-26 ("[C]ivil conspiracy 'came to be used to extend liability in tort . . . beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts.'"). "Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" Id. at 926 (quoting State v. Standard Oil Co., 107 S.W.2d 550, 559 (Tex. 1937)). Thus, to survive summary judgment on the conspiracy claims asserted in this action, PEP must present evidence that is sufficient to create genuine issues of material fact on the underlying torts as well as the conspiracy. See TMIRS Enterprises, Ltd. v. Godaddy.com, Inc., 2010 WL 3063659, *4 (S.D. Tex. 2010).

     5.    RICO

PEP alleges that the "Conspiring Defendants" in the BASF Action, i.e., all of the defendants named in that action except BASF Corp. and BASF FINA, violated the provisions of 18 U.S.C. §§ 1962(c) and (d) by creating an association in fact enterprise, by participating directly and indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity,

-21-

and by knowingly conspiring to participate in the operation of the association-in-fact enterprise by committing predicate acts of importing and selling in the United States millions of dollars worth of condensate stolen from Mexico's Burgos Field.[13]

RICO provides civil causes of action for recovery of treble damages for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Plaintiffs have alleged that defendants have violated §§ 1962(c) and (d). These subsections state:

    (c)    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

    (d)    It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

18 U.S.C. §§ 1962(c) and (d). The Fifth Circuit has interpreted these subsections to mean that "a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity[, and that] a person cannot conspire to violate subsection[] . . . (c)." St. Paul Mercury Insurance Co. v. Williamson, 224 F.3d 425, 439 (5th Cir. 2000). To establish a RICO violation plaintiff must

---

[13]Third Amended Complaint, Docket Entry No. 220, pp. 35-39 ¶¶ 203-226.

-22-

prove facts showing: "(1) a *person* who engages in (2) a *pattern of racketeering activity* (3) connected to the acquisition, establishment, conduct, or control of an *enterprise*." Id. (quoting Delta Truck & Tractor, Inc. v. J.I. Case Co., 855 F.2d 241, 242 (5th Cir. 1988), cert. denied, 109 S.Ct. 1531 (1989)). See also St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir.), cert. denied, 129 S.Ct. 2835 (2009). Once these three elements are established the plaintiff must establish the substantive elements of each respective subsection of the statute. Id.

## B. Limitations Defense

All defendants who have filed motions for summary judgment seek summary judgment that the Texas state law claims asserted against them are barred by the two-year statute of limitations contained in Texas Civil Practice & Remedies Code § 16.003(a). PEP alleges that

109. This suit was brought within two years after PEP knew, or by the exercise of reasonable diligence should have known, of the facts giving rise to PEP's claims against the Defendants. Therefore, limitations have been tolled as to those claims by the "discovery rule."

110. The conversion and theft of PEP's condensate was a deceptive and fraudulent act. Moreover, it was inherently undiscoverable that the Defendants had taken dominion in the United States of Mexico's sovereign property without right or title, and the resulting injury from the Defendants' wrongful dominion over the sovereign property of Mexico is objectively verifiable.

-23-

111.    The Conspiring Defendants actively concealed their
        conspiracy and illegal actions, and therefore
        limitations is tolled by the doctrine of
        "fraudulent concealment."

112.    Mexico and PEP, as sovereign entities, never
        abandoned their sovereign rights in the stolen
        condensate.[14]

1.    The Limitations Period for State Law Claims is Two Years

        Under Texas law the statute of limitations for PEP's claims

for conversion, unjust enrichment, money had and received,

constructive trust, TTLA violations, and civil conspiracy is the

two-year period provided by Texas Civil Practice and Remedies Code

§ 16.003, which states:

> [A] person must bring suit for trespass for injury to the
> estate or to the property of another, conversion of
> personal property, taking or detaining the personal
> property of another, personal injury, forcible entry and
> detainer, and forcible detainer not later than two years
> after the day the cause of action accrues.

Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a).   The parties all

agree that PEP's claims are governed by this two-year statute of

limitations.[15]    See Mayo, 354 F.3d at 410 ("The applicable

_____

[14]First Amended Complaint (Big Star Action), Docket Entry
No. 378, p. 20 ¶¶ 109-112.  See also Third Amended Complaint,
Docket Entry No. 220, p. 32, ¶¶ 177-180.

[15]See, e.g., Defendant Plains Marketing, L.P.'s Motion for
Summary Judgment ("Plains Marketing's MSJ"), Docket Entry No. 475,
p. 28 (agreeing that applicable statute of limitations is that
stated in Tex. Civ. Prac. & Rem. Code § 16.003); and PEP's
Dispositive Motion, Docket Entry No. 492, p. 31, and The Opposition
of Plaintiff Pemex Exploración y Producción to the Dispositive
Motions of Defendants ("PEP's Opposition to Defendants' Dispositive
                                                (continued...)

-24-

limitations period for [plaintiff's] claim—whether it is formally labeled 'unjust enrichment' or 'conversion' — is two years."); id. at 409 (recognizing that claims for constructive trust are not causes of action but, instead, claims for remedial relief, and that the limitations period to be applied must be determined with reference to the theory on which a constructive trust is sought); Elledge v. Friberg-Cooper Water Supply Co., 240 S.W.3d 869, 870 (Tex. 2007) (recognizing that the limitations period for unjust enrichment claims is the two-year period provided by Tex. Civ. Prac. & Rem. Code § 16.003(a)); Kingvision Pay-Per-View, Ltd. v. Betancourt, Civil Action No. H-11-0236, 2011 WL 1900166, *5 (S.D. Tex. May 19, 2011) (recognizing that the limitations period for TTLA claims is the two-year period provided by Tex. Civ. Prac. & Rem. Code § 16.003(a)); Navarro v. Grant Thornton, LLP, 316 S.W.3d 715, 719 (Tex.App.—Houston [14th Dist.] 2010, no pet.) (recognizing that civil conspiracy claims are subject to the two-year statute of limitations provided by Tex. Civ. Prac. & Rem. Code § 16.003(a)).

2.    The Limitations Period Begins When Legal Injury Occurs

"When the legislature employs the term 'accrues' without an accompanying definition, the courts must determine when the cause of action accrues and thus when the statute of limitations

---

[15] (...continued)
Motions"), Docket Entry No. 545, p. 26 (recognizing that Texas' statute of limitations for conversion is two years).

commences to run." Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex. 1990). The traditional rule in Texas is that a cause of action accrues and the limitations period begins to run as soon as the owner suffers some injury, regardless of when the injury becomes discoverable. Id. See also Mayo, 354 F.3d at 410 ("Texas follows the 'legal injury' test, under which '[a] cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy.' Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 514 (Tex. 1998)"). This is true "even if the fact of injury is not discovered until later," S.V. v. R.V., 933 S.W.2d 1, 4 (Tex. 1996), "even if all resulting damages have not yet occurred," id., and even if the alleged wrongdoers have not been identified. Russell v. Ingersoll-Rand Co., 841 S.W.2d 343, 344 n.3 (Tex. 1992) ("limitations begin to run when the fact of injury is known . . . not when the alleged wrongdoers are identified"). See also Robinson v. Weaver, 550 S.W.2d 18, 20 (Tex. 1977) (recognizing that "preclusion of a legal remedy alone is not enough to justify a judicial exception to the statute [of limitations]).

The Texas Supreme Court has explained that

[t]he test to determine when the statute of limitations begins to run against an action sounding in tort is whether the act causing the damage does or does not of itself constitute a legal injury, that is, an injury giving rise to a cause of action because it is an invasion of some right of plaintiff. If the act is of

itself not unlawful in this sense, and plaintiff sues to recover damages subsequently accruing from, and consequent on, the act, the cause of action accrues, and the statute begins to run, when, and only when, the damages are sustained; and this is true although at the time the act is done it is apparent that injury will inevitably result.

If, however, the act of which the injury is the natural sequence is of itself a legal injury to plaintiff, a completed wrong, the cause of action accrues and the statute begins to run from the time the act is committed, even where little, if any, actual damages occurs immediately on commission of the tort.

Atkins v. Crosland, 417 S.W.2d 150, 153 (Tex. 1967). This "legal injury" rule is often traced to Houston Water-Works Co. v. Kennedy, 8 S.W. 36 (1888). See Murphy v. Campbell, 964 S.W.2d 265, 270 (Tex. 1997). In Kennedy the defendant cut an arch in plaintiff's building while installing a water pipe in 1884. The arch, being concealed, was not discoverable until it eventually caused the building to settle and crack. Plaintiff brought his negligence action in 1887, three years after the alleged negligence but within two years after the injury became manifest. The Court concluded that the action was barred by limitations:

If . . . the act of which the injury was the natural sequence was a legal injury, — by which is meant an injury giving cause of action by reason of its being an invasion of a plaintiff's right, — then, be the damage however slight, limitation will run from the time the wrongful act was committed, and will bar an action for any damages resulting from the act. . . [A] mere want of knowledge by the owner of injury to his property does not prevent the running of the statute.

8 S.W. at 37-38. In other words, because the negligently cut arch constituted a legal injury, limitations began to run immediately.

Texas jurisprudence, however, creates two limited exceptions to the legal injury test described in Atkins and Kennedy: fraudulent concealment and the discovery rule. See S.V., 933 S.W.2d at 4 ("We observe the distinction between the two categories because each is characterized by different substantive and procedural rules.").

3.     Exceptions to the Legal Injury Rule

(a)     Fraudulent Concealment

Fraudulent concealment of material facts underlying a cause of action by a defendant may prevent the defendant from relying on the statute of limitations. See Borderlon v. Peck, 661 S.W.2d 907, 908 (Tex. 1983). In Borderlon the Texas Supreme Court noted that where a defendant is under a duty to make disclosure but fraudulently conceals the existence of a cause of action from the party to whom it belongs, the defendant is estopped from relying on the defense of limitations until the party learns of the right of action or should have learned thereof through the exercise of reasonable diligence. Id. See also Velsicol Chemical Corp. v. Winograd, 956 S.W.2d 529, 531 (Tex. 1997) (recognizing that in cases involving fraud or fraudulent concealment, accrual is deferred "until the fraud is discovered or could have been discovered with reasonable diligence"). The doctrine of fraudulent concealment defers accrual because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run.     S.V., 933 S.W.2d at 6.     A party asserting fraudulent

-28-

concealment bears the burden of raising it in response to a summary judgment motion and of coming forward with evidence raising a fact issue with regard to each of the following four elements: (1) existence of an underlying tort; (2) defendant's knowledge of the tort; (3) defendant's use of deception to conceal the tort; and (4) plaintiff's reasonable reliance on the deception. See Jones v. Thompson, 338 573, 583 (Tex.App.—El Paso 2010, pet. denied) (citing KPMG Peat Marwick v. Harrison County Housing Finance Corp., 988 S.W.2d 746, 748 (Tex. 1999)).

### (b) The Discovery Rule

The discovery rule defers the running of limitations if "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." S.V., 933 S.W.2d at 6. "An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." Id. at 7 (citing Computer Associates International, Inc. v. Altai, Inc., 918 S.W.2d 453, 456 (Tex. 1996)). The discovery rule is applied to categories of cases where the nature of the injury is inherently undiscoverable, not to particular cases. HECI Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998). The objectively verifiable element of the discovery rule is typically satisfied when the facts upon which liability is asserted can be demonstrated by direct, physical evidence. Id. The Texas Supreme Court has held that expert

testimony is not sufficient to satisfy the objective verification prong of the discovery rule, id. (citing Robinson, 550 S.W.2d at 21), but that confessions, criminal convictions, and records or written statements showing contemporaneous physical injury resulting from the alleged conduct can be sufficient to satisfy the objective verification prong of the discovery rule. Id. at 15.

The discovery rule only defers running of limitations until "the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury." Id. at 4 (citing Trinity River Authority v. URS Consultants, Inc.- Texas, 889 S.W.2d 259, 262 (Tex. 1996)). See id. ("We first referred to this exception as the 'discovery rule' in Gaddis v. Smith, 417 S.W.2d 577, 578 (Tex. 1967)). See also Colonial Penn Ins. v. Market Planners Ins. Agency Inc., 157 F.3d 1032, 1034 (5th Cir. 1998) (acknowledging that the discovery rule only delays the running of the statute of limitations until the claimant knows or should know the facts that could support a cause of action). The party seeking to benefit from the discovery rule "bear[s] the burden of proving and securing favorable findings thereon." Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 518 (Tex. 1988).

(c) Applying Exceptions to the Legal Injury Rule in the Summary Judgment Context

A Texas rule of summary judgment procedure requires the moving party to negate the application of the doctrine of fraudulent concealment and/or the discovery rule by proving as a matter of law

that no issue of material fact exists concerning when the plaintiff discovered or should have discovered its cause of action. See Woods, 769 S.W.2d at 518 n.2. Federal courts, however, follow the federal rule of summary judgment procedure. F.D.I.C. v. Shrader & York, 991 F.2d 216, 220 (5th Cir. 1993), cert. denied, 114 S.Ct. 2704 (1994) (citing Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc., 669 F.2d 1026, 1036 n.10 (5th Cir. 1982)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue," the nonmoving party must go "beyond the pleadings" and produce summary judgment evidence designating "'specific facts showing that there is a genuine issue for trial.'" Id. (citing Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(e)). "The plaintiff is required to act with diligence in seeking to discover fraud after being put on inquiry; and if it failed to do so under all of the facts and circumstances of the case, the [running of the] statute [of limitations] will not be [deferred]." Professional Geophysics, Inc. v. Placid Oil Co. (In re Placid Oil Co.), 932 F.2d 394, 399 (5th Cir. 1991) (quoting Pan Am. Petroleum Corp. v. Orr, 319 F.2d 612, 613 (5th Cir. 1963)). Thus, while defendants relying on the affirmative defense of limitations bear the burden of proving all the elements of limitation, plaintiff bears the burden of producing summary judgment evidence capable or raising a genuine issue of material fact as to whether fraudulent concealment and/or the discovery rule applies to defer the running of limitations.

-31-

## IV. **Defendants' Motions for Summary Judgment**

Pending before the court are motions for summary judgment filed by the following defendants: (1) Defendant Plains Marketing, L.P.'s Motion for Summary Judgment (Docket Entry No. 475); (2) Defendant Murphy Energy Corporation's Motion for Final Summary Judgment (Docket Entry No. 479); (3) Defendants Superior Crude Gathering, Inc. and Jeff Kirby's Motion for Summary Judgment (Docket Entry No. 486); (4) BASF Corporation and BASF FINA Petrochemicals Limited Partnership's Motion for Summary Judgment (Docket Entry No. 489); and (5) Defendants RGV Energy Partners, LLC and F&M Transportation, Inc.'s Motion for Summary Judgment (Docket Entry No. 517). These defendants all seek summary judgment on claims that they argue are time barred by the applicable two-year statute of limitations because limitations began to run more than two years before PEP filed suit against them. These defendants also seek summary judgment on PEP's substantive claims by arguing that these claims fail as a matter of law because PEP is unable to present evidence on one or more of the elements of each of these claims. PEP responds that the defendants moving for summary judgment are not entitled to summary judgment on any of the claims alleged against them because the claims are neither time barred nor subject to failure as a matter of law.[16]

_____

[16]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545.

## A. Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed. R. Civ. P. 56(c). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 106 S.Ct. at 2552. A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S.Ct. at 2553-2554). If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S.Ct. at 2553-2554). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations

-33-

or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products,</u> <u>Inc.</u>, 120 S.Ct. 2097, 2110 (2000). Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." <u>Little</u>, 37 F.3d at 1075.

## B. **Plains Marketing, L.P.**

PEP first asserted claims against Plains Marketing on April 20, 2012, when PEP filed a First Amended Complaint (Docket Entry No. 378) in the Big Star Action, Civil Action No. H-11-2019. PEP specifically alleges that

> 80. Plains is a large, publicly-traded limited partnership that markets hydrocarbons and then transports them through a sister company.
>
> 81. PEP does not allege that Plains acted with intent or knowledge or that it was a part of any conspiracy.
>
> 82. Although PEP's investigation continues, Plains purchased and subsequently resold millions of dollars of stolen condensate. For example, in 2008, Plains purchased at least $700,000 worth of condensate from Kemco at its George West facility, which Kemco had purchased from Arnoldo Maldonado and F&M. Plains sold this and other amounts to Valero. There were other transactions, and on information and belief, much more condensate was purchased and sold by Plains.
>
> 83. Plains is liable for all of its transactions involving the stolen property of Mexico.[17]

---

[17]First Amended Complaint (Big Star Action), Docket Entry No. 378, p. 16 ¶¶ 80-83.

Based on these allegations of fact, PEP has asserted claims against

Plains Marketing for conversion, and for equitable relief based on

theories of money had and received and unjust enrichment.[18]

Plains Marketing argues that it is entitled to summary

judgment on all of the claims asserted against it in PEP's First

Amended Complaint filed in the Big Star Action (Docket Entry

No. 378) because

> (i) PEP cannot meet its burden under Texas law to show
> that the hydrocarbons purchased by Plains Marketing are
> the identical hydrocarbons allegedly stolen from PEP,
> (ii) Plains Marketing was a good-faith purchaser that
> obtained good title to the hydrocarbons it purchased,
> (iii) any of Plains Marketing's alleged purchases of
> stolen Mexican condensate that occurred prior to
> April 20, 2010 are time-barred, and (iv) PEP's money had
> and received and unjust enrichment claims fail as a
> matter of law.[19]

PEP responds that the defendants named in this action, including

_inter alia_ Plains Marketing, are not entitled to summary judgment

on any of the claims alleged against them because PEP need not show

that the hydrocarbons purchased and sold by the defendants are the

identical hydrocarbons stolen from PEP, the defendants did not

obtain good title to the stolen hydrocarbons that they purchased,

claims arising from alleged purchases that occurred more than two

years before PEP filed suit against any of the defendants are not

---

[18]Because PEP does not allege that Plains Marketing is a
"Conspiring Defendant," PEP has not asserted a claim for
constructive trust against Plains Marketing.

[19]Plains Marketing's MSJ, Docket Entry No. 475, pp. 1-2.

time barred, and the claims for equitable relief asserted in this action do not fail as a matter of law.[20]

1.    Plains Marketing is Entitled to Summary Judgment on PEP's Equitable Claims for Unjust Enrichment and Money Had and Received

Plains Marketing argues that PEP's money had and received

claim fails on its face because

[t]here is no evidence that Plains Marketing has any money that in good conscience belongs to PEP, a requisite element of PEP's money had and received claim. Additionally, PEP does not allege that Plains Marketing perpetrated any kind of fraud or duress on PEP, or that Plains Marketing took undue advantage of PEP in allegedly purchasing stolen PEP condensate, which would be required to prove an unjust enrichment claim.[21]

Quoting Heldenfels Bros., Inc. v. City of Corpus Christi, 832

S.W.2d 39, 41 (Tex. 1992), Plains Marketing asserts that "[a] party

may recover under the unjust enrichment theory when one person has

obtained a benefit from another by fraud, duress, or the taking of

an undue advantage."[22]   Plains Marketing argues that PEP's unjust

enrichment claim fails on its face because

[i]n this case, PEP does not — and could not — allege that Plains Marketing perpetrated any kind of fraud or duress on PEP, or that Plains Marketing took undue advantage of PEP in allegedly purchasing stolen Mexican condensate. To the contrary, "PEP does not allege that Plains acted with intent or knowledge or that it was a

---

[20]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545.

[21]Plains Marketing's MSJ, Docket Entry No. 475, p. 5.

[22]Id. at 39.

-36-

part of any conspiracy." [PEP's First Amended Complaint, Docket Entry No. 378, ¶ 81.] PEP's pleadings constitute binding admissions that Plains Marketing acted without any intent to defraud or take undue advantage of PEP, and there are no allegations to support a finding of duress.[23]

Citing the Texas Court of Appeals decision in Heldenfels, City of Corpus Christi v. Heldenfels Bros., Inc., 802 S.W.2d 35, 40 (Tex.App.—Corpus Christi 1990), for its statement that "[u]njust enrichment occurs when the party sought to be charged wrongfully secures a benefit *or passively receives* one which would be unconscionable for him to retain," PEP argues that Plains Marketing's lack of fraudulent intent does not prejudice the viability of its equitable claims for unjust enrichment and money had and received.[24] PEP argues that if it "is incorrect that it owns its proportionate share of a commingled mass, and cannot prove the technical tracing needed for conversion, PEP could still recover under an unjust enrichment theory."[25]

The court is not persuaded by PEP's arguments because it has neither alleged nor produced evidence of any facts capable of establishing claims for unjust enrichment or money had and received. Based on the facts alleged in PEP's First Amended Complaint filed in the Big Star Action and contained

---

[23]Id.

[24]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 37.

[25]Id.

-37-

in the summary judgment record, the court concludes that PEP's only claim against Plains Marketing is for conversion.

Conversion is the wrongful exercise of dominion and control over another's property in denial of, or inconsistent with, the other's rights. Mayo, 354 F.3d at 410; Bandy, 835 S.W.2d at 622. PEP alleges and cites evidence that it contends establishes that Plains Marketing purchased condensate from Kemco and STUSCO that was stolen from PEP, and that Plains Marketing then sold that condensate to Valero. A party who purchases and then sells stolen property is subject to a cause of action for conversion. See Sandford v. Wilson, 2 Willson 188, 1884 WL 8120, *1 (Tex. 1884) ("When the possession of personal property is wrongfully acquired in the first instance, and is transmitted successively to several [parties], each possession is a new conversion."). Although PEP alleges that all defendants, including inter alia, Plains Marketing, "were unjustly enriched by any profits, commissions, or benefits received by use of PEP's condensate,"[26] and that "[a]ll defendants profited from their improper dominion of PEP's property, and therefore, they hold money that in equity and good conscience belongs to PEP,"[27] PEP has failed either to allege any facts or to present any evidence capable of proving that Plains Marketing

---

[26]First Amended Complaint (Big Star Action), Docket Entry No. 378, p. 19 ¶ 103.

[27]Id. ¶ 125.

-38-

profited from its use of PEP's condensate, or received money that in equity and good conscience belongs to PEP. Accordingly, the court concludes that Plains Marketing is entitled to summary judgment on PEP's equitable claims for unjust enrichment and money had and received.

## 2.    Plains Marketing Is Not Entitled to Summary Judgment on PEP's Conversion Claims as a Good-Faith Purchaser

Citing Texas Business and Commerce Code § 2.403, and asserting that PEP has no evidence tying the hydrocarbons purchased by Plains Marketing to any theft, Plains Marketing argues that it is entitled to summary judgment on PEP's conversion claims because it purchased hydrocarbons for value and, therefore, received good title to the hydrocarbons as a good-faith purchaser for value.[28]    Plains Marketing argues that PEP has not alleged that Plains Marketing "acted with intent or knowledge or that it was part of any conspiracy,"[29] and that Kemco and STUSCO — the sellers from whom Plains Marketing allegedly purchased stolen condensate — each purchased for value the hydrocarbons that they sold to Plains Marketing.[30]    Plains Marketing argues that Kemco and STUSCO had at

---

[28]Plains Marketing's MSJ, Docket Entry No. 475, pp. 26-27.

[29]Id. at 27 (citing First Amended Complaint (Big Star Action), Docket Entry No. 378, p. 16 ¶ 81).

[30]Id. (citing Exhibit 39, Deposition of STUSCO trader Ed Vrana, pp. 27, 70 (stating that STUSCO purchased condensate from JAG and AGE Refining and sold condensate to Plains); and Exhibit 32, (continued...)

least voidable title and that Plains Marketing therefore received good title to the hydrocarbons purchased from Kemco and STUSCO. Thus, Plains Marketing argues that it is entitled to summary judgment on PEP's conversion claims because PEP cannot prove that PEP had superior title or right of possession to the property at issue.[31]

A bona fide purchaser for value has an affirmative defense against a conversion claim. Carter, 271 S.W.3d at 858 & n.3. A party asserting an affirmative defense must sufficiently plead and prove the defense. Quantum Chemical, 47 S.W.3d at 478. The court is not persuaded by Plains Marketing's contention that it is entitled to summary judgment as a good-faith purchaser for value because Plains Marketing has failed to cite any evidence capable of establishing that Kemco and/or STUSCO acquired voidable — as opposed to void — title to the hydrocarbons at issue. Section 2.403(a) of the UCC as codified in the Texas Business and Commerce Code provides:

(a) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser

---

[30](...continued)
Deposition of Kemco Vice-President, Kyle May, pp. 10-12, 22 (stating that Kemco purchased product from St. James at Swinney Switch, and sold product to Plains at George West).

[31]Plains Marketing's MSJ, Docket Entry No. 475, p. 27.

for value. When goods have been delivered under
a transaction of purchase the purchaser has such
power even though

(1) the transferor was deceived as to the
identity of the purchaser, or

(2) the delivery was in exchange for a check
which is later dishonored, or

(3) it was agreed that the transaction was to be
a "cash sale", or

(4) the delivery was procured through fraud
punishable as larcenous under the criminal
law.

(b) Any entrusting of possession of goods to a
merchant who deals in goods of that kind gives him
power to transfer all rights of the entruster to
a buyer in ordinary course of business.

(c) "Entrusting" includes any delivery and any
acquiescence in retention of possession regardless
of any condition expressed between the parties to
the delivery or acquiescence and regardless of
whether the procurement of the entrusting or the
possessor's disposition of the goods have been
such as to be larcenous under the criminal law.

Plains Marketing neither argues nor presents any evidence capable

of establishing that PEP created apparent authority in Kemco,

STUSCO, or any of the entities from which PEP contends that Kemco

and STUSCO acquired condensate sold to Plains Marketing. Nor has

Plains Marketing cited any evidence that PEP took affirmative

action to clothe Kemco, STUSCO, or any of their sellers "with the

indicia of ownership." Absent evidence that PEP ever entrusted

condensate to Kemco or STUSCO, or to any seller from whom Kemco or

STUSCO acquired condensate sold to Plains Marketing, Plains

Marketing has failed to raise a fact issue as to whether its

sellers possessed voidable as opposed to void title. Moreover, Plains Marketing has not offered any evidence capable of establishing that the condensate it purchased was not stolen.

If, as PEP contends, Plains Marketing purchased stolen condensate from Kemco and/or STUSCO, then those purchases would not qualify as transactions of purchase within the meaning of the U.C.C., and Plains Marketing would not qualify as a good-faith purchaser for value who acquired good title. See A. Benjamini, Inc. v. Dickson, 2 S.W.3d 611, 614 (Tex.App.—Houston [14th Dist.] 1999, no pet.). In Benjamini an employee stole property and sold it to Mr. Benjamini. The Texas Court of Appeals affirmed an order returning the property to the owner even though Mr. Benjamini claimed a right to the property under the U.C.C.'s protection for good faith purchasers. The court held that "[a] thief who wrongfully takes goods against the will of the owner does not take the goods through a transaction of purchase within the meaning of section 2.403 [of the U.C.C.] . . . Only voluntary transfers can constitute transactions of purchase, and a thief is not a purchaser under section 2.403.". See Kotis v. Nowlin Jewelry, Inc., 844 S.W.2d 920, 923 (Tex.App.—Houston [14th Dist.] 1992, no writ). See also Olin Corp. v. Cargo Carriers, Inc., 673 S.W.2d 211, 216 (Tex.App.—Houston [14th Dist.] 1984, no writ) (holding that one who purchases stolen property from a thief, no matter how innocently, acquires no title in the property). If, as PEP contends, the condensate purchased by Plains Marketing was stolen, then no one in

the chain of title following the alleged thieves could transfer title to a subsequent purchaser like Plains Marketing.

Texas law is well settled that one who purchases stolen property, no matter how innocently, acquires no title to the property; title remains in the owner. See McKinney v. Croan, 188 S.W.2d 144, 146 (Tex. 1945) ("[I]t is well settled that one in rightful possession of personal property may maintain an action for its recovery against a thief or one holding under him."). This principle of Texas law and the policy supporting it has been aptly stated many times. See Sinclair Houston Federal Credit Union v. Hendricks, 268 S.W.2d 290, 295 (Tex.Civ.App.—Galveston 1954, writ ref'd n.r.e.) ("The general rule is that the owner of stolen property can recover it or its value from anyone who has received it and exercised dominion over it."); Olin, 673 S.W.2d at 214 (rule that one who purchases stolen property from a thief, no matter how innocently, acquires no title, places the responsibility of ascertaining true ownership on the purchaser); Benjamini, 2 S.W.3d at 613 ("One who purchases stolen property from a thief, no matter how innocently, acquires no title in the property; title remains in the owner."). In Olin a jury found that Ragsdale was a good-faith purchaser for value of Olin's fertilizer. Nevertheless, the

> court sustain[ed Olin's] third point of error because this finding [of a good-faith purchaser for value] is immaterial to [Olin's] right to recover the value of its stolen goods from the purchasers thereof. *One who purchases stolen property from a thief, no matter how innocently, acquires no title in the property; title remains in the owner.* This rule places the responsibility of ascertaining true ownership on the purchaser.

-43-

Appellee, Ragsdale, asserts that he falls within the exception to the common law rule that if an owner of property, by some act has vested the possession and right to the property apparently in the seller, he thereby estops himself from setting up a claim to the property as against the purchaser for value without notice. This exception does not apply to appellees, Tinney and Ragsdale, because there is no evidence that . . . the owner of the fertilizer, by some act vested possession and right to the property apparently in the sellers . . . Although a seller may have possession and represents that he has title to the property, *an innocent purchaser still cannot defend against the true owner, unless there has been some[] affirmative act by the owner which either creates apparent authority to sell the property in the seller or clothes the seller with the indicia of ownership.*

Olin, 673 S.W.2d at 216 (emphasis added).

Plains Marketing has failed to establish either that it was a good-faith purchaser for value who received good title to the hydrocarbons at issue, or that Plains Marketing is entitled to summary judgment on PEP's conversion claims on this basis. Therefore, Plains Marketing's argument that it is entitled to summary judgment on PEP's conversion claims because it is a good-faith purchaser for value has no merit.

### 3. Whether PEP Can Trace Stolen Property to Plains Marketing Is a Fact Issue

Plains Marketing argues that it is entitled to summary judgment on PEP's conversion claim because PEP cannot provide any competent evidence that Plains Marketing

purchased the identical condensate allegedly stolen from PEP. PEP has failed to provide any competent evidence of such identification, either by tracing the allegedly stolen hydrocarbons from PEP to Plains Marketing or by showing that the hydrocarbons allegedly stolen from PEP

-44-

> and the hydrocarbons purchased by Plains Marketing share
> the same distinctive and unique characteristics.[32]

In support of this argument, Plains Marketing cites a number of

cases in which Texas courts have held that plaintiffs asserting

claims for conversion must specifically identify what property was

stolen and prove that the defendant converted the very same

property. See, e.g., Satterfield v. Knippel, 169 S.W.2d 795, 796

(Tex.Civ.App.—Amarillo 1943, writ denied) (cattle); Shaw's D.B. &

L., Inc. v. Fletcher, 580 S.W.2d 91, 94 (Tex.Civ.App.—Houston [1st

Dist.] 1979, writ denied) (silverware); Hughes Blanton, Inc. v.

Shannon, 581 S.W.2d 538, 539 (Tex.Civ.App.—Dallas 1979, writ

denied) (tools).

Citing Moore v. Conway, 108 S.W.2d 954, 955-56 (Tex.Civ.App.—

Waco 1937, no writ), Plains Marketing contends that "a conversion

plaintiff has the burden of showing the quantity of product

allegedly taken with 'reasonable certainty.'"[33] Asserting that PEP

does not know how much condensate was stolen, does not know when

its condensate was stolen, does not know from where its condensate

was stolen, and does not know who stole its condensate, Plains

Marketing argues that PEP is using assumptions — not evidence — to

meet its burden of proof. Plains Marketing also cites evidence

contradicting PEP's contention that no gas condensate was legally

exported from Mexico to the United States from August of 2006 to

---

[32]Plains Marketing's MSJ, Docket Entry No. 475, pp. 3-4.

[33]Id. at 6-7.

-45-

mid-2011.[34]  Finally, Plains Marketing argues that there is no
admissible evidence showing that the condensate it purchased from
Kemco or STUSCO consisted of Mexican condensate stolen from PEP or,
if so, how much.  Plains Marketing argues that the evidence, in
fact, shows that it purchased naphtha and crude oil from Kemco and
STUSCO and not gas condensate.[35]  Plains Marketing argues that

> it is not enough for PEP to show that there is some
> probability or possibility that Plains Marketing received
> some barrels of condensate stolen from PEP, particularly
> when the facts in evidence lead to multiple equally
> possible inferences as to whether Plains Marketing
> received any such condensate and if so, how much.  PEP
> must have some evidence that a specific number of barrels
> actually received by Plains Marketing are actually PEP's
> condensate.  PEP has no such evidence.[36]

PEP responds that

> the issue is not molecules, but ownership.  PEP is not
> required to prove that the defendants converted the exact
> same molecules stolen by the Cartel.  Instead, as stated
> in defendants' own authority, PEP has to prove that it
> "had, at the time of the alleged conversion, acquired
> some right or title to the identical goods or chattels
> claimed to have been converted."  O'Connor [v. Fred M.
> Manning, Inc., 255 S.W.2d 277,] 278 [(Tex.Civ.App.—
> Eastland 1953)].  With readily identifiable goods, there
> is no distinction between the identical property and the
> property owned.  With fungible goods, however, ownership
> does not necessarily follow molecules of oil or water, or
> grains of sand or wheat, but flows through transactions
> and transfers of title according to property rules
> codified in the UCC.[37]

---

[34]Id. at 15-16.

[35]Id. at 17-26.

[36]Id. at 24.

[37]PEP's Opposition to Defendants' Dispositive Motions, Docket
Entry No. 545, p. 5.

As PEP recognizes, "[r]esolution of this argument is critical to determination of this case,"[38] because it

> permeates defendants' factual challenges, particularly the repeated claim that PEP cannot trace its property. For example, if Big Star filled its single sales tank with a mixture of 25% stolen condensate and 75% legal crude, Plains argues that it is mere assumption that the deliveries out of that tank to Plains contained 25% of stolen condensate. As a matter of chemistry, Plains *might* be correct; it is highly doubtful, but at least theoretically possible, that Plains fortuitously received no hydrocarbon molecules traceable to PEP's Burgos Field.
>
> According to the UCC and property law rules explained at length in PEP's dispositive motion, however, as a matter of law, PEP *owns* 25% of the commingled mass, *precisely because* individual molecules are mixed together and no longer separable. Since PEP *owns* a fixed percentage of a combined mass, when defendants bought a portion of the combined mass they took possession of PEP's property without paying PEP for that property.
>
> In other words, the issue is one of legal ownership, not chemistry. And, PEP's ownership is determined by the same rules and practices that govern defendants' many daily transactions in crude and condensate.
>
> Ignoring their own trade practices and the UCC's property law governing ownership of commingled goods, the defendants ask this Court to adopt an impossible proof standard that requires PEP to trace individual hydrocarbon molecules. The proposed rule is directly contrary to established law. In fact, Corpus Juris Secundum states: "Other claims which are not a defense [to conversion] include . . . commingling of the property with other property before the conversion." 90 C.J.S. Trover and Conversion § 68 (2013) (footnotes omitted). On the other hand, the defendants cite no opinions denying recovery for conversion because the goods converted were fungible and tracing required use of circumstantial evidence. The law of conversion clearly encompasses goods that, according to the defendants, are not identifiable.

---

[38] Id.

-47-

Applying Texas' actual legal rules governing ownership of goods, as set out in the UCC, however, PEP can and has traced its title to the condensate from within Mexico into the defendants' hands. The defendants cannot defeat this proof by referencing irrelevant law related to a different type of property.[39]

Missing from PEP's argument quoted above is any cite to Texas law or to a Texas case that has applied the principles of proportionate ownership on which PEP relies in the context of conversion. Instead, citing Humble Oil and Refining Co. v. West, 508 S.W.2d 812 (Tex. 1974), Ortiz Oil Co. v. Luttes, 141 S.W.2d 1050 (Tex.Civ.App.—Texarkana 1940, writ dism'd by agr.), and Mooers v. Richardson Petroleum Co., 201 S.W.2d 134 (Tex.Civ.App.—San Antonio 1946), aff'd in part, rev'd in part, 204 S.W.2d 606 (Tex. 1947), PEP asserts that "hydrocarbons can be converted, and there is a well-established legal regime for determining ownership in such cases."[40] But none of the cases PEP cites absolved the plaintiff from having to identify the converted property; at issue was only the amount of property converted. These cases all stand for the principle that where there has been a conversion of goods through intentional commingling, and the evidence establishes a reasonably certain estimate of the amount of property converted, judgment should be entered on the basis of that amount, even though the precise amount cannot be ascertained with reasonable certainty. See Exxon Corp. v. West, 543 S.W.2d 667, 673 (Tex.Civ.App.—Houston

---

[39] Id. at 6-7.

[40] Id. at 8.

1976) (citing <u>Ortiz Oil Co. v. Luttes</u>, 141 S.W.2d 1050, 1055
(Tex.Civ.App.—Texarkana 1940, writ dism'd by agr.).

PEP seeks to avoid the identification requirement by
contending either that the requirement should not apply to fungible
goods, or that under the confusion of goods doctrine, once PEP has
shown that it owns a fixed percentage of a combined mass, it is
entitled to a presumption that any defendant who bought a portion
of that combined mass took possession of a proportionate percentage
of PEP's property. The court is not persuaded that either argument
has merit. Texas courts have not made an exception to the
identification requirement for fungible goods, and this court is
unwilling to create such an exception. Moreover, PEP has not cited
— and the court has not found — any Texas case that has applied a
proportionate percentage of ownership presumption to a conversion
claim asserted against a defendant who purchased or acquired a
portion of a commingled mass.

PEP's proportionate percentage argument is based on the legal
principle that where one wrongfully confuses and commingles his
goods with the goods of another, the wrongdoer bears the burden of
pointing out his own goods and unless he does so, he is liable for
the whole mass. <u>See</u> <u>Holloway Seed Co. v. City National Bank</u>, 47
S.W. 95 (Tex. 1898). In <u>Holloway</u> the Texas Supreme Court explained
that

> [t]he rule as to the confusion of goods is merely a rule
> of evidence. The wrongful mingling of one's own goods
> with those of another, when the question of

-49-

identification of the property arises, throws upon the
wrongdoer the burden of pointing out his own goods, and,
if this cannot be done, he must bear the loss which
results from it. It is but an application of the
principle that all things are presumed against the
spoilator; that is to say, against one who wrongfully
destroys or suppresses evidence.

Id. at 97. While this principle may be applicable against
defendants such as Big Star who are alleged to have commingled
condensate stolen from PEP with other hydrocarbons, the principle
has no application against Plains Marketing because there are no
allegations or evidence that Plains Marketing commingled PEP's
condensate, much less that Plains Marketing did so wrongfully. See
Kenyon v. Bender, 174 S.W.2d 110, 112 (Tex.Civ.App.—Beaumont 1943,
writ refused w.o.m.).

In Kenyon two junk dealers, Bender and Feldman, wrongfully
converted plaintiffs' dragline by cutting it into scrap metal.
Defendants Eisen, Sampson, and Sampson, purchased scrap metal from
the two junk dealers. Plaintiffs sued the junk dealers and the
purchasers for conversion. The trial court instructed a verdict in
favor of the purchasers upon finding that the evidence raised no
issue as to them, and submitted the case against the dealers to a
jury. Plaintiffs appealed the directed verdict entered for the
purchasers. The appeals court affirmed the directed verdict upon
concluding that the evidence showed the tonnage, and the value of
the junk metal that the defendants purchased from the dealers, "but
it was also shown that scrap metal purchased from the garbage dump
of the City of Vinton, Louisiana, was included and it was nowhere

shown what part of said tonnage came from [the plaintiff's] dragline." Id. Plaintiffs argued that they were entitled to recover for the full amount based on the principle that one who wrongfully confuses and commingles his goods with the goods of another bears the burden of pointing out his own goods or being held liable for the whole mass. Id. The court rejected this argument because there was no evidence either that the purchasers — as opposed to the junk dealers — had commingled scrap from the plaintiff's dragline with scrap from another source. Nor was there any evidence that the purchasers had knowledge or notice that the dealers from whom they purchased the scrap did not own all of it. On rehearing, however, the court concluded that the issue of the purchasers' liability should have been presented to the jury because there was testimony that could have warranted a jury finding that all of the scrap metal purchased from the dealers came from the plaintiff's dragline. The court explained that "even though Sampson et al purchased without notice that the metal had been wrongfully taken by the sellers, they are liable to appellants for the junk value of the metal purchased from appellants' machine, as of the time it was received by them." Id.

Kenyon illustrates that plaintiffs in a conversion action must trace the property actually converted to the defendant, and may not hold defendants liable based on the confusion of goods principle, unless (1) the defendants themselves wrongfully commingled the goods, or (2) the defendants acquired the commingled goods with

notice that the sellers from whom they purchased did not own all of
the goods. Therefore, in order to hold Plains Marketing liable for
conversion, PEP must trace condensate that was actually stolen from
it in Mexico to Plains Marketing. PEP must also present evidence
from which the jury could form a reasonably certain estimate of the
amount of stolen condensate, if any, that Plains Marketing
purchased. See Ortiz Oil, 141 S.W.2d at 1055. These issues are
not required to be proven with exact certainty, only with
reasonable certainty. See Southwest Battery Corp. v. Owen, 115
S.W.2d 1097 (Tex. 1938).

The only evidence that PEP cites that would allow a fact-
finder to conclude that Plains Marketing purchased reasonably
certain amounts of stolen condensate is cited in PEP's Dispositive
Motion (Docket Entry No. 492). There, PEP argues that

> on one occasion, around October 2008, F&M purchased
> $539,479 in stolen condensate from Continental.
> Exhibit 32 at 104 (deposition of Frank del Angel, Jr.);
> Exhibit 33:695 (relevant invoice).
>
> F&M resold this stolen condensate to a company
> called Kemco Resources (Exhibit 32 at 105-106; see also
> Exhibit 34:199), which then sold it to Plains Marketing.
> Exhibit 35 at 29-30, 32 (deposition of Kyle May, Kemco's
> president); see also exhibit 36 (invoices produced by
> Kemco showing the sale to Plains).[41]

Exhibit 33 is a Continental Fuels invoice for $539,479.25, dated
November 6, 2008, showing sales of condensate to F&M
Transportation, Inc. that occurred on October 30-31, 2008, and

_____

[41]PEP's Dispositive Motion, Docket Entry No. 492, pp. 7-8.

November 1-6, 2008. Exhibit 34 is a Bill Payment Stub showing that On November 20, 2008, Kemco paid F&M Transportation $590,098.61 for FMS100-1008 dated October 31, 2008. Exhibit 36 consists of two invoices showing quantities and prices of "Crude Oil" that Plains Marketing purchased from Kemco in October and December of 2008.[42]

As evidence that the products being sold by Continental Fuels, including that which made its way to Plains Marketing in October and December of 2008, was stolen from Mexico, PEP cites the deposition of Timothy Brink of Continental Fuels. Brink testified that in July of 2008 his employee, Josh Crescenzi, told him that the product he was purchasing was stolen from Mexico.[43] Brink also testified that once he looked closely at the paperwork documenting shipments of product that he bought from Mexico, the number of discrepancies he spotted caused him to realize that the product was stolen.[44] PEP also cites the transcript from the court proceeding in which Arnoldo Maldonado of Y Oil & Gas pleaded guilty for his role in supplying stolen Mexican condensate to Continental Fuels.[45]

---

[42]Exhibit 36 to PEP's Dispositive Motion, Docket Entry No. 493-24.

[43]PEP's Dispositive Motion, Docket Entry No. 492, p. 4 (citing Deposition of Timothy Brink, Exhibit 10, Docket Entry No. 492-12, pp. 13-14).

[44]See Plaintiff PEP's Reply in Support of Its Dispositive Motion [Dkt. 492] ("PEP's Reply in Support of Its Dispositive Motion"), Docket Entry No. 577, pp. 15-16.

[45]PEP's Dispositive Motion, Docket Entry No. 492 (citing Transcript of Rearraignment, Exhibit 12, Docket Entry No. 492-14, p. 20).

Although not dispositive, this evidence together with the invoices in Exhibits 33-34, and 36 to PEP's Dispositive Motion, is sufficient to raise a fact issue as to whether in October of 2008 Plains Marketing purchased reasonably ascertainable quantities of condensate stolen from PEP in Mexico.

However, for the reasons explained below, the court concludes that claims arising from purchases made by Plains Marketing before May 29, 2009, are time-barred. Therefore, because the only purchases cited by PEP from which a fact-finder could conclude that Plains Marketing purchased reasonably certain amounts of stolen condensate would not be admissible to support PEP's conversion claim, Plains Marketing is entitled to summary judgment on PEP's conversion claim because PEP cannot trace condensate actually stolen from it in Mexico to Plains Marketing in Texas.

### 4.   Conversion Claims Arising from Purchases that Occurred Before May 29, 2009, Are Time Barred

Asserting that PEP did not name it as a defendant until April 20, 2012, when PEP filed its First Amended Complaint in the Big Star Action (Docket Entry No. 378), Plains Marketing argues that all of the conversion claims that PEP has asserted against it for injuries arising from purchases alleged to have occurred more than two years earlier, i.e., before April 20, 2010, are time barred.[46] Plains Marketing argues that PEP's conversion claims are time barred because those claims accrued when the condensate was

---

[46]Plains Marketing's MSJ, Docket Entry No. 475, p. 4.

initially stolen. Acknowledging that PEP has pleaded the discovery rule in an attempt to avoid the time bar imposed by Texas' two-year statute of limitations, Plains Marketing argues that the discovery rule is inapplicable to PEP's claims because the injuries that PEP suffered as a result of its alleged wrongdoing were not inherently undiscoverable, because PEP has admitted knowing that its condensate was being stolen and converted by sale in the United States long before April 20, 2010, and because Plains Marketing did not conceal PEP's claims.[47]

PEP responds that the claims asserted against Plains Marketing are not time barred because they all relate back to May 29, 2011, i.e., the date that PEP filed its Original Complaint in Civil Action No. H-11-2019 (Big Star Action).[48] PEP also argues that the claims asserted against Plains Marketing are not time barred because they did not accrue until PEP demanded return of and/or compensation for its condensate from Plains Marketing, and Plains Marketing had a reasonable time to investigate that demand.[49] Alternatively, PEP argues that its claims are not time barred because the discovery rule and/or the doctrine of fraudulent

---

[47]Id. at 5.

[48]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 38.

[49]PEP's Dispositive Motion, Docket Entry No. 492, pp. 30-31; PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, pp. 22-25.

concealment toll the limitations period for these claims.[50] For the reasons explained below, the court concludes that PEP's claims against Plains Marketing relate back to the filing of PEP's Original Complaint in the Big Star Action, i.e., to May 29, 2011, but that all of the claims arising from purchases that accrued over two years before that date, i.e., all of the claims arising from purchases made before May 29, 2009, are time barred and neither the doctrine of fraudulent concealment nor the discovery rule prevents Plains Marketing from relying on Texas' two-year limitations period to bar those claims.

> (a) PEP's Claims Against Plains Marketing Relate Back to the Filing of the Original Complaint in the Big Star Action on May 29, 2011

PEP argues that the claims asserted against Plains Marketing in the First Amended Complaint filed in the Big Star Action are not barred by limitations because they relate back to the date on which it filed its Original Complaint, i.e., May 29, 2011.[51]

### (1) Applicable Law

A party who timely files a complaint may amend the complaint by adding new parties after the applicable statute of limitations has run if the requirements of Federal Rule of Civil Procedure

---

[50]PEP's Dispositive Motion, Docket Entry No. 492, pp. 30-31; PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, pp. 25-28.

[51]Id.

-56-

15(c) are met. See Krupski v. Costa Crociere S. p. A., 130 S.Ct.
2485, 2496 (2010) (addressing when claims asserted against a newly
added defendant relate back to a suit filed against a related
party). If the requirements of Rule 15(c) are met, the amended
complaint will "relate back" to the date the original complaint was
filed. Id. Rule 15(c) states:

> **(1)**   ***When an Amendment Relates Back.*** An amendment to a
> pleading relates back to the date of the original
> pleading when:
>
>> **(A)**   the law that provides the applicable statute
>> of limitations allows relation back;
>>
>> **(B)**   the amendment asserts a claim or defense that
>> arose out of the conduct, transaction, or
>> occurrence set out--or attempted to be set
>> out--in the original pleading; or
>>
>> **(C)**   the amendment changes the party or the naming
>> of the party against whom a claim is
>> asserted, if Rule 15(c)(1)(B) is satisfied
>> and if, within the period provided by Rule
>> 4(m) for serving the summons and complaint,
>> the party to be brought in by amendment:
>>
>>> **(i)**   received such notice of the action that
>>> it will not be prejudiced in defending on
>>> the merits; and
>>>
>>> **(ii)** knew or should have known that the action
>>> would have been brought against it, but
>>> for a mistake concerning the proper
>>> party's identity.

Fed. R. Civ. P. 15(c). The Supreme Court has stated that "[t]he
question under Rule 15(c)(1)(C)(ii) is not whether [the plaintiff]
knew or should have known the identity of [the newly named
defendant] as the proper defendant, but whether [the newly named

defendant] knew or should have known that it would have been named as a defendant but for an error. Rule 15(c)(1)(C)(ii) asks what the prospective defendant knew or should have known during the Rule 4(m) period." <u>Krupski</u>, 130 S.Ct. at 2493-94. Information in the plaintiff's possession is relevant only as it relates to the defendant's understanding of whether there was a mistake concerning the proper party's identity. The proper inquiry under Rule 15(c)(1)(C)(ii) is whether the newly named defendant knew or should have known that but for the plaintiff's mistake, the action would have been brought against him. <u>Id.</u>

### (2) Original Pleadings

PEP's Original Complaint filed on May 29, 2011, in the Big Star Action, Civil Action No. H-11-2019, asserted against Plains All-American Pipeline, L.P. the same claims based on the same facts that PEP asserted against Plains Marketing in PEP's First Amended Complaint filed on April 20, 2012.[52]

### (3) Analysis

PEP argues that Rule 15(c)'s requirements for relation back are satisfied as to Plains Marketing because (1) PEP added Plains Marketing as a defendant after Plains All-American Pipeline complained that it was not the proper party, (2) Plains Marketing

---

[52]<u>See</u> Original Complaint, Docket Entry No. 1 filed in Civil Action No. H-11-2019 (Big Star Action), pp. 4, 15 and 20-23.

is being sued for the same claims arising from the same factual basis as Plains All-American Pipeline was sued in PEP's Original Complaint, and (3) Plains Marketing and Plains All-American Pipeline are related entities that share legal counsel. PEP argues that these factors "demonstrat[e] the requisite knowledge," i.e., that Plains Marketing received notice of the original action within the period provided by Rule 4(m) for serving summons and complaint such that it will not be prejudiced in defending on the merits; and that Plains Marketing knew or should have known that the action would have been brought against it, but for PEP's mistake concerning the proper party's identity.[53]

Plains Marketing opposes PEP's relation back argument based solely on PEP's failure to dismiss the claims asserted against Plains All-American Pipeline, L.P. when PEP filed its First Amended Complaint. Citing two unpublished cases, Trigo v. TDCJ-CID Officials, Civil Action No. H-05-2012, 2010 WL 3359481, *18 (S.D. Tex. August 24, 2010), and Hansen v. ASAP Consultants, Inc., No. CIVASA02CA0663-XR, 2003 WL 22249767 (W.D. Tex. August 29, 2003), Plains Marketing argues that the claims asserted against it do not relate back to the filing of PEP's Original Complaint because

> [t]he adding of a previously-unidentified party to a case
> is not a "mistake" under Rule 15(c)(1)(C)(ii) that

---

[53]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 38.

> qualifies for relation back of the new claims to the
> original claims. The statute of limitations did not stop
> running on PEP's claims against Plains Marketing until
> PEP filed suit against Plains Marketing on April 20,
> 2012.[54]

Plains Marketing argues that

> PEP's conduct demonstrates that, when it amended its
> complaint in April 2012, it was not merely correcting
> mistake as to the proper name or the identity of Plains
> All-American Pipeline vs. Plains Marketing. PEP intended
> to add a second Plains entity as a separate defendant,
> and both Plains All-American Pipeline and Plains
> Marketing subsequently participated in the substance of
> this case.[55]

Missing from Plains Marketing's opposition is any argument or

evidence from which the court could conclude that the requirements

of Rule 15(c) have not been satisfied either because Plains

Marketing did not receive timely notice of this lawsuit as required

by Rule 15(c)(1)(C)(i) or because Plains Marketing did not know

that this action would have been brought against it but for a

mistake concerning the proper party's identity as required by

Rule 15(c)(1)(C)(ii). The unpublished cases that Plains Marketing

cites in support of its opposition to PEP's relation back argument

are distinguished from the facts of this case. In Trigo, Civil

Action No. H-05-2012, 2010 WL 3359481, at *14-15, the court

rejected the plaintiff's attempt to have claims asserted against

newly added defendants relate back to the original filing because

---

[54]Plains Marketing, L.P.'s Reply in Support of Motion for
Summary Judgment, Docket Entry No. 567, p. 22.

[55]Id. at 21-22.

there was no evidence that the newly named defendants received timely notice of the lawsuit, or that the newly named defendants knew that but for a mistake concerning the proper party's identity, the action would have been brought against them. In Hansen, No. CIVASA02CA0663-XR, 2003 WL 22249767, at *1-*2, the court held that claims asserted against the plaintiff's co-worker did not relate back to the claims asserted against the plaintiff's employer in the original complaint because the plaintiff's failure to name the supervisor in the original complaint was not a mistake.

PEP's First Amended Complaint added Plains Marketing without dismissing Plains All-American Pipeline, L.P., but pursuant to PEP's Agreed Stipulation and Order of Dismissal of Claims Against Plains All-American Pipeline, L.P. (Docket Entry No. 533) signed by the court on March 15, 2013, all of the claims asserted against Plains All-American Pipeline have been dismissed. As the Supreme Court has explained, "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period." Krupski, 130 S.Ct. at 2493-94. Plains All-American Pipeline, L.P. and Plains Marketing have similar names and are represented by the same counsel. Similar names and interrelationship "heighten the expectation that [Plains Marketing] should suspect a mistake has been made when [Plains All-American Pipeline] is named in a complaint that actually describes [Plains Marketing's] activities." Id. at 2498. A party who timely files a complaint may amend the complaint by adding new parties after the

applicable statute of limitations has run provided the requirements

of Federal Rule of Civil Procedure 15(c) are met.   Krupski, 130

S.Ct. at 2496.   Here, the court has no basis on which to conclude

that the Rule 15(c) requirements are not satisfied.

### (4) Conclusion

Because the factual basis and the claims asserted against

Plains Marketing in PEP's First Amended Complaint are virtually

identical to the factual basis and the claims asserted against

Plains All-American Pipeline in PEP's Original Complaint, and

because Plains Marketing does not dispute that the requirements of

Rule 15(c) are satisfied, the court concludes that the claims

asserted against Plains Marketing in PEP's First Amended Complaint

filed in the Big Star Action relate back to the date that PEP's

Original Complaint was filed in that action, i.e., May 29, 2011.

> (b)   PEP's Conversion Claims Accrued When Plains
>       Marketing Purchased Allegedly Stolen Condensate

Arguing that PEP alleges that it is liable for purchases of

allegedly stolen Mexican condensate that occurred from April 2006

to July 2010, and recognizing that Texas applies a "legal injury"

test to determine when a cause of action has accrued, Plains

Marketing argues that the claims asserted against it in this action

are all time barred because "PEP's claims accrued when the thefts

first occurred."[56]   PEP argues that the claims asserted against

Plains Marketing are not time barred because

---

[56]Id.

-62-

limitations d[id] not begin to run when PEP's property
was stolen or when the defendants [— including <u>inter alia</u>,
Plains Marketing —] obtained it, but when the defendants
knew of and resisted PEP's ownership. The defendants
present no evidence that they knew of PEP's claims more
than two years before suit.[57]

For the reasons explained below, the court concludes that
limitations did not begin to run when the thefts first occurred as
Plains Marketing argues, or when Plains Marketing knew of and
resisted PEP's ownership as PEP argues but, instead, when Plains
Marketing purchased allegedly stolen condensate.

### (1) The Limitation Period Did Not Start When the Thefts First Occurred

Plains Marketing cites <u>Ayers v. Erickson</u>, Civil Action No. 07-
04-0383, 2006 WL 435026, at *2 (Tex.Civ.App.—Amarillo 2006, no
pet.) in support of its argument that PEP's claims accrued and
limitations began to run when the thefts occurred. In <u>Ayers</u> the
court held that limitations on claims for conversion of firearms
began to run on the date the firearms were stolen even though the
plaintiff did not know the thieves' identities. Because the
defendants in <u>Ayers</u> were individuals said to be connected to the
theft of the firearms and were not identified as subsequent
purchasers like Plains Marketing, the <u>Ayers</u> holding does not
support Plains Marketing's argument that PEP's claims against it
accrued and limitations began to run on the date of the original
thefts. Instead, the <u>Ayers</u> holding stands for the well-established

---

[57]PEP's Reply in Support of Its Dispositive Motion, Docket
Entry No. 577, p. 11.

rule of Texas law that "[i]n most cases, a cause of action accrues when a wrongful act causes an injury, even if the fact of injury is not discovered until later and even if all resulting damages have yet to occur." Id. at *1 (citing Childs v. Haussecker, 974 S.W.2d 31, 36 (Tex. 1998), and S.V. v. R.V., 933 S.W.2d 1, 4 (Tex. 1996)).

### (2) The Limitation Period Did Not Start When Plains Marketing Knew of and Resisted PEP's Ownership

Arguing that its claims against a particular defendant did not accrue until it could have sued that defendant for a legal injury, PEP asserts

[t]hat, of course, occurred at the earliest when the defendant exercised control over PEP's property. But . . . PEP's legal rights were not invaded by defendants' innocent possession of PEP's property. Rather, PEP was legally wronged (and defendants' possession of PEP's property unlawful) only after PEP had demonstrated its ownership of the condensate, and the defendants refused to return or pay for the property.[58]

Citing Sandford v. Wilson, 2 Willson 188, 1884 WL 8120 (Tex. 1884), PEP argues that "[a]n innocent buyer of stolen goods has not committed conversion until the buyer unreasonably refuses to return the goods on demand of the owner,"[59] and citing Textile Supplies, Inc. v. Garrett, 687 F.2d 123, 128 (5th Cir. 1982), PEP argues that "p]er the UCC, 'the mere purchase of personal property in good faith from a person who has no right to sell it is not a

---

[58]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 23.

[59]PEP's Dispositive Motion, Docket Entry No. 492, p. 29.

conversion.'"[60]    PEP's reliance on Sandford, Garrett, and some unidentified provisions of the Uniform Commercial Code (U.C.C.) to support its contention that the claims asserted against Plains Marketing did not accrue and limitations did not start running until Plains Marketing knew of and resisted PEP's ownership has no merit because purchases of stolen property are not governed by the U.C.C. and because the Sandford and Garrett cases on which PEP relies are factually and legally distinguishable.

PEP's reliance on the U.C.C. and the Fifth Circuit's statement in Garrett that "the mere purchase of personal property in good faith from a person who has no right to sell it is not a conversion," 687 F.2d at 128, is misplaced because assuming — as PEP alleges — that the condensate was stolen, subsequent purchases of that condensate by Plains Marketing were not transactions of purchase within the meaning of the UCC. See A. Benjamini, Inc. v. Dickson, 2 S.W.3d 611, 614 (Tex.App.—Houston [14th Dist.] 1999, no pet.).    In Benjamini an employee stole property and sold it to Mr. Benjamini.    The Texas Court of Appeals affirmed an order returning the property to the owner even though Mr. Benjamini claimed a right to the property under the U.C.C.'s protection for good-faith purchasers.    The court held that "[a] thief who wrongfully takes goods against the will of the owner does not take

---

[60]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 24.

the goods through a transaction of purchase within the meaning of section 2.403 [of the U.C.C.] . . . Only voluntary transfers can constitute transactions of purchase, and a thief is not a purchaser under section 2.403."). See Kotis v. Nowlin Jewelry, Inc., 844 S.W.2d 920, 923 (Tex.App.—Houston [14th Dist.] 1992, no writ). See also Olin Corp. v. Cargo Carriers, Inc., 673 S.W.2d 211, 216 (Tex.App.—Houston [14th Dist.] 1984, no writ) (holding that one who purchases stolen property from a thief, no matter how innocently, acquires no title in the property). Because PEP alleges that the condensate was stolen, there is no transaction of purchase to which the U.C.C. applies; thus, no one in the chain of title following the alleged thieves could transfer title to a subsequent purchaser like Plains Marketing.

The Fifth Circuit's statement in Garrett that "the mere purchase of personal property in good faith from a person who has no right to sell it is not a conversion," was based on Mississippi law which, the Fifth Circuit explained, differed from "[t]he well settled legal proposition that 'ordinarily when one buys any consumer chattels which belong to another he becomes a converter and must pay for his conversion regardless of his good faith.'" 687 F.2d at 128 & n.13 (quoting First Camden National Bank & Trust Co. v. J.R. Watkins Co., 122 F.2d 826, 826-27 (3d Cir. 1941)). Texas law is in accord with the "well settled legal proposition" referenced in Garrett. See Sandford, 1884 WL 8120, *1 ("When the

possession of personal property is wrongfully acquired in the first
instance, and is transmitted successively to several, each
possession is a new conversion.").

PEP cites <u>Sandford</u>, 1884 WL 8120, in support of its contention
that Texas law distinguishes between an innocent purchaser's
possession of stolen goods and a wrongful converter's possession of
stolen goods. PEP explains that

> Hodge stole Sandford's horse and sold it to Wilson. When
> Sandford asked Wilson to return the horse, Wilson
> demanded that Sandford prove his ownership. Even then,
> Wilson refused to return Sandford's horse until Sandford
> produced the thief so Wilson could get his money back.
> Then, the horse was stolen again, this time from Wilson's
> stable.
>
> The court ruled that, although Hodge, as a horse
> thief, did not transfer title to Wilson, Wilson's initial
> possession "was lawful and not a conversion per se." *Id.*
> at 189. Wilson did not commit conversion until he
> unreasonably refused to return the horse after Sandford
> established his ownership. *Id.* at 191. In other words,
> "Wilson had the right to refuse delivery until Sandford
> established his ownership in some way." *Id.* at 191.
>
> The rule of *Sandford* is well-recognized and
> logical, because it affords innocent purchasers of stolen
> goods an opportunity to preemptively cure a conversion
> claim. . . According to this rule, an innocent purchaser
> has done nothing wrong until the purchaser is shown that
> the item is stolen: "Until demand and refusal, the
> purchaser in good faith is not considered a wrongdoer."
> *DeWeerth*, 836 F.2d at 106 (citing *Gillet*, 57 N.Y. at
> 28).[61]

PEP argues that "aside from the few defendants that admit they
bought stolen goods (none of whom filed dispositive motions), the

---

[61]<u>Id.</u> at 24-25.

defendants continue to claim that they lack sufficient information to determine that they took possession of PEP's property, so they cannot claim that conversion occurred years ago."[62]

PEP's reliance on Sandford in support of its contention that defendants' possession of its condensate was not unlawful until defendants unreasonably refused PEP's demand either to return or pay for PEP's property is misplaced because Sandford is both factually and legally distinguishable from this case. Sandford is legally distinguishable because limitations was not at issue. Sandford is factually distinguishable because when Sandford discovered the conversion, the defendant still possessed the converted property, i.e., Sandford's horse. Thus, Sandford could demand that the defendant return the horse. Only after the defendant refused to return the horse did Sandford seek damages for conversion. Here, in contrast, PEP asserts that it did not know that Plains Marketing had converted its condensate until May of 2011,[63] but offers no evidence showing that by that date Plains Marketing continued to possess any stolen condensate. The only summary judgment evidence that PEP has provided of Plains Marketing's purchases of stolen condensate are two invoices showing

---

[62]Id. at 25.

[63]PEP's Second Supplemental and Amended Answers and Objections to Defendant Plains All-American Pipeline's First Set of Interrogatories to PEP ("PEP's Second Supplemental Answers and Objections"), Exhibit 43 to PEP's Dispositive Motion, Docket Entry No. 493-31, p. 6 ("PEP discovered in or around May 2011 that Plains had purchased stolen condensate.").

that Plains Marketing purchased "Crude Oil" from Kemco in October and December of 2008. Assuming that the "Crude Oil" referenced on the two invoices was — as PEP contends — stolen condensate, since PEP alleges that Plains Marketing sold and transferred the "Crude Oil" to Valero soon after purchasing it, any demand that PEP could have made for the condensate's return in or after May of 2011 would have been useless because Plains Marketing no longer had the condensate to return. Under these circumstances demand and refusal are neither conditions precedent to nor required elements of a conversion claim.

In Presley v. Cooper, 284 S.W.2d 138, 141 (Tex. 1955), the Texas Supreme Court explained that

> a demand and refusal are merely evidence of a conversion, and where a conversion by the bailee cannot otherwise be shown than by his refusal to comply with the demand for possession, such a demand and refusal are necessary. But they are not necessary if the other evidence establishes an act of conversion. The rule is well expressed by the Supreme Court of Delaware in *Mastellone v. Argo Oil Corp.*, 7 Terry 102, 46 Del. 102, 82 A.2d 379, 384, in this language:
>
>> "To us the purpose of the 'demand and refusal' rule, in those cases where it applies, is simply to settle whether there has been a conversion or not. If from other circumstances it is clear that the tort has been committed, the question needs no further settlement, and the court moves on to whatever other questions are in the case."

See also Bures v. First National Bank, Port Lavaca, 806 S.W.2d 935, 938 (Tex.Civ.App.—Corpus Christi 1991, no pet.) ("We recognize the rule that a demand and refusal is usually required to establish

conversion if possession is acquired lawfully; however, there are exceptions."); McVea v. Verkins, 587 S.W.2d 526, 531 (Tex.Civ.App.— Corpus Christi 1979, no writ) ("demand and refusal are not required after the conversion has become complete, or where it is shown that a demand would have been useless"); Loomis v. Sharp, 519 S.W.2d 955, 958 (Tex.Civ.App.—Texarkana 1975, writ dism'd) ("refusal and demand are not necessary when the circumstances and the acts of the possessor authorize a finding, as they do here, of a clear repudia-tion of the owner's rights and are tantamount to a refusal after demand"); Neyland v. Brammer, 73 S.W.2d 884, 888 (Tex.Civ.App.— Galveston 1933, writ dismissed) ("any necessity for a demand had been obviated; the conversion having become complete").

PEP's contention that Plains Marketing's purchase and subsequent sale of the allegedly stolen condensate was not wrongful until PEP informed Plains Marketing of its superior ownership interest lacks support in Texas law. As recognized by the court in Sandford, 1884 WL 8120, *1,

> [i]t is settled law that no man can be divested of his property without his consent, and, consequently, even the honest purchaser under a defective title cannot hold against the true proprietor. With regard to sales of personal property, the rules of law with regard to market overt, as known to the common law, do not apply in this state.

See also Olin, 673 S.W.2d at 216. The corollary to this law is that one who takes property without title takes property wrongfully. See Cotten v. Heimbecher, 48 S.W.2d 402, 405 (Tex.Civ. App.—Amarillo 1932, no writ) ("Since . . . neither Bowman nor Aetna

Company had acquired any title to the tile, the taking and appropriation thereof by Cotten and his second contractors was wrongful and in such case a demand is not a condition precedent to the right to sue [for conversion]."). The existence of long established Texas law holding that one who purchases stolen property from a thief takes the property without title is not only acknowledged but also relied upon by PEP in its briefing.[64] Therefore, PEP's contention that its claims against Plains Marketing did not accrue until PEP demanded return of or compensation for its stolen property and the defendants unreasonably refused that demand has no merit.

The Texas Supreme Court has explained that

[t]he test to determine when the statute of limitations begins to run against an action sounding in tort is whether the act causing the damage does or does not of itself constitute a legal injury, that is, an injury giving rise to a cause of action because it is an invasion of some right of plaintiff.

Atkins, 417 S.W.2d at 153. Texas courts have recognized an exception to this general rule in conversion cases where a tortfeasor's original possession is lawful — for example, under a bailment contract — in which case a claim for conversion accrues when the true owner, or one claiming superior possessory rights, demands that the goods be returned and the tortfeasor refuses to return the property. Las Mendozas, Inc. v. Powell, 368 F.2d 445, 450 (5th Cir. 1966). But where a tortfeasor originally gains

---

[64]PEP's Dispositive Motion, Docket Entry No. 492, p. 29.

possession of property without legal authority, for example by purchasing stolen property from a thief or another person or entity without title, the legal injury occurs when the act of conversion is complete. See Bodin v. Gulf Oil Corp., 707 F.Supp. 875, 884-85 (E.D. Tex. 1988). Nothing in Sandford contradicts this principle of Texas of law. On the contrary, Sandford expressly states that "[w]hen the possession of personal property is wrongfully acquired in the first instance, and is transmitted successively to several, each possession is a new conversion." Sandford, 1884 WL 8120, *1.

### (3) Conclusions

Applying long-established Texas law the court concludes that PEP's claims against Plains Marketing arising from purchases of allegedly stolen condensate did not accrue when the condensate was originally stolen as Plains Marketing argues, and did not accrue upon demand for return and refusal as PEP argues. PEP's claims against Plains Marketing accrued, instead, when Plains Marketing purchased and took possession of the allegedly stolen Mexican condensate because that is when Plains Marketing wrongfully exercised dominion and control over the condensate in denial of and/or inconsistent with PEP's rights, and when PEP suffered a legal injury.[65]  See Mayo, 354 F.3d at 410; Solis, 951 S.W.2d at

---

[65]See PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 23 (recognizing that "PEP's claims against a particular defendant accrued when PEP could have sued the defendant for a legal injury. That, of course, occurred at the earliest when the defendant exercised control over PEP's property.").

391; Atkins, 417 S.W.2d at 153. See also Pipes v. Hemingway, 358
S.W.3d 438, 450 (Tex.App.-Dallas 2012, no pet.) (citing Autry v.
Dearman, 933 S.W.2d 182, 193 (Tex.App.-Houston [14th Dist.] 1996,
writ denied) (recognizing that well settled Texas law holds that
the limitations period for a conversion claim begins to run at the
time of conversion, i.e., at the time of the unlawful taking,
because that is when legal injury occurs); Rogers v. Ricane
Enters., Inc., 930 S.W.2d 157, 166 (Tex.App.-Amarillo 1996, writ
denied).

> (c) Plains Marketing's Purchases of Allegedly Stolen
> Condensate Evidenced in Summary Judgment Record
> Are Time Barred

The only evidence of specific purchases by Plains Marketing of
allegedly stolen condensate contained in the summary judgment
record consists of two invoices attached to PEP's dispositive
motion that show Plains Marketing purchased "Crude Oil" from Kemco
in October and December of 2008.[66] Assuming that the "Crude Oil"
Plains Marketing purchased from Kemco was — as PEP contends —
stolen condensate, claims arising from the purchases reflected on
the two invoices are time barred because those purchases all
occurred more than two years before May 29, 2011, the day PEP filed
its Original Complaint in the Big Star Action, and the date to
which the court has concluded that PEP's claims against Plains
Marketing relate back. See Tex. Civ. Prac. & Rem. Code § 16.003.

---

[66]Invoices, Exhibit 36 to PEP's Dispositive Motion, Docket
Entry No. 493-24.

Citing <u>Pan American Petroleum Corp. v. Orr</u>, 319 F.2d 612, 617 (5th Cir. 1963), PEP asserts that "the Fifth Circuit expressly applies Texas's discovery rule to conversions by a thief,"[67] and argues that the discovery rule applies to defer running of limitations until it had sufficient facts to support claims against the individual defendants including, <u>inter alia</u>, Plains Marketing. In support of its argument that the discovery rule applies to claims asserted in this action including, <u>inter alia</u>, to claims arising from Plains Marketing's purchases of allegedly stolen condensate, PEP argues that

> this case is permeated with fraudulent and deceptive conduct designed to launder the condensate and keep its source and the scheme itself hidden—bribery and threats to PEMEX employees and border guards, falsification of export documents on PEMEX letterhead, fraudulent mislabeling of the product to avoid detection.[68]

PEP's citation to <u>Orr</u> and contention that this case is permeated with fraudulent and deceptive conduct raises the issue of fraudulent concealment, not the discovery rule.

### (1) Fraudulent Concealment Does Not Defer Limitations on PEP's Conversion Claims

Fraudulent concealment and the discovery rule are distinct concepts both procedurally and substantively. <u>Matter of Placid Oil</u>, 932 F.2d at 399. Unlike the discovery rule, fraudulent concealment is an affirmative defense to the statute of limitations

---

[67]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 26.

[68]<u>Id.</u> at 28.

-74-

that must be pleaded and proved by the plaintiff. Id. (citing Weaver v. Witt, 561 S.W.2d 792, 793 (Tex. 1977) (per curiam)). In addition,

> [t]he plaintiff must prove that the defendant had *actual knowledge* of the facts allegedly concealed *and a fixed purpose to conceal the wrong. Mere concealment does not constitute fraudulent concealment for purposes of tolling the statute of limitations*; rather, the plaintiff is under a duty to exercise reasonable diligence to discover its cause of action.

Id. Because PEP has not cited any evidence showing that Plains Marketing concealed any facts from PEP, or that Plains Marketing had a fixed purpose to conceal the wrongs alleged and, instead, states in its pleadings that "PEP does not allege that Plains acted with intent or knowledge or that it was a part of any conspiracy,"[69] PEP has failed either to allege or raise facts capable of showing that the limitations period for its claims against Plains Marketing are subject to deferral because Plains Marketing fraudulently concealed facts from PEP.

### (2) The Discovery Rule Does Not Defer Limitations on PEP's Conversion Claims

PEP has not cited and the court has not found any case in which a Texas court has applied the discovery rule — as opposed to the doctrine of fraudulent concealment — to a case such as this in which the defendant's initial possession of the property at issue was unlawfully — as opposed to lawfully — acquired. See HECI

---

[69]First Amended Complaint (Big Star Action), Docket Entry No. 378, p. 16 ¶ 81.

Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998) (discovery rule is applied to categories of cases, not to particular cases); Steinhagen v. Ehl, 126 S.W.3d 623, 626-27 (Tex.App.—Beaumont 2004, writ denied) (distinguishing between two classes of conversion cases: one where defendant's initial possession of property was lawfully acquired, and another where initial possession was unlawfully acquired). The discovery rule applies in conversion cases where the defendant's initial possession of the property was lawfully acquired, e.g., bailment cases. See Hofland v. Elgin-Butler Brick Co., 834 S.W.2d 409, 414 (Tex.App.-Corpus Christi 1992, no writ). The discovery rule does not apply in this case because defendants' initial possession of the property was unlawful. In this type of case the claims accrued, and the limitations period began to run, when the legal injury occurred. See Sunwest Bank of El Paso v. Basil Smith Engineering Co., Inc., 939 S.W.2d 671, 674 (Tex.App.—El Paso 1996, writ denied) (discovery rule not applicable to injury caused by embezzelment); Autry v. Dearman, 933 S.W.2d 182, 192-93 (Tex.App.—Houston [14th Dist.] 1996, writ denied) (discovery rule not applicable to cause of action for conversion of lawsuit proceeds subject to subrogation); Rogers, 930 S.W.2d at 166 (discovery rule not applicable to conversion of oil and gas produced under void lease); Ayers, Civil Action No. 07-04-0383, 2006 WL 435026, at *2 (discovery rule not applicable to toll limitations until plaintiff learned identity of thief).

Even if this were a case to which the discovery rule applied, that rule would not defer running of the limitations period for PEP's conversion claims against Plains Marketing because PEP has neither alleged facts nor presented evidence capable of raising a fact issue for trial on this issue. Because PEP has invoked the discovery rule as a means to avoid being barred by limitations, PEP is required to show that the discovery rule applies to this case, and is also required to present evidence capable of establishing that PEP acted with diligence after being put on inquiry notice. Here, PEP alleges that it brought suit "within two years after PEP knew, or by the exercise of reasonable diligence should have known, of the facts giving rise to PEP's claims against the Defendants. Therefore, limitations have been tolled as to those claims by the 'discovery rule.'"[70] PEP argues that limitations should be tolled until it had an opportunity to discover not only that its condensate had been stolen and converted but also the identities of the responsible parties. Under Texas law all that is required to commence the running of the limitations period is the discovery of an injury and its general cause, not the exact cause in fact and the specific parties responsible. See Russell, 841 S.W.2d at 344 n.3 ("limitations begin to run when the fact of injury is known," Moreno, 787 S.W.2d at 351, not when the alleged wrongdoers are identified"). Childs, 974 S.W.2d at 40 (discovery rule delays

---

[70]First Amended Complaint (Big Star Action), Docket Entry No. 378, p. 20 ¶¶ 109-112.

accrual of cause of action until plaintiff knew or should have known of its injury, not the identity of the wrongdoer).

Alternatively, the discovery rule does not apply to defer limitations for PEP's claims against Plains Marketing because both PEP's injury and its general cause were known by PEP long before PEP filed suit against Plains Marketing.   The extent of PEP's knowledge is evidenced by PEP's responses to Plains Marketing's interrogatories:

**INTERROGATORY NO. 1:**

**With respect to each instance in which Plains . . . purchased or received Natural Gas Condensate that you believe was stolen from PEP . . . identify the following:**

. . .

**c.    The date on which you discovered that the Natural Gas condensate was stolen;**

PEP first discovered in or around May 2011 that Plains had purchased condensate that was stolen from Mexico.   As explained in its Answer to Interrogatory No. 1(a), PEP does not, and cannot, know when each barrel of stolen condensate purchased by Plains was stolen from Mexico.

To the best of PEP's knowledge, PEP learned of some, but not all, of the thefts within days of the individual incidents of theft.   There are however almost certainly incidents of theft that PEP still has not uncovered.

PEP was aware in general that it was a victim of theft — without knowing the full extent of the thefts — by at least 2006.[71]

_____

[71]PEP's Second Supplemental Answers and Objections, Exhibit 43 to PEP's Dispositive Motion, Docket Entry No. 493-31, p. 4.

. . .

**d.     The volume of Natural Gas Condensate purchased or received;**

<u>Quantified Purchases</u>

PEP's information to date shows that Plains purchased approximately 100,888 known barrels of stolen condensate from STUSCO and Kemco Resources, valued at $7,920,079.

Exhibit 1 shows PEP's current knowledge of Plains' purchases of stolen condensate from Kemco Resources. Plains purchased approximately 84,394 barrels of stolen condensate from Kemco, valued at $6,991,601.

Exhibit 2 shows PEP's current knowledge of Plains' purchases of stolen condensate from STUSCO.    Plains purchased   approximately   16,490   barrels   of   stolen condensate from STUSCO, that STUSCO had purchased from JAG Energy, valued at $928,478.

. . .

**i.     The date on which you discovered that Plains . . . had come into possession of the Natural Gas Condensate;**

PEP discovered in or around May 2011 that Plains had purchased stolen condensate.

**j.     Each individual or entity that had possession or ownership of the Natural Gas Condensate from the time of its alleged theft in Mexico until it was sold or transferred to Plains. . .**

. . .

All of the condensate sold to Kemco by F&M had been purchased by F&M from Continental Fuels. Although Continental Fuels' records are incomplete and unclear, Continental's President, Tim Brink, confessed to trading in stolen goods, and in his sworn deposition confirmed [th]at all condensate purchased and sold by Continental was form Mexico, was purchased without title, and was stolen. All of Continental's records known to exist have been produced.

Although Y Gas & Oil's records are incomplete, Arnoldo Maldonado, Y Gas & Oil's owner, confessed to trading in stolen goods, and in his sworn deposition confirmed [th]at all condensate purchased and sold by Y Gas & Oil was from Mexico. All of Y Gas & Oil records known to exist have been produced.

. . .

l.      **Each individual or entity to whom Plains . . . transferred possession of the Natural Gas Condensate; and**

Plains sold the stolen condensate to Valero.

m.      **The dates on which Plains . . . transferred possession of the Natural Gas Condensate.**

Plains transferred the stolen condensate to Valero shortly after Plains' purchase from suppliers.[72]

. . .

**INTERROGATORY NO. 6:**

**Describe how you, or any individual or entity acting on your behalf, discovered that Plains . . . had possession of Natural Gas Condensate stolen from PEP. In your answer, include the identity of the individuals involved in the discovery and the date on which the discovery occurred.**

**ANSWER:**
       . . . PEP discovered in or around May 2011 that Plains had been purchasing stolen condensate. The discovery was made by analyzing instant message and other transcripts, all of which have been produced to all defendants. Counsel for PEP also obtained this information by speaking with Josh Crescenzi in May 2011.[73]

---

[72]Exhibit 43 to Plaintiff's Dispositive Motion, Docket Entry No. 493-31, pp. 3-4.

[73]PEP's Second Supplemental Answers and Objections, Exhibit 43 to Plaintiff's Dispositive Motion, Docket Entry No. 493-31, p. 16.

PEP's answers to Plains Marketing's interrogatories and the exhibits presented by PEP in support of its Dispositive Motion show that (1) PEP was aware that its condensate was being stolen by at least 2006; (2) PEP learned of some, but not all, of the thefts within days of the individual incidents of theft; (3) Plains purchased allegedly stolen condensate from Kemco in October and December of 2008;[74] (4) Plains sold the stolen condensate to Valero; and (5) Plains transferred the stolen condensate to Valero shortly after purchasing it. Although PEP contends that it did not discover that Plains Marketing had purchased and sold its stolen condensate until May of 2011, and that PEP made this discovery by analyzing instant messages and other transcripts and by having its counsel talk to Josh Crescenzi, PEP fails either to argue or present any evidence from which a reasonable fact-finder could conclude that despite knowing since 2006 that its condensate was being stolen in Mexico and converted in the United States, PEP did not and could not have learned facts that would have entitled it to bring suit against Plains Marketing before May of 2011.

In Childs, 974 S.W.2d at 40, the Texas Supreme Court held that even under the discovery rule once a person "discovers or in the exercise of reasonable diligence should have discovered the injury and that it was likely caused by the wrongful acts of another," a

---

[74]Exhibit 36 to PEP's Dispositive Motion, Docket Entry No. 493-24.

cause of action accrues, "even if the plaintiff does not know the exact identity of the wrongdoer." The fact that PEP did not discover the identities of all of the subsequent purchasers of its condensate or mixtures thereof until over two years after the conversions occurred did not prevent limitations from running. See Russell, 841 S.W.2d at 344 n.3. See also Steinhagen, 126 S.W.3d at 626 (applying this rule to a claim for conversion).

The court has concluded that PEP's conversion claims against Plains Marketing accrued when Plains Marketing purchased the condensate. PEP's knowledge of thefts shortly after they occurred, and knowledge that its condensate was being converted by sale in the United States, is sufficient to trigger the running of limitations because — by PEP's own admissions — PEP was aware of its injury and the cause at or near the time of the conversions. Moreover, although PEP contends that it did not learn that Plains Marketing purchased and sold its stolen condensate until May of 2011, PEP has failed either to argue or to present any evidence from which a reasonable fact-finder could conclude that had PEP exercised reasonable diligence PEP could not have discovered Plains Marketings' purchases within the two-year period following the dates on which those purchases occurred. The discovery rule only defers accrual until the discovery of the injury; it does not operate to toll the running of the limitations period until such time as plaintiff discovers all of the elements of a cause of

action. See Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co., 866 S.W.2d 740, 743 (Tex.App.-Houston [14th Dist.] 1993, writ denied).

## C. BASF Corporation and BASF FINA Petrochemicals L.P.

PEP first asserted claims against BASF on June 7, 2010, when PEP filed its Original Complaint (Docket Entry No. 1) in the BASF Action, Civil Action No. H-10-1997. PEP added BASF FINA Petrochemicals Limited Partnership ("BFLP") as a defendant when it filed its Third Amended Complaint (Docket Entry No. 220) on June 17, 2011. PEP's Third Amended Complaint alleges that

59. BASF is the self-described "world's leading chemical company" with world-wide operations and more than 100,000 employees. In Port Arthur Texas, BASF through BASF FINA operates the world's largest steam cracker. BASF is an end-user of condensate in its chemical operations.

60. BASF purchased stolen condensate, apparently without knowing it was stolen.

61. PEP does not allege that BASF acted with intent or knowledge or that it was a part of any conspiracy.

62. Between April 2007 and March 2009, BASF purchased more than $44 million of stolen PEP condensate. The stolen condensate was purchased directly from Trammo Petroleum Corp. Trammo Petroleum has admitted in a related criminal proceeding that it acquired the condensate illegally, knowing it was stolen property.

63. According to information provided by Trammo Petroleum Corp., BASF Sabon LT Std made the following purchases of stolen condensate:

-83-

| Trammo Petroleum's Source | Date | Barrels | Cost per Barrel | Total Price |
|---|---|---|---|---|
| Continental Sales | April 2007 | 15,430 | $66 | $1,016,521.00 |
| | May 2007 | 19,981 | $65 | $1,306,886.00 |
| | June 2007 | 31,332 | $70 | $2,185,207.00 |
| | July 2007 | 19,729 | $79 | $1,567,753.00 |
| | August 2007 | 39,984 | $77 | $3,072,683.00 |
| | September 2007 | 9,926 | $85 | $840,846.00 |
| | October 2007 | 19,874 | $90 | $1,790,189.00 |
| | November 2007 | 30,082 | $100 | $2,997,744.00 |
| | August 2008 | 4,932 | $112 | $554,279.00 |
| Murphy Energy | May 2007 | 19,577 | $65 | $1,280,403.00 |
| | June 2007 | 8,408 | $70 | $586,443.00 |
| | July 2007 | 39,435 | $78 | $3,084,323.00 |
| | August 2007 | 22,214 | $77 | $1,707,111.00 |
| | September 2007 | 29,693 | $83 | $2,477,979.00 |
| | October 2007 | 21,084 | $90 | $1,903,966.00 |
| | November 2007 | 9,971 | $100 | $993,677.00 |
| | December 2007 | 12,121 | $97 | $1,171,356.00 |
| | February 2009 | 16,038 | $43 | $689,769.00 |
| | March 2009 | 19,803 | $52 | $1,034,872.00 |
| | March 2009 | 14,464 | $52 | $749,341.00 |
| Petro Source, predecessor of High Sierra Crude Oil & Marketing, LLC | March 2007 | 38,421 | $62 | $2,387,748.00 |
| | May 2007 | 83,155 | $65 | $5,436,642.00 |
| | October 2007 | 38,955 | $91 | $3,554,123.00 |
| | December 2008 | 24,021 | $47 | $1,118,671.00 |
| | February 2009 | 16,813 | $44 | $737,976.00 |
| Total | | | | $44,246,508.00 |

64.   None of BASF's purchases carried title from Mexico or from PEP.

65.  BASF has refused to return PEP's condensate or to reimburse PEP for the condensate BASF received without title or right.[75]

Based on these allegations PEP asserts claims against BASF Corp. and BFLP for conversion and for equitable relief based on theories of money had and received and unjust enrichment.[76]

BASF and BFLP argue that they are entitled to summary judgment on all of PEP's claims because (1) PEP's money had and received and unjust enrichment claims fail as a matter of law; (2) PEP's conversion claims against BASF fail as a matter of law because BASF never exercised dominion or control over the condensate at issue; all of the complained of transactions were with BFLP, not BASF; (3) BFLP was a good-faith purchaser that obtained good title to the hydrocarbons it purchased; (4) PEP cannot meet its burden under Texas law to show that the hydrocarbons purchased by BFLP are the identical hydrocarbons allegedly stolen from PEP; (5) claims arising from any of BFLP's alleged purchases of stolen Mexican condensate that occurred before June 7, 2008, are time-barred.[77] BASF and BFLP also argue that

[o]ther than the two 2008 transactions and the February 2009 transaction . . . all of the[ alleged] transactions

---

[75]Third Amended Complaint, Docket Entry No. 220, pp. 10-12 ¶¶ 60-65.

[76]Because PEP does not allege that either BASF or BASF FINA is a "Conspiring Defendant," PEP has not asserted a claim for constructive trust against these defendants.

[77]BASF Corporation and BASF FINA Petrochemicals Limited Partnership's Motion for Summary Judgment ("BASF and BFLP's MSJ"), Docket Entry No. 489, pp. 3-5.

are either time-barred on their face or have been
judicially admitted as being fully restituted.[78]

PEP responds that the defendants named in this action,
including inter alia BASF and BFLP, are not entitled to summary
judgment because the claims for equitable relief asserted in this
action do not fail as a matter of law, the defendants did not
obtain good title to the stolen hydrocarbons that they purchased,
PEP need not show that the hydrocarbons purchased and sold by the
defendants are the identical hydrocarbons stolen from PEP, and
claims arising from alleged purchases that occurred more than two
years before PEP filed suit against any of the defendants are not
time barred.[79] PEP also responds that even if BFLP and not BASF
purchased the stolen condensate, BASF can still be held liable for
BFLP's purchases because BFLP had no employees, all of its
operations were run by employees of two joint venture partners –
BASF and Total Petrochemicals – and BASF employed the individuals
who arrange for the purchases at issue.[80]

1. BASF and BFLP Are Entitled to Summary Judgment on PEP's
Equitable Claims for Unjust Enrichment and Money Had
and Received

Citing Bank of Saipan v. CNG Fin. Corp., 380 F.3d 836, 840
(5th Cir. 2004), for the principle that a claim for money had and

---

[78]Id. at 6.

[79]PEP's Opposition to Defendants' Dispositive Motions, Docket
Entry No. 545.

[80]Id. at 38-39.

-86-

received arises when the defendant obtains money that in equity and good conscience belongs to the plaintiff, BASF and BFLP argue that PEP's money-had-and-received claim fails on its face because

> [in] this case, PEP alleges that Defendants were end-users of condensate sold to it by Trammo. (*See* Dkt. No. 220, 3d Am. Compl. ¶ 59.) Because they were, according to PEP's own allegations, end-*users*, not *sellers*, of allegedly stolen condensate, Defendants do not have any money that they received, much less any money that in good conscience belongs to PEP. Accordingly, PEP's claim for money had and received should be dismissed.[81]

Quoting Heldenfels, 832 S.W.2d at 41, for the principle that "[a] party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage,"[82] BASF and BFLP argue that PEP's unjust enrichment claim fails on its face because

> [i]n this case, PEP does not—and could not—allege that Defendants perpetrated any kind of fraud or duress on PEP, or that Defendants took undue advantage of PEP in allegedly purchasing stolen PEP condensate. To the contrary, PEP specifically alleges that "BASF [and BFLP] purchased stolen condensate, apparently without knowing it was stolen." (Dkt. No. 220, 3d Am. Compl. ¶ 60.) Further, "PEP does not allege that BASF [or BFLP] acted with intent or knowledge that [they were] part of any conspiracy." (*Id.* ¶ 61.) PEP's pleadings constitute binding admissions that Defendants acted without any intent to defraud or take undue advantage of PEP, and there are no allegations to support a finding of duress. . . . Accordingly, PEP's unjust enrichment claim fails as a matter of law.[83]

---

[81]BASF and BFLP's MSJ, Docket Entry No. 489, pp. 22-23.

[82]Id. at 23.

[83]Id. at 23-24.

Citing the Texas Court of Appeals decision in Heldenfels, City of Corpus Christi v. Heldenfels Bros., Inc., 802 S.W.2d 35, 40 (Tex.App.—Corpus Christi 1990), for its statement that "[u]njust enrichment occurs when the party sought to be charged wrongfully secures a benefit *or passively receives* one which would be unconscionable for him to retain," PEP argues that defendants' lack of fraudulent intent does not prejudice the viability of its equitable claims for unjust enrichment and money had and received.[84] PEP argues that if it "is incorrect that it owns its proportionate share of a commingled mass, and cannot prove the technical tracing needed for conversion, PEP could still recover under an unjust enrichment theory."[85]

PEP has neither alleged nor produced evidence of any facts capable of establishing claims for unjust enrichment or money had and received against BASF or BFLP. Based on the facts alleged in PEP's Third Amended Complaint and contained in the summary judgment record, the court concludes that PEP's only claim against BASF and BFLP is for conversion. Conversion is the wrongful exercise of dominion and control over another's property in denial of, or inconsistent with, the other's rights. Mayo, 354 F.3d at 410; Bandy, 835 S.W.2d at 622. PEP alleges and cites evidence that it contends establishes that BASF — or BFLP acting on BASF's behalf —

---

[84]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 37.

[85]Id.

-88-

purchased condensate from Continental Fuels, Murphy Energy, and Petro Source that was stolen from PEP and that BASF used that condensate in its chemical operations. A party who purchases and then uses stolen property is subject to a cause of action for conversion. See Parker v. Kangerga, 482 S.W.2d 43, 47 (Tex.Civ. App.–Tyler 1972, writ ref'd n.r.e.) ("In removing timber and applying it to their own uses after it had been severed from the land, said parties were . . . guilty of conversion."). Although PEP alleges that all defendants, including inter alia BASF and BFLP, "profited from their improper dominion of PEP's property, and therefore, they hold money that in equity and good conscience belongs to PEP,"[86] PEP has failed either to allege any facts or to present any evidence capable of proving that BASF or BFLP profited from its use of PEP's condensate or received money that in equity and good conscience belongs to PEP. Accordingly, these defendants are entitled to summary judgment on PEP's claims for unjust enrichment and money had and received.

### 2. BASF Is Not Entitled to Summary Judgment on PEP's Conversion Claim on Grounds That It Never Exercised Dominion or Control Over PEP's Condensate

BASF argues that it is entitled to summary judgment because it has conclusively established that it never exercised dominion or control over PEP's condensate. In support of this argument, BASF argues that

---

[86]Third Amended Complaint, Docket Entry No. 220, p. 34 ¶ 193.

all of the condensate that PEP alleges BASF purchased "directly from Trammo" was purchased by BFLP as the "BUYER." (Dkt. No. 220, 3d Am. Compl. ¶ 63.) Trammo and BFLP, a joint venture between BASF and Total Petrochemicals & Refining USA, Inc., entered into a master contract, called a Crude Oil Sale Confirmation, to govern the sale of "crude oil and condensate" by Trammo. (See, e.g., Ex. 57, Oct. 2, 2006 Crude Oil Sale Confirmation between Trammo and BFLP.) The contract identifies the "Buyer" as BFLP and specifically provides that delivery shall be "into Buyer's or Buyer's assignee's designated carrier at the deliver point (the 'Delivery Location') (A) and (B) into BFLP leased tankage at Sun Nederland." (Id. at 1, 5.) . . .

BASF has made the distinction between itself and BFLP known to PEP since BASF filed its Original Answer. (See Dkt. No. 5, BASF Answer and Cross-Claims ¶ 3 ("BASF denies that it purchased condensate for use in its Port Arthur, Texas plant: that plant is an asset of the BASF FINA Petrochemicals Limited Partnership.") And, BASF continues to assert the corporate separateness of BASF and BFLP as a defense to PEP's claims. (See Dkt. No. 229, BASF Answer to 3d Am. Compl. and Cross-Claims at 41 (asserting as its "Third Defense" that "Plaintiff's claims against BASF are barred because BASF is not a condensate purchaser from, or counterparty to any condensate purchasing agreements with, any other defendants.").)

To the extent any BASF employees made purchases of condensate, they did so on behalf of and for the benefit of BFLP.[87]

Citing the deposition of BASF employee, David Zani, PEP responds that BASF is not entitled to summary judgment on its conversion claim because Zani negotiated and arranged for the purchases of stolen condensate. Zani also testified that all of his purchases were made on behalf of BFLP, a joint venture between

---

[87]BASF and BFLP's MSJ, Docket Entry No. 489, pp. 37-38.

BASF and Total Petrochemicals that had no employees of its own.[88] BASF does not dispute that Zani was its employee, that he arranged for the condensate purchases at issue, or that BFLP had no employees of its own. Instead, BASF argues that because Zani's purchases were all made on behalf of BFLP, that BASF cannot be held liable for those purchases unless PEP sued BASF as a general partner of BFLP. In support of this argument, BASF cites a number of Texas cases as standing for the principle that Texas law requires a plaintiff suing under an alter ego theory to separately plead each basis for disregarding the corporate fiction.[89] The court is not persuaded that this argument has merit because the cases that BASF cites are either distinguishable, i.e., at issue are debts or other contractual obligations, or not supportive of BASF's argument. For example, in No Barriers, Inc. v. Brinker Chili's Tex., Inc., 262 F.3d 496, 499 (5th Cir. 2001), the court stated that "Texas law requires that, to impose liability on a general partner of a limited partnership, the plaintiff must plead and prove a cause of action against that entity in its capacity as the general partner," but that statement was dicta because the capacity in which the defendants had been sued had not been

---

[88]Deposition of David R. Zani, Exhibit 59 to PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 546-31, pp. 9-11.

[89]Defendants' Reply in Support of Motion for Summary Judgment, Docket Entry No. 580, pp. 24-25.

challenged. Since the undisputed summary judgment evidence is that Zani was responsible for negotiating and arranging the purchases at issue and that Zani was employed by BASF, the court is not persuaded that BASF is entitled to summary judgment even if Zani made the purchases on behalf of BFLP.

### 3.    BASF and BFLP Are Not Entitled to Summary Judgment on PEP's Conversion Claims as Good-Faith Purchasers

Citing Texas common law and the Texas Business and Commerce Code § 2.403 and asserting that PEP has failed to produce any evidence tying the hydrocarbons purchased by BASF and/or BFLP to any theft, BASF and BFLP argue that they are entitled to summary judgment on PEP's conversion claims because BFLP purchased hydrocarbons for value and, therefore, received good title to the hydrocarbons as a good-faith purchaser for value.[90] In support of this argument BASF and BFLP argue that the undisputed evidence shows that they purchased the condensate at issue from Trammo in good faith and for valuable consideration without actual or constructive knowledge of any outstanding claims by a third-party. BASF and BFLP also argue that PEP has not alleged that either of them acted "with intent or knowledge or that it was part of any conspiracy."[91] Thus, BASF and BFLP argue that they are entitled to

---

[90]BASF and BFLP's MSJ, Docket Entry No. 489, pp. 35-37.

[91]Id. at 37 (citing Third Amended Complaint, Docket Entry No. 220, p. 10 ¶ 61).

summary judgment on PEP's conversion claims because PEP cannot
prove that PEP had superior title or right of possession to the
property at issue.

A bona fide purchaser for value has an affirmative defense
against a conversion claim. Carter, 271 S.W.3d at 858 & n.3. It
is the burden of a party asserting an affirmative defense to
sufficiently plead and prove the defense. Quantum Chemical, 47
S.W.3d at 478. The court is not persuaded by BASF and BFLP's
contention that they are entitled to summary judgment as good-faith
purchasers for value under either the common law of Texas or the
U.C.C. because they have failed to cite any evidence capable of
establishing that the condensate they purchased was not stolen.
Moreover, for the reasons explained below, the court concludes that
PEP has submitted evidence capable of establishing that the
condensate BASF and BFLP purchased from Trammo was stolen.

If, as PEP contends, the condensate that BASF and BFLP
purchased from Trammo was stolen, BASF and BFLP would not qualify
as good-faith purchasers for value under either the common law of
Texas or the U.C.C. because no one in the chain of title following
a thief could transfer good title to a subsequent purchaser like
BASF or BFLP. Texas law is well settled that one who purchases
stolen property, no matter how innocently, acquires no title to the
property; title remains in the owner. See McKinney v. Croan, 188
S.W.2d 144, 146 (Tex. 1945) ("[I]t is well settled that one in

-93-

rightful possession of personal property may maintain an action for its recovery against a thief or one holding under him."). This principle of Texas law and the policy supporting it has been aptly stated many times. See Sinclair Houston Federal Credit Union v. Hendricks, 268 S.W.2d 290, 295 (Tex.Civ.App.—Galveston 1954, writ ref'd n.r.e.) ("The general rule is that the owner of stolen property can recover it or its value from anyone who has received it and exercised dominion over it."); Olin, 673 S.W.2d at 214 (rule that one who purchases stolen property from a thief, no matter how innocently, acquires no title, places the responsibility of ascertaining true ownership on the purchaser). See Benjamini, 2 S.W.3d at 614, and discussion of the U.C.C. requirements in § IV.B.2, above, where the court rejected the same argument presented by Plains Marketing. Because BASF and BFLP have failed to establish that the condensate they purchased was not stolen, their argument that they are entitled to summary judgment on PEP's conversion claims because they are good-faith purchasers for value has no merit.

## 4. Conversion Claims Arising from Purchases that Occurred Before June 7, 2008, Are Time Barred

Citing the two-year statute of limitations provided by Texas Civil Practices and Remedies Code § 16.003(a), BASF and BFLP argue that PEP's conversion claims arising from purchases of allegedly stolen condensate that occurred prior to June 7, 2008, i.e., more

-94-

than two years before PEP filed suit on June 7, 2010, are time barred.[92]

PEP responds that the claims asserted against BASF and BFLP are not time barred because they did not accrue until PEP demanded return of and/or compensation for its condensate, and defendants had a reasonable time to investigate that demand.[93] Alternatively, PEP argues that its claims are not time barred because the discovery rule and/or the doctrine of fraudulent concealment toll the limitations period for these claims.[94] For the reasons stated in § IV.B.4(b), above, the court has already concluded that the

---

[92]In their reply brief (Docket Entry No. 580 at pp. 11-14), BASF and BFLP argue for the first time that the conversion claims asserted against BFLP in PEP's Third Amended Complaint do not relate back to the filing of PEP's Original Complaint because PEP has not substituted BFLP for BASF but, instead, simply added BFLP as a defendant. Defendants argue that Rule 15(c)(1)(C) does not apply when a party adds a new defendant instead of substituting a misidentified defendant. The court will not consider this argument because in addition to being raised for the first time in defendant's reply brief, it conflicts with the relief requested in their motion for summary judgment where defendants argue only that claims arising from transactions that occurred prior to June 7, 2008, are time barred. See Docket Entry No. 489, p. 8. Moreover, even if the court were to consider this argument, the court would grant PEP's request to add BFLP for largely the same reasons that the court previously allowed PEP to add Plains Marketing as a party defendant over similar objections from Plains Marketing and Plains All-American Pipeline. See Memorandum Opinion and Order, Docket Entry No. 377, pp. 22-25.

[93]PEP's Dispositive Motion, Docket Entry No. 492, pp. 30-31; PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, pp. 22-25.

[94]PEP's Dispositive Motion, Docket Entry No. 492, pp. 30-31; PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, pp. 25-28.

conversion claims asserted in this action accrued and limitations
started to run on the dates that the defendants purchased allegedly
stolen condensate.     For the reasons stated below, the court
concludes that neither fraudulent concealment nor the discovery
rule defer the limitations period from running on PEP's conversion
claims against BASF and BFLP.

PEP's Third Amended Complaint contains a long list of
purchases of allegedly stolen condensate that BASF made from Trammo
Petroleum. The list identifies the dates the purchases were made,
the quantity of condensate purchased, and the price paid.    The
majority of these transactions occurred in 2007 and are, therefore,
time barred because they occurred more than two years before PEP
filed suit on June 7, 2010.    Citing Orr, 319 F.2d at 617, PEP
asserts that "the Fifth Circuit expressly applies Texas's discovery
rule to conversions by a thief,"[95] and argues that the discovery
rule applies to defer running of limitations until it had
sufficient facts to support claims against the individual
defendants including, inter alia, BASF and BFLP. In support of its
argument that the discovery rule applies to claims asserted in this
action including, inter alia, to claims arising from BASF's
purchases of allegedly stolen condensate, PEP argues that

> this case is permeated with fraudulent and deceptive
> conduct designed to launder the condensate and keep its

---

[95]PEP's Opposition to Defendants' Dispositive Motions, Docket
Entry No. 545, p. 26.

source and the scheme itself hidden — bribery and threats
to PEMEX employees and border guards, falsification of
export documents on PEMEX letterhead, fraudulent
mislabeling of the product to avoid detection.[96]

PEP's citation to Orr and contention that this case is permeated
with fraudulent and deceptive conduct raises the issue of
fraudulent concealment, not the discovery rule.

> (a) Fraudulent Concealment Does Not Defer Limitations
> on PEP's Conversion Claims

As explained in § IV.B.4(c)(1), above, fraudulent concealment
is an affirmative defense to the statute of limitations that
requires the plaintiff to

prove that the defendant had *actual knowledge* of the
facts allegedly concealed *and a fixed purpose to conceal
the wrong.* *Mere concealment does not constitute
fraudulent concealment for purposes of tolling the
statute of limitations*; rather, the plaintiff is under a
duty to exercise reasonable diligence to discover its
cause of action.

Matter of Placid Oil, 932 F.2d at 399. PEP has neither alleged nor
cited any evidence capable of establishing that BASF or BFLP
concealed any facts from PEP or had a fixed purpose to conceal the
wrongs alleged. Instead, PEP states in its pleadings that "PEP
does not allege that BASF acted with intent or knowledge or that it
was a part of any conspiracy."[97] PEP has therefore failed either
to allege or raise facts capable of showing that the limitations

---

[96]Id. at 28.

[97]Third Amended Complaint, Docket Entry No. 220, p. 10 ¶ 61.

-97-

period for its claims against BASF or BFLP are subject to deferral because either of them fraudulently concealed facts from PEP.

> (b) The Discovery Rule Does Not Defer Limitations on PEP's Conversion Claims

As explained in § IV.B.4(c)(2), above, PEP has not cited and the court has not found any case in which a Texas court has applied the discovery rule — as opposed to the doctrine of fraudulent concealment — to a case such as this in which the defendant's initial possession of the property at issue was unlawfully — as opposed to lawfully — acquired. See HECI, 982 S.W.2d at 886 (discovery rule is applied to categories of cases, not to particular cases); Steinhagen, 126 S.W.3d at 626-27) (distinguishing between two classes of conversion cases: one where defendant's initial possession of property was lawfully acquired and another where initial possession was unlawfully acquired). Conversion cases to which the discovery rule has been applied are cases where the defendant's initial possession of the property at issue is lawfully acquired, e.g., bailment cases. See Hofland, 834 S.W.2d at 414. The discovery rule does not apply to this case because it belongs to the class of cases where the defendants' initial possession of the property was unlawful. In this type of case the claims accrued and the limitations period began to run when the legal injury occurred. See Sunwest Bank, 939 S.W.2d at 674 (discovery rule not applicable to injury caused by embezzlement); Autry, 933 S.W.2d at 192-93 (discovery rule not applicable to cause

-98-

of action for conversion of lawsuit proceeds subject to subrogation); Rogers, 930 S.W.2d at 166 (discovery rule not applicable to conversion of oil and gas produced under void lease). Ayers, Civil Action No. 07-04-0383, 2006 WL 435026, at *2 (discovery rule not applicable to toll limitations until plaintiff learned identity of thief).

Even if this were a case to which the discovery rule applied, that rule would not defer running of the limitations period for PEP's conversion claims against BASF and BFLP. Because PEP has invoked the discovery rule as a means to avoid being barred by limitations, PEP is not only required to show that the discovery rule applies to this case, but also to present evidence capable of establishing that PEP acted with diligence after being put on inquiry notice. Here, PEP alleges that it brought suit "within two years after PEP knew, or by the exercise of reasonable diligence should have known, of the facts giving rise to PEP's claims against the Defendants. Therefore, limitations have been tolled as to those claims by the 'discovery rule.'"[98]    PEP argues that limitations should be tolled until it had an opportunity to discover not only that its condensate had been stolen and converted but also the identities of the responsible parties.

Under Texas law all that is required to commence the running of the limitations period is the discovery of an injury and its general cause, not the exact cause in fact and the specific parties

---

[98]Id. at 32 ¶ 177.

responsible. See Russell, 841 S.W.2d at 344 n.3 ("limitations begin to run when the fact of injury is known," Moreno, 787 S.W.2d at 351, not when the alleged wrongdoers are identified"); Childs, 974 S.W.2d at 40 (discovery rule delays accrual of cause of action until plaintiff knew or should have known of its injury, not the identity of the wrongdoer). The discovery rule does not apply to defer limitations for PEP's claims against BASF and BFLP because both PEP's injury and its general cause were known by PEP long before PEP filed suit against these defendants.

PEP's knowledge that it had been injured by the conversions of gas condensate in the United Sates is evidenced by PEP's responses to the following requests for admissions:

**REQUEST FOR ADMISSION NO. 11:**

Admit that you were aware in 2007 that condensate stolen from you was being sold in the U.S. market.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

[Subject to objections] . . . this request for admission is ADMITTED.[99]

This admission establishes that PEP was aware that stolen condensate was being sold in the United States at least as early as 2007. PEP fails either to argue or to offer any evidence from which a reasonable fact-finder could conclude that despite knowing since 2007 that its condensate was being stolen in Mexico and converted in the United States, PEP did not and could not have

_____

[99]Plaintiff PEP's Responses to BASF Corporation's Requests for Admission ("PEP's Responses to BASF's Requests for Admission"), Exhibit 8 to BASF and BFLP's MSJ, Docket Entry No. 489-9, p. 7.

-100-

learned facts that would have entitled it to bring suit against
BASF before June of 2010. In Childs, 974 S.W.2d at 40, the Texas
Supreme Court held that even under the discovery rule once a person
"discovers or in the exercise of reasonable diligence should have
discovered the injury and that it was likely caused by the wrongful
acts of another," a cause of action accrues "even if the plaintiff
does not know the exact identity of the wrongdoer." The fact that
PEP did not discover the identities of all of the subsequent
purchasers of its condensate or mixtures thereof until more than
two years after some of the conversions occurred did not prevent
limitations from running. See Russell, 841 S.W.2d at 344 n.3;
Steinhagen, 126 S.W.3d at 626 (applying this rule to a claim for
conversion).

PEP's knowledge that its condensate was being converted by
sale in the United States is sufficient to trigger the running of
limitations because — by PEP's own admissions — PEP was aware of
its injury and the general cause at or near the time of the
conversions. See § IV.B.4(c)(2), above. Moreover, PEP has failed
either to argue or to present any evidence from which a reasonable
fact-finder could conclude that had PEP exercised reasonable
diligence PEP could not have discovered BASF's and BFLP's purchases
within the two-year period following the dates on which those
purchases occurred. The discovery rule only defers accrual until
the discovery of the injury; it does not operate to toll the
running of the limitations period until such time as plaintiff

discovers all of the elements of a cause of action. See Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co., 866 S.W.2d 40, 743 (Tex.App.-Houston [14th Dist.] 1993, writ denied). Accordingly, the court concludes that the discovery rule does not apply to defer the running of limitations for PEP's conversion claims against BASF and BFLP.

### 5. Whether PEP Can Trace Stolen Property to BASF and BFLP Is a Fact Issue for Trial

As stated in § IV.B.3, above, in order to hold any individual defendant liable for conversion, PEP must trace condensate that was actually stolen in Mexico to the individual defendant. PEP must also present evidence from which a fact-finder could form a reasonably certain estimate of the amount of stolen condensate, if any, that each defendant converted. See Ortiz Oil, 141 S.W.2d at 1055. The amount of condensate converted is not required to be proven with exact certainty, only with reasonable certainty. See Southwest Battery, 115 S.W.2d at 1097. PEP's contention that "when the defendants mixed PEP's condensate with other hydrocarbons, PEP became owner of its proportionate share of the mixed product as a whole, not just the individual molecules that were drawn from Mexican soil,"[100] does not absolve PEP from having to identify its stolen condensate and trace it to the individual defendants.

---

[100]PEP's Reply in Support of Its Dispositive Motion, Docket Entry No. 577, p. 3.

-102-

BASF and BFLP argue that they are entitled to summary judgment

on PEP's conversion claims because

> PEP has no evidence that BFLP actually purchased Mexican
> condensate from Trammo, or that any Mexican condensate
> that BFLP purchased (if any) was the identical condensate
> stolen from PEP. PEP and its witnesses have admitted
> that PEP cannot trace any specific condensate stolen from
> PEP to any specific purchase of hydrocarbons by BFLP or
> any other defendant, and PEP has no other evidence to
> show that the hydrocarbons purchased by BFLP are the same
> barrels of condensate stolen from PEP. . . As a result,
> PEP cannot satisfy its burden of proof and its conversion
> claims against BFLP should be dismissed.[101]

In § IV.C.4, above, the court concluded that conversion claims

asserted against BASF and BFLP arising from purchases made more

than two years before PEP filed its Original Complaint are time

barred. Thus, only six of the BASF purchases listed in PEP's Third

Amended Complaint remain viable, i.e., one purchase in August of

2008 of condensate alleged to have originated from Continental

Fuels; one purchase in December of 2008 of condensate alleged to

have originated from Petro Source; two purchases in February of

2009, one of which allegedly originated from Petro Source and one

of which allegedly originated from Murphy Energy; and two purchases

in March of 2009 of condensate alleged to have originated from

Murphy Energy. The only evidence that PEP cites that would allow

a reasonable fact-finder to conclude that the six purchases of

condensate that BASF and BFLP made from Trammo in 2008 and 2009

that are not time-barred were purchases of stolen condensate is

cited in PEP's Dispositive Motion (Docket Entry No. 492).

---

[101]BASF and BFLP's MSJ, Docket Entry No. 489, p. 24.

In its Dispositive Motion PEP cites evidence capable of establishing that the condensate BASF purchased from Trammo was stolen Mexican condensate that Trammo acquired from defendants Continental Fuels and Murphy Energy. As evidence that the condensate being sold by Continental Fuels, including that which made its way to BASF in August of 2008 via Trammo Petroleum, was stolen from Mexico, PEP cites the deposition of Timothy Brink of Continental Fuels. Brink testified that in July of 2008 his employee, Josh Crescenzi, told him that the product he was purchasing was stolen from Mexico.[102] Brink also testified that once he looked closely at the paperwork documenting shipments of product that he bought from Mexico the number of discrepancies he spotted caused him to realize that the product was stolen.[103] As additional evidence that the product being sold by Continental Fuels was stolen, PEP cites the transcript from the guilty plea of Arnoldo Maldonado, which included facts about the role that he and his company, Y Gas & Oil, played in supplying stolen Mexican condensate to Continental Fuels.[104]

PEP also cites the guilty plea and the deposition of Trammo's president, Donald Schroeder, who not only confirmed that

---

[102]PEP's Dispositive Motion, Docket Entry No. 492, p. 4 (citing Deposition of Timothy Brink, Exhibit 10, Docket Entry No. 492-12, pp. 13-14).

[103]See PEP's Reply in Support of Its Dispositive Motion, Docket Entry No. 577, pp. 15-16 (citing Deposition of Timothy Brink, Exhibit 39 to PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 546-10, pp. 33-44).

[104]Id. (citing Exhibit 12 in Docket Entry No. 492).

Continental was dealing in stolen condensate, but also that Trammo

sold to BASF the stolen Mexican condensate that it purchased from

Continental Fuels.[105]   During his guilty plea Schroeder admitted

that the following facts stated by the Assistant United States

Attorney were true:

> [V]arious companies imported Mexican condensate stolen
> from PEMEX into the United States. The stolen condensate
> was sold by these import companies to other U.S.
> companies such as the following companies: Continental
> Fuels, Murphy Energy Corporation, and Trammo Petroleum.
> These companies were in the United States. The companies
> just mentioned then sold the condensate to larger
> companies in the United States, such as the company BASF.
> The import companies sent semi-truck tankers loaded with
> stolen condensate from Mexico into the U.S. via border
> ports of entry. The import companies then directed the
> tanker trucks to deliver the condensate to U.S. companies
> like Continental Fuels, which was located inside the Port
> of Brownsville, Texas. The import companies were then
> paid by wire transfer to various accounts.
>
> Under the arrangement of this case in 2009,
> Continental Fuels paid the importers of the stolen
> Mexican condensate. Continental Fuels then stored the
> product until there was a sufficient quantity of
> condensate to load on a barge and deliver to an end user,
> which in this case was BASF. Generally, the condensate
> physically stayed with Continental Fuels, or at least in
> their tanks, until it was delivered to BASF, though the
> condensate was sold to intermediaries, such as Murphy
> Energy and Trammo Petroleum.
>
> One of the intermediaries, Trammo Petroleum,
> through arrangements made by Mr. Donald Schroeder,
> purchased the stolen Mexican condensate in 2009, which
> was ultimately sold to BASF. Mr. Schroeder, working
> through Trammo Petroleum, sold the stolen Mexican
> condensate in the barge operation beginning in January
> 2009 to BASF.

---

[105]PEP's Dispositive Motion, Docket Entry No. 492, p. 5 (citing
guilty plea of Donald Schroeder, Exhibit 14-72 in Docket Entry
No. 492, pp. 19-21; Deposition of Donald Schroeder, Exhibit 15 in
Docket Entry No. 492, pp. 46-47).

As an example of this, on or about February 7th, 2009, Mr. Schroeder and others were responsible for the loading of a barge containing stolen condensate in Brownsville, Texas. The barge then transported the stolen condensate to Port Arthur, Texas where it was ultimately sold to BASF.

Mr. Schroeder and others were responsible for the sale and barging of about 2 million [dollars] in stolen condensate in 2009, though the profits received by Trammo corporation were about 150,000.

The United States can show that Mr. Schroeder had knowledge that the condensate transactions described above involved stolen condensate from Mexico through a series of recorded conversations in 2008 and 2009, in which arrangements for the sale and transport were discussed.[106]

PEP asserts, and BASF does not dispute, that documents from Trammo confirm that all but one of Continental's sales to Trammo were sold to BASF.[107]

As additional evidence that the condensate purchased by BASF was stolen Mexican condensate, PEP cites the affidavit of Murphy Energy's Executive Vice-President, Greg Westfall, who described purchases of Mexican condensate that Murphy made in 2009:

13.    In early 2009, Donald Schroeder—the then-president of Trammo—contacted Murphy Energy via instant message (under the username "big_daddy77079"), stating that condensate was about to start flowing across the United States border again at Brownsville, Texas. Schroeder states that, although Continental Fuels, Inc. had suppliers lined up, it did not have the cash liquidity to purchase the condensate on a daily basis. Schroeder asked whether Murphy Energy was interested in purchasing the condensate under the

---

[106]Transcript from Guilty Plea of Donald Schroeder, Exhibit 14-72 to PEP's Dispositive Motion, Docket Entry No. 492-16, pp. 19-21.

[107]PEP's Dispositive Motion, Docket Entry No. 492.

same commercial conditions as before, except that
the storage facility would be that owned by
Continental Fuels, Inc. in Brownsville, Texas
instead of the TransMontaigne facility previously
used by Murphy Energy. Schroeder also informed
Murphy Energy that Trammo would purchase the
condensate delivered to Port Arthur, Texas under
terms essentially the same as before.

14.   Both Tim Brink, President of Continental, and Josh
Crescenzi, Vice President of Operations of
Continental, contacted Murphy Energy immediately
after the discussions with Schroeder and described
the potential transaction in a similar way.

15.   In 2009, Murphy Energy purchased condensate as
follows:

| Purchase Date | Volume (Barrels) | Purchase Price |
|---|---|---|
| January 2009 | 17,745.29 | $625,589.38 |
| February 2009 | 30,276.04 | $1,051,523.15 |
| March 2009 | 20,854.34 | $843,465.07 |
| TOTAL: | 68,875.67 | $2,520,577.60 |

16.   Murphy Energy sold the condensate it purchased in
2009 for a total of $3,066,903.00. . .[108]

BASF objects to Westfall's testimony as not based on personal

knowledge, but only challenges Westfall's testimony that the

condensate was stolen; BASF does not challenge Westfall's testimony

about the details of Trammo's purchases from Continental and sales

to BASF on which the court is relying here.[109]

Although BASF and BFLP argue that "PEP cannot, however, prove

that the hydrocarbons purchased by BFLP from Trammo consisted, in

_____

[108]Declaration of Greg Westfall, Exhibit 21-2 to PEP's
Dispositive Motion, Docket Entry No. 493-1, p. 3 ¶¶ 13-16.

[109]Defendants' Reply in Support of Motion for Summary Judgment,
Docket Entry No. 580, p. 23.

whole or in any identifiable part, of allegedly stolen Mexican condensate,"[110] the evidence quoted above regarding BASF's purchases of condensate from Trammo that originated with Continental Fuels and Murphy Energy is sufficient to create a fact issue for trial as to whether at least four of BASF's non-time-barred purchases were purchases of stolen Mexican condensate. Accordingly, the court concludes that BASF and BFLP are not entitled to summary judgment on PEP's conversion claim on grounds that PEP is unable either to trace the stolen condensate to these defendants or to establish a reasonably certain estimate of the amount of stolen condensate, if any, that they converted.

## 6.    BASF and BFLP are Not Entitled to Summary Judgment on Transactions for Which PEP Has Received Restitution

BASF and BFLP argue that they are entitled to summary judgment for the three complained of 2009 purchases of condensate from Trammo through Murphy Energy because PEP has received full restitution for those purchases. The transactions for which BASF and BFLP seek summary judgment are identified on the transaction table in PEP's Third Amended Complaint as follows:

| Trammo Petroleum's Source | Date | Barrels | Cost per Barrel | Total Price |
|---|---|---|---|---|
| Murphy Energy | February 2009 | 16,038 | $43 | $689,769.00 |
| Murphy Energy | March 2009 | 19,803 | $52 | $1,034,872.00 |
| Murphy Energy | March 2009 | 14,464 | $52 | $749,341.00 |
| Total | | | | $2,473,982.00 |

[110]BASF and BFLP's MSJ, Docket Entry No. 489, p. 29.

-108-

In support of this argument BASF and BFLP cite PEP's sworn answer to Interrogatory No. 10 and PEP's response to request for admissions 35, BASF and BFLP argue that they are entitled to summary judgment on the conversion claims arising from these three transactions because PEP has already received restitution for them from Trammo. In a sworn interrogatory answer,[111] PEP stated that

it has received the following monies, things of value, restitution, or settlement payments, or insurance payments with regard to condensate that was stolen from PEP in 2007, 2008, or 2009. Some or all of the stolen PEP condensate in question was ultimately purchased by BASF entity.

| Payment on or About | Payment Amount | Payment Description |
|---|---|---|
| August 10, 2009 | $2,415,635.72 | Cashier's check from Trammo Petroleum, Inc. |
| June 18, 2010 | $40,130.45 | Check from the United States Treasury in payment of claim in civil forfeiture action related to defendant Continental Fuels, Inc. (Civil Action No. 09-cv-1564, Southern District of Texas, Houston Division) |
| August 2010 | $118,109.28 | Check from the United States Treasury in payment of claim in civil forfeiture action related to Sun Petroco, LLC and Luis Ariel Rivera (Civil Action No. 09-cv-286, Southern District of Texas, Houston Division) |
| October 29, 2010 | $1,000,000 | Settlement Amount from Trammo Petroleum, Inc. |

In response to a request for admission dated January 19, 2011, PEP stated:

---

[111]Plaintiff PEP's Responses to BASF Corporation's First Set of Interrogatories ("PEP's Responses to BASF's First Interrogatories"), Exhibit 1 to BASF and BFLP's MSJ, Docket Entry No. 489-2, pp. 18-19, Interrogatory No. 10.

**REQUEST FOR ADMISSION NO. 35:**

Admit that you received $2.4 million in restitution for the $2.4 million of stolen condensate referenced in ¶ 94(H) of the Complaint.

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

. . .

[T]his request for admission is ADMITTED.[112]

On January 19, 2011, the live complaint in the BASF Action was PEP's Second Amended Complaint (Docket Entry No. 108) filed on November 24, 2010. Paragraph 94(H) of that complaint alleged:

[o]n or about January-March 2009, Donald Schroeder, Jr. and Trammo Petroleum and their co-conspirators knowingly arranged for Trammo Petroleum's sale of at least $2.4 million worth of stolen PEP condensate to Defendant BASF Corporation, knowing the condensate in question to have been stolen from PEP in Mexico. PEP does not allege that Defendant BASF knew that the condensate in question was stolen.[113]

BASF's and BFLP's argument that they are entitled to summary judgment because PEP has already been compensated for at least three of the transactions for which they have been sued raises the applicability of Texas' one satisfaction rule to PEP's claims. "Under the one satisfaction rule, a plaintiff is entitled to one recovery for any damages suffered." Crown Life Ins. Co. v.

---

[112]Plaintiff PEP's Responses to BASF's Requests for Admission, Exhibit 8 to BASF and BFLP's MSJ, Docket Entry No. 489-9, p. 18.

[113]Second Amended Complaint, Docket Entry No. 108, p. 27 ¶ 94.H. See also Original Complaint, Docket Entry No. 1, p. 24 ¶ 88.H (same); Amended Complaint, Docket Entry No. 59, p. 26 ¶ 94.H (same); and First Amended Complaint (Big Star Action), Docket Entry No. 378, p. 27 ¶ 160.i (same).

Casteel, 22 S.W.3d 378, 390 (Tex. 2000) (citing Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 7 (Tex. 1991)). "The one satisfaction rule is grounds for summary judgment in cases in which (1) the one satisfaction rule applies, (2) the settlement credit entirely sets-off the maximum amount of liability claimed by the plaintiff, and (3) punitive damages are not an issue." Nowak v. Pellis, 248 S.W.3d 736, 741 (Tex.App.—Houston [1st Dist.] 2007, no pet.) (citing Cohen v. Arthur Andersen, L.L.P., 106 S.W.3d 304, 309-10 (Tex.App.—Houston [1st Dist.] 2003, no pet.)).

The undisputed summary judgment evidence cited by BASF and BFLP shows that Trammo has paid PEP approximately $2.4 million, but that the amount PEP claims it is owed as a result of Trammo's sales of stolen condensate to BASF and BFLP is substantially more than the $2.4 million. Because Trammo's payment of $2.4 million to PEP does not entirely set-off the maximum amount of liability claimed by PEP, BASF and BFLP are not entitled to summary judgment on any individual transactions. The issue of allocation of settlement credits, if any, is an issue to be reached at trial, not on summary judgment. Accordingly, the court concludes that BASF's and BFLP's argument that they are entitled to summary judgment because PEP has already been compensated for damages caused by some of their purchases of stolen Mexican condensate has no merit.

## D.  **RGV Energy Partners LLC and F&M Transportation**

PEP first asserted claims against F&M Transportation in the Original Complaint filed on May 29, 2011, in the Big Star Action

(Docket Entry No. 1) in Civil Action No. H-11-2019. PEP added RGV
Energy as a defendant in PEP's First Amended Complaint in the Big
Star Action filed on April 20, 2012 (Docket Entry No. 378). PEP
alleges that

70.    F&M voluntarily joined the conspiracy to market
       and distribute stolen PEP condensate.

71.    F&M played an important role in the US conspiracy.
       F&M both bought and sold condensate and also
       transported much of condensate bought and sold by
       other members of the conspiracy.

72.    For example, F&M bought condensate from, and
       brokered contracts for, Continental Fuels, whose
       president has confessed its role in the illegal
       scheme, and Y Oil and Gas, operated by Arnoldo
       Maldonado, who also confessed to, and was
       convicted of, trafficking in condensate stolen
       from PEP.

73.    F&M bought and sold at least $20 million dollars
       worth of stolen condensate. For example, in
       October 2008 F&M purchased 8,500 barrels of
       "Petroleum Condensate" from Continental Fuels.
       F&M knew that it was purchasing stolen goods from
       Continental. F&M sold the condensate to Kemco
       Resources, Inc. ("Kemco"), which sold it to
       Plains, which sold it to Valero. F&M bought this
       stolen condensate for $539,000, and sold it for a
       substantial profit without informing its customer
       that the condensate was stolen.

74.    F&M knew that the condensate it purchased and
       resold was stolen. In the alternative, F&M either
       consciously disregarded the fact that the
       condensate was stolen or should have known that
       the condensate was stolen.

75.    As to each of its purchases and sales of PEP
       condensate, F&M committed at least the following
       acts in furtherance of the conspiracy:
       (a) defrauded the ultimate purchaser of the source
       and patrimony of the condensate in violation of
       state law and the federal mail and wire fraud
       statutes, 18 U.S.C. §§ 1341 and 1343;
       (b) knowingly engaged in transactions involving

stolen goods in violation of 18 U.S.C. §§ 2314 and 2315 and the Texas Theft Liability Act (or TTLA), Tex. Civ. Prac. & Rem. Code § 134.001-.005; and (c) committed money laundering in violation of 18 U.S.C. § 1956.

76. F&M also provided transportation and brokerage services to the conspiracy knowing that the condensate it was transporting was stolen. While transporting the condensate, F&M took possession of stolen condensate, knowing it was stolen. In the alternative, F&M either consciously disregarded the fact that the condensate was stolen or should have known that the condensate was stolen. For example, in February 2009, F&M transported more than 21,000 gallons of "petroleum distillates"—a euphemism for condensate designed to disguise its source—from Y Oil and Gas, the seller, to Continental Fuels, the buyer.

77. As to its transportation services, F&M likewise committed specific acts in furtherance of the conspiracy, including violations of 18 U.S.C. §§ 2314—which applies to "Whoever transports, transmits, or transfers in interstate or foreign commerce any goods . . . knowing the same to have been stolen, converted or taken by fraud"—and 2315—which applies to taking possession of property "knowing the same to have been stolen, unlawfully converted, or taken"—and the Texas Theft Liability Act (or TTLA), Tex. Civ. Prac. & Rem. Code § 134.001-.005.

78. F&M was aware that the conspiracy was much larger than its individual participation and that for the conspiracy to succeed, additional criminal conduct was needed to conceal the conspiracy from PEP and from US and Mexican authorities, including the bribery of government officials and the forging of documents.

79. F&M is responsible for all damages inflicted on PEP from the larger conspiracy. Alternatively, F&M is liable for all of its transactions involving the stolen property of Mexico, including the transactions in which it transported or brokered sales.[114]

---

[114]First Amended Complaint (Big Star Action), Docket Entry No. 378, pp. 13-15 ¶¶ 70-79.

-113-

The First Amended Complaint does not allege any facts specific to RGV's alleged involvement in the trade of stolen Mexican condensate. The only reference to RGV in PEP's pleadings is as one of the "Conspiring Defendants:"

> 108. The Conspiring Defendants—. . . Superior Crude, Kirby, RGV, and F&M—are also responsible for the actions of all members of the conspiracy, whether named in this action [or] not, and they are therefore responsible for the value of all condensate stolen from PEP that reached the United States, currently estimated to be more than $300 million.[115]

Based on these allegations of fact, PEP has asserted claims against F&M Transportation and RGV Energy Partners and F&M Transportation for conversion, for equitable relief including constructive trust based on theories of money had and received and unjust enrichment, for civil conspiracy, and for violation of the TTLA.

F&M Transportation and RGV Energy argue that they are each entitled to summary judgment because

> [t]here is no evidence that RGV had any connection whatsoever to PEP's condensate after April 20, 2010 (two years before it was sued in PEP's First Amended Complaint). Similarly, there is no evidence that F&M had any connection whatsoever to PEP's condensate after May 29, 2009 (two years before it was sued in PEP's Original Complaint).[116]

In support of the argument that PEP's claims against them are time barred, these defendants assert that "[a]ll of the alleged facts

---

[115]Id. at 20 ¶ 108.

[116]Defendants RGV Energy Partners, LLC and F&M Transportation, Inc.'s Motion for Summary Judgment ("RGV and F&M's MSJ"), Docket Entry No. 517, p. 3.

relating to their involvement with PEP's condensate occurred well outside the two-year limitations period."[117] These two defendants "expressly adopt and incorporate all legal arguments and evidence submitted by all other defendants on this issue, including those related to the discovery rule . . . and fraudulent concealment."[118]

PEP acknowledges in its response that its claims are all governed by Texas' two-year statute of limitations, and PEP does not dispute RGV and F&M's assertions that neither of them had any connection with PEP's condensate in the two years preceding the filing of suit against them. Moreover, in its Dispositive Motion PEP acknowledges that the "Two Year Amount" of damages for F&M is "\$0."[119] PEP's only argument against granting these two defendants summary judgment based on limitations is that the claims asserted against them are not time barred because the running of limitations is deferred by fraudulent concealment and the discovery rule.

Based on the legal analysis stated in §§ IV.B.4 and IV.C.4, the court concludes that the claims asserted against RGV Energy and F&M Transportation are all governed by a two-year statute of limitations and that all of the claims asserted against them are time barred because PEP has failed to allege facts or present any

---

[117]Id. at 5.

[118]Id.

[119]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 31.

evidence capable of establishing that either of these defendants had any connection to stolen condensate within two years of the dates on which PEP filed suit against them. Fraudulent concealment does not prevent these two defendants from relying on the limitations defense because PEP has neither alleged nor cited any evidence capable of establishing that either of them concealed any facts from PEP or had a fixed purpose to conceal the wrongs alleged.

The undisputed evidence shows that F&M Transportation provided PEP affiliate PMI information that it was exporting Mexican condensate during the period that PEP contends Mexican condensate could not legally be exported from Mexico. Because this evidence shows that PEP knew or with the exercise of reasonable diligence should have known that F&M Transportation was dealing in Mexican condensate long before PEP filed suit, and because the evidence already cited in §§ IV.B.4(c)(2) and IV.C.4(c), shows that PEP was well aware that Mexican condensate was being stolen in Mexico and converted in the United States years before it filed suit against any defendant, the discovery rule does not preclude F&M Transportation or RGV Energy from relying on limitations to bar the claims asserted against them in this action. Accordingly, the court concludes that F&M Transportation and RGV Energy are entitled to summary judgment because the claims alleged against them are all barred by the two-year statute of limitations.

## E.   Murphy Energy

PEP first asserted claims against Murphy Energy on June 7,

2010, when PEP filed its Original Complaint (Docket Entry No. 1) in

the BASF action, Civil Action No. H-10-1997.  PEP's Third Amended

Complaint alleges that:

80.   Murphy  Energy  provides  producer  services,
      marketing services, and transportation services
      for various hydrocarbons, including crude oil,
      condensate, and natural gas liquids.

81.   Murphy Energy voluntarily joined the conspiracy to
      market and distribute stolen PEP condensate.

82.   Murphy Energy distributed stolen PEP condensate
      that it purchased from Defendant Continental Fuels
      and sold stolen PEP condensate to at least Trammo
      Petroleum.

83.   Murphy  Energy  knew  that  the  condensate  it
      purchased  and  resold  was  stolen.    In  the
      alternative,  Murphy  Energy  either  consciously
      disregarded  the  fact  that  the  condensate  was
      stolen or should have known that the condensate
      was stolen.

84.   In February 2009, certain Murphy Energy employees
      met at a Houston-area restaurant with Defendant
      Brink, of Defendant Continental Fuels, Inc., and
      others.  The conversation was recorded by federal
      officers.   During the meeting, the participants
      discussed several subjects, including that (a) PEP
      condensate was not legally exported from Mexico;
      (b) Mexican drug cartels arranged the delivery of
      the PEP condensate that Murphy Energy and others
      purchased and resold in Texas; (c) the PEP
      condensate was purposefully misidentified so it
      could be smuggled out of Mexico; and (d) customs
      officials were being bribed at the border to
      smuggle the PEP condensate into the United States.

85.   The tone of the conversation makes clear that the
      information discussed in the meeting was no
      surprise to Murphy Energy.  Murphy Energy had been

-117-

dealing with these same people regarding PEP condensate since at least late 2006.

86.     Murphy Energy's knowledge is also demonstrated by its attempt to manufacture false proof that PEP was aware of its activities.   In early January 2008, Murphy Energy twice tried to deliver emails to a "Vallín Rivero" at "gas.pemex.com."   The email address indicates that, at best, Mr. Rivero worked for Pemex Gas y Petroquímica Básica, a different entity, albeit a Pemex subsidiary.   In any event, the emails bounced back.   These original two emails contained nothing that would implicate Murphy Energy in any wrongdoing.   After the emails were rejected, and Murphy Energy knew its email would not reach anyone at any Pemex affiliate, Murphy Energy drafted a much longer email, sent to the same bad address, purporting to inform Pemex of Murphy's purchases and sale of Mexican condensate in the United States.

87.     Although neither PEP nor PMI are secret organizations, Murphy Energy never sought to communicate with an actual person at either. Murphy Energy never spoke to anyone at any Pemex affiliate or with the Mexican government.

88.     PEP was never informed by Murphy Energy of its trading in PEP's stolen condensate, and PEP never approved that conduct.

89.     As to each of its purchases and sales of PEP condensate, Murphy Energy committed at least the following acts in furtherance of the conspiracy: (a) defrauded the ultimate purchaser of the source and patrimony of the condensate in violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343; (b) knowingly engaged in transactions involving stolen goods in violation of 18 U.S.C. §§ 2314 and 2315 and Texas Theft Liability Act (or TTLA), Tex. Civ. Prac. & Rem. Code § 134.001-.005; and (c) committed money laundering in violation of 18 U.S.C. § 1956.

90.     Murphy Energy also was aware of the conduct of others necessary for the conspiracy to succeed, including the bribery of government officials and the forging of documents.

91.     Murphy Energy was aware that the conspiracy was
        much larger than its individual involvement.[120]

Based on these allegations of fact PEP has asserted claims against Murphy Energy for conversion, for equitable relief including constructive trust based on theories of money had and received and unjust enrichment, civil conspiracy, and TTLA and RICO violations.

Murphy Energy argues that it is entitled to summary judgment on all of PEP'S claims because (1) PEP's claims for conversion, equitable relief, and violation of the Texas Theft Liability Act arising from acts that occurred before June 7, 2008, are time-barred; (2) PEP's conversion claim is barred because PEP cannot meet its burden under Texas law to show that the hydrocarbons purchased by Murphy Energy are the identical hydrocarbons allegedly stolen from PEP; (3) PEP's conspiracy claim is barred because there is no evidence that Murphy had knowledge of a conspiracy to convert PEP's condensate and defraud end users; (4) PEP's claim for violation of the Texas Theft Liability Act is barred because there is no evidence that Murphy formed the requisite intent to violate the Act; (5) PEP's RICO claim is barred because there is no evidence that Murphy engaged in racketeering activity; and (6) Texas' one-satisfaction rule bars Murphy Energy from being held liable for losses for which PEP has already received restitution.[121]

---

[120]Third Amended Complaint, Docket Entry No. 220, pp. 14-16, ¶¶ 80-91.

[121]Defendant Murphy Energy Corporation's Motion for Final Summary Judgment ("Murphy's MSJ"), Docket Entry No. 479, pp. 2-3.

PEP disputes that Murphy Energy is entitled to summary judgment on any of the claims asserted against it.[122]

### 1.   PEP's Claims for Conversion, Equitable Relief, and Violation of the Texas Theft Liability Act Arising from Acts that Occurred Before June 7, 2008, Are Time Barred

Citing the two-year statute of limitations provided by Texas Civil Practice and Remedies Code § 16.003(a), Murphy Energy argues that PEP's claims for conversion, equitable relief, and violation of the Texas Theft Liability Act arising from acts that occurred prior to June 7, 2008, i.e., more than two years before PEP filed suit on June 7, 2010, are time barred. The parties do not dispute that the two-year limitations period contained in § 16.003(a) governs all of the state law claims asserted in this action.

PEP responds that the claims asserted against all defendants including, _inter alia_, Murphy Energy are not time barred because they did not accrue and limitations did not start running until PEP demanded return of and/or compensation for its condensate, and defendants had a reasonable time to investigate that demand.[123] Alternatively, PEP argues that its claims are not time barred because the defendants' fraudulent concealment of their actions and/or the discovery rule defer the start of the limitations period

---

[122]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545.

[123]PEP's Dispositive Motion, Docket Entry No. 492, pp. 30-31; PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, pp. 22-25.

until PEP identified the entities and individuals who conspired to convert its condensate in the United States.[124]

For the reasons stated in § IV.B.4(b), above, the court has already concluded that the conversion claims asserted in this action accrued and limitations started to run on the dates that the defendants purchased allegedly stolen condensate because that is the date that the defendants caused the legal injury for which PEP seeks relief. The limitations period on PEP's claims for equitable relief, civil conspiracy, and violation of the Texas Theft Liability Act also begins to run when legal injury occurs, i.e., when defendants' conduct invades PEP's legal interest causing loss and damage. See Nelson v. American National Bank of Gonzales, 921 S.W.2d 411, 415 (Tex.App.—Corpus Christi 1996, no pet.) (citing Cathey v. First City Bank of Aransas Pass, 758 S.W.2d 818, 822 (Tex.App.—Corpus Christi 1988, writ denied)). Thus, unless subject to an exception, PEP's claims for conversion, equitable relief, civil conspiracy, and violation of the TTLA arising from any act committed more than two years prior to the filing of suit are barred by limitations. See Autry v. Dearman, 933 S.W.2d 182, 191 (Tex.App.—Houston [14th Dist.] 1996, writ denied) (causes of action for unjust enrichment based on allegations of money had and received arise when money is paid); Carroll v. Timmers Chevrolet,

---

[124]PEP's Dispositive Motion, Docket Entry No. 492, pp. 30-31; PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, pp. 25-28.

Inc., 592 S.W.2d 922, 925 (Tex. 1979) (It is not the agreement itself, but an injury to the plaintiff resulting from the underlying tort that gives rise to a cause of action for civil conspiracy.). For the reasons stated below, the court concludes that neither fraudulent concealment nor the discovery rule defer the limitations period from running on PEP's conversion claims against Murphy Energy.

(a) Fraudulent Concealment Does Not Defer PEP's Claims

PEP argues that the defendants' fraudulent concealment of their wrongful acts and identities defers the beginning of the limitations period. When applicable the equitable doctrine of fraudulent concealment estops a defendant from relying on limitations as a defense. In Borderlon, 661 S.W.2d at 908, the Texas Supreme Court noted that where a defendant is under a duty to make disclosure but fraudulently conceals the existence of a cause of action from the party to whom it belongs, the defendant is estopped from relying on the defense of limitations until the party learns of the right of action or should have learned thereof through the exercise of reasonable diligence. The doctrine is limited to those situations in which the defendant has a duty of disclosure, such as a physician to a patient, or an attorney to a client, or a fiduciary relationship exists. Id. In Velsicol, 956 S.W.2d at 531, the Texas Supreme Court explained that in cases involving fraud or fraudulent concealment accrual is deferred

-122-

"until the fraud is discovered or could have been discovered with reasonable diligence." PEP has neither alleged nor presented any evidence capable of establishing that Murphy Energy had a duty of disclosure to PEP. The doctrine of fraudulent concealment, therefore, is inapplicable to PEP's claims against Murphy Energy.

        (b)   The Discovery Rule Does Not Defer PEP's Claims

When the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable courts have applied the discovery rule as an exception to the "legal injury" rule of accrual. See Childs, 974 S.W.2d at 36-37. See also S.V., 933 S.W.2d at 4; Computer Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 456 (Tex. 1996). Asserting that "[k]nowing that property was stolen is not the same as knowing who bought the stolen goods, which could be decades later,"[125] PEP offers public policy arguments why the running of the limitations period should be deferred until PEP discovered the tortfeasors' identities.

As explained in §§ IV.B.4(c)(2) and IV.C.4(b), above, PEP has not cited and the court has not found any case in which a Texas court has applied the discovery rule to a case such as this in which the defendants' initial possession of the property at issue was unlawfully — as opposed to lawfully — acquired. See HECI, 982

---

[125]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 29.

S.W.2d at 886 (discovery rule is applied to categories of cases, not to particular cases); Steinhagen, 126 S.W.3d at 626-27 denied) (distinguishing between two classes of conversion cases: one where defendant's initial possession of property was lawfully acquired, and another where initial possession was unlawfully acquired). Conversion cases to which the discovery rule has been applied are cases where the defendant's initial possession of the property at issue is lawfully acquired, e.g., bailment cases. See Hofland, 834 S.W.2d at 414. The discovery rule does not apply to this case because it belongs to the class of cases where the defendants' initial possession of the property was unlawful. In this type of case the claims accrued and the limitations period began to run when the legal injury occurred. See Sunwest Bank, 939 S.W.2d at 674 (discovery rule not applicable to injury caused by embezzelment); Autry, 933 S.W.2d at 192-93 (discovery rule not applicable to cause of action for conversion of lawsuit proceeds subject to subrogation); Rogers, 930 S.W.2d at 166 (discovery rule not applicable to conversion of oil and gas produced under void lease). Ayers, Civil Action No. 07-04-0383, 2006 WL 435026, at *2 (discovery rule not applicable to toll limitations until plaintiff learned identity of thief).

Even if this were a case to which the discovery rule applied, that rule would not defer running of the limitations period for PEP's conversion claims against Murphy Energy. Because PEP has invoked the discovery rule as a means to avoid being barred by

limitations, PEP is not only required to show that the discovery rule applies to this case, but also to present evidence capable of establishing that PEP acted with diligence after being put on inquiry notice. Here, PEP alleges that it brought suit "within two years after PEP knew, or by the exercise of reasonable diligence should have known, of the facts giving rise to PEP's claims against the Defendants. Therefore, limitations have been tolled as to those claims by the 'discovery rule.'"[126]   PEP argues that limitations should be tolled until it had an opportunity to discover not only that its condensate had been stolen and converted but also the identities of the responsible parties.

Under Texas law all that is required to commence the running of the limitations period is the discovery of an injury and its general cause, not the exact cause in fact and the specific parties responsible. See Russell, 841 S.W.2d at 344 n.3 ("limitations begin to run when the fact of injury is known," Moreno, 787 S.W.2d at 351, not when the alleged wrongdoers are identified"); Childs, 974 S.W.2d at 40 (discovery rule delays accrual of cause of action until plaintiff knew or should have known of its injury, not the identity of the wrongdoer). The discovery rule does not apply to defer limitations for PEP's claims against Murphy Energy because both PEP's injury and its general cause were known by PEP long before PEP filed suit against these defendants.

---

[126]Id. at 32 ¶ 177.

PEP's knowledge that its condensate was being converted by sale in the United States is sufficient to trigger the running of limitations because — by PEP's own admissions — PEP was aware of its injury and the general cause at or near the time of the conversions. Moreover, PEP has failed either to argue or to present any evidence from which a reasonable fact-finder could conclude that had PEP exercised reasonable diligence PEP could not have discovered BASF's and BFLP's purchases within the two-year period following the dates on which those purchases occurred. The discovery rule only defers accrual until the discovery of the injury; it does not operate to toll the running of the limitations period until such time as plaintiff discovers all of the elements of a cause of action. See Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co., 866 S.W.2d 740, 743 (Tex.App.-Houston [14th Dist.] 1993, writ denied). Accordingly, the court concludes that the discovery rule does not apply to defer the running of limitations for PEP's conversion claims against Murphy Energy.

## 2. Whether PEP Can Trace Stolen Property to Murphy Is a Fact Issue for Trial

As stated in § IV.B.3, above, in order to hold any individual defendant liable for conversion PEP must trace condensate that was actually stolen in Mexico to the individual defendant. PEP must also present evidence from which a fact-finder could form a reasonably certain estimate of the amount of stolen condensate, if any, that each defendant converted. See Ortiz Oil, 141 S.W.2d at 1055. The amount of condensate converted is not required to be

proven with exact certainty, only with reasonable certainty. See Southwest Battery, 115 S.W.2d at 1097. PEP's contention that "when the defendants mixed PEP's condensate with other hydrocarbons, PEP became owner of its proportionate share of the mixed product as a whole, not just the individual molecules that were drawn from Mexican soil,"[127] does not absolve PEP from having to identify its stolen condensate and trace it to the defendants.

Murphy Energy argues that it is entitled to summary judgment on PEP's conversion claims because

> PEP alleges that Murphy purchased stolen Mexican condensate from July 2006 through March 2009, from suppliers Continental, Hutchison Hayes, M&B Trading, Trinity Partners/Alliance Energy Corp. and Valley Fuels. . . . PEP has no evidence that Murphy actually purchased Mexican condensate from any of these entities, or that any Mexican condensate that Murphy purchased (if any) was the identical condensate stolen from PEP. PEP and its witnesses have admitted that PEP cannot trace any condensate stolen from PEP to any specific purchase of hydrocarbons by Murphy, and PEP has no other evidence to show that the hydrocarbons purchased by Murphy are the same barrels of condensate stolen from PEP. . . As a result, PEP cannot satisfy its burden of proof and its conversion and constructive trust claims should be dismissed.[128]

The court has concluded that PEP's claims against Murphy Energy for conversion, equitable relief, civil conspiracy, and violation of the TTLA arising from acts that occurred more than two years before PEP filed suit against Murphy Energy are time barred. Therefore, only three of the BASF purchases of condensate allegedly

---

[127]PEP's Reply in Support of Its Dispositive Motion, Docket Entry No. 577, p. 3.

[128]Murphy's MSJ, Docket Entry No. 479, p. 20.

supplied to Trammo by Murphy Energy listed in PEP's Third Amended Complaint remain viable, i.e., one purchase in February of 2009 and two purchases in March of 2009. The only evidence that PEP cites that would allow a reasonable fact-finder to conclude that the condensate that Murphy Energy supplied to Trammo was stolen is cited in PEP's Dispositive Motion (Docket Entry No. 492).

In its Dispositive Motion PEP cites the deposition testimony of Continental Fuels president, Timothy Brink, as evidence that Murphy Energy acquired the condensate that it sold to Trammo from Continental Fuels, and that all of the condensate that Continental Fuels sold to Murphy Energy was stolen Mexican condensate. Brink testified that in July of 2008 his employee, Josh Crescenzi, told him that the product he was purchasing was stolen from Mexico.[129] Brink also testified that once he looked closely at the paperwork documenting shipments of product that he bought from Mexico the number of discrepancies he spotted caused him to realize that the product was stolen.[130] As additional evidence that the product being sold by Continental Fuels was stolen, PEP cites the transcript from the court proceeding in which Arnoldo Maldonado of

---

[129]PEP's Dispositive Motion, Docket Entry No. 492, p. 4 (citing Deposition of Timothy Brink, Exhibit 10, Docket Entry No. 492-12, pp. 13-14).

[130]See PEP's Reply in Support of Its Dispositive Motions, Docket Entry No. 577, pp. 15-16 (citing Deposition of Timothy Brink, Exhibit 39 to PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 546-10, pp. 33-44).

Y Gas & Oil pleaded guilty for his role in supplying stolen Mexican condensate to Continental Fuels.[131]

As evidence for the amount of stolen condensate that Murphy Energy purchased, PEP cites the affidavit of Murphy Energy's Executive Vice-President, Greg Westfall, who described purchases of Mexican condensate that Murphy made in 2009:

> 13.  In early 2009, Donald Schroeder—the then-president of Trammo—contacted Murphy Energy via instant message (under the username "big_daddy77079"), stating that condensate was about to start flowing across the United States border again at Brownsville, Texas. Schroeder states that, although Continental Fuels, Inc. had suppliers lined up, it did not have the cash liquidity to purchase the condensate on a daily basis. Schroeder asked whether Murphy Energy was interested in purchasing the condensate under the same commercial conditions as before, except that the storage facility would be that owned by Continental Fuels, Inc. in Brownsville, Texas instead of the TransMontaigne facility previously used by Murphy Energy. Schroeder also informed Murphy Energy that Trammo would purchase the condensate delivered to Port Arthur, Texas under terms essentially the same as before.

> 14.  Both Tim Brink, President of Continental, and Josh Crescenzi, Vice President of Operations of Continental, contacted Murphy Energy immediately after the discussions with Schroeder and described the potential transaction in a similar way.

> 15.  In 2009, Murphy Energy purchased condensate as follows:

---

[131]Id. (citing Transcript of Arnoldo Maldonado Rearraignment, Exhibit 12 to PEP's Dispositive Motion, Docket Entry No. 492-14).

| Purchase Date | Volume (Barrels) | Purchase Price |
|---|---|---|
| January 2009 | 17,745.29 | $625,589.38 |
| February 2009 | 30,276.04 | $1,051,523.15 |
| March 2009 | 20,854.34 | $843,465.07 |
| **TOTAL** | **68,875.67** | **$2,520,577.60** |

16. Murphy Energy sold the condensate it purchased in 2009 for a total of $3,066,903.00. . .[132]

Although not dispositive, this evidence is sufficient to raise a fact issue as to whether Murphy Energy purchased reasonably ascertainable quantities of stolen Mexican condensate in 2009. Accordingly, the court concludes that Murphy Energy is not entitled to summary judgment on grounds that PEP is unable either to trace the stolen condensate to it or to establish a reasonably certain estimate of the amount of stolen condensate, if any, that Murphy Energy converted.

3. <u>Murphy Energy Is Not Entitled to Summary Judgment on PEP's Claims for Civil Conspiracy</u>

"An actionable civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." <u>Massey</u>, 652 S.W.2d at 934. PEP alleges that the object and purpose of the conspiracy was "committing of common law conversion of PEP's condensate and the defrauding of end-users which would not have knowingly purchased

---

[132]Declaration of Greg Westfall, Exhibit 21-2 to PEP's Dispositive Motion, Docket Entry No. 493-1, p. 3 ¶¶ 13-16.

stolen product."[133]  Murphy Energy argues that it is entitled to summary judgment on PEP's claim for conspiracy because "[t]here is no evidence that Murphy had knowledge of a conspiracy to convert PEP's condensate and defraud end users.  There is, however, overwhelming evidence that Murphy never believed that the product that it was buying was stolen."[134]  PEP responds that not only is there ample evidence that Murphy knew the condensate was stolen, but that the same evidence establishes a conspiracy.  PEP explains that "[t]hese defendants knew they were buying and selling stolen goods.  Knowing the goods were stolen, the defendants had to know that someone stole the goods, and with that knowledge, they agreed to buy the goods and join in the conspiracy."[135]

As evidence that Murphy Energy knew about the conspiracy to convert PEP's condensate and defraud end users,  PEP cites the deposition of Continental Fuels' president, Timothy Brink, who named Murphy Energy's president, Greg Westfall, as one of his co-conspirators:[136]

---

[133]Third Amended Complaint, Docket Entry No. 220, p. 35 ¶ 201.

[134]Murphy's MSJ, Docket Entry No. 479, p. 30.

[135]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 33.

[136]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 32 (citing Deposition of Timothy Brink, Exhibit 39, Docket Entry No. 546-10, p. 29).

Q.    The elements, as outlined by the Judge, of the
      conspiracy to commit the crime of dealing in
      stolen products were:  One, that two or more
      persons made an agreement to commit the crime of
      receiving, possessing or selling stolen goods as
      charged.

      Was that true, that you had two or more persons
      that made such an agreement?

A.    Yes.

Q.    Were the individuals who made that agreement the
      ones you just mentioned, Greg Westfall, Don
      Schroeder,    Steve    Pechenik,    [and]    Arnoldo
      Maldonado?

A.    Yes.[137]

.  .  .

Q.    Is there any doubt in your mind of the people that
      you named as your co-conspirators, Greg Westfall,
      Don Schroeder, Arnoldo Maldonado and the Marin
      brothers, that they knew there was a criminal
      conspiracy to import stolen Mexican condensate?

A.    Absolutely none.[138]

PEP cites the deposition testimony of Murphy's Greg Westfall

as evidence that Murphy admitted that it sold Mexican condensate

after receiving credible information that the condensate was

stolen.    Westfall testified that in April of 2009 Murphy's

customer, Trammo, informed Murphy that it would no longer accept

delivery of condensate from Murphy unless Murphy could provide a

---

[137]Deposition of Timothy Brink, Exhibit 39 to PEP'S Opposition
to Defendants' Dispositive Motions, Docket Entry No. 546-10,
p. 29:3-14.

[138]Id. at 75:25-76:6.

-132-

certificate of origin and proof of title to the condensate.
Westfall explained that Trammo's refusal to accept delivery of
condensate followed Trammo's receipt of notice from the
United States government that Murphy's condensate had been stolen
from Pemex.[139]    Westfall testified that Murphy had neither
certificates of origin nor proofs of title for the condensate that
it had sold to Trammo.[140]  Westfall also testified that following
Trammo's refusal to accept delivery of condensate Murphy had in
storage, Murphy sold that condensate to AGE Refining without
telling AGE Refining that Murphy had received notice that the
condensate had been stolen from Pemex:

> Q.    . . . When Trammo advised Murphy in April of 2009
> that the U.S. government had advised Trammo that
> PEMEX had advised the U.S. government that the
> condensate had been stolen, Trammo notified Murphy
> of those facts -- of those allegations?
>
> A.    Trammo notified Murphy of what they said they had
> been told, yes.
>
> Q.    And at that point Murphy still had some condensate
> that it had purchased from Continental but not yet
> sold to Trammo. Correct?
>
> A.    Correct.
>
> Q.    And, in fact, in that same notification Trammo
> said it would not purchase the condensate because
> of those facts that the U.S. government had told

---

[139]Deposition of Gregory A. Westfall, Exhibit 36 to PEP's
Opposition to Defendants' Dispositive Motions, Docket Entry
No. 546-7, pp. 109-114.

[140]Id. at 114:1-7.

        — or allegations that the U.S. government had told
        Trammo.  Correct?

A.    I believe that's correct.

Q.    And then Murphy sold that remaining condensate
        after receiving that notice to AGE refinery?

A.    Yes.

Q.    Now, at the time that Murphy sold that to AGE
        refinery, did Murphy tell AGE what Murphy had
        learned from Trammo?

A.    No.

Q.    Before that time, it is your testimony that Murphy
        had no idea, no indication that anyone was
        claiming that the condensate Murphy was purchasing
        had been stolen from PEP?

A.    That's correct.[141]

Murphy Energy's contention that it had no knowledge that the condensate it was purchasing was stolen from PEP is contradicted by the presence and participation of Westfall and two other Murphy employees in a lunch meeting with Continental employees Tim Brink and Josh Crescenzi, and Trammo president, Donald Schroeder, on February 3, 2009. The conversation at the lunch was taped during the United States' criminal investigation:[142]

Josh
Crescenzi:  Yeah.  I mean the biggest problem down there
          right now is a lot of the guys who used to
          run the product.  M&B.  Uh, they aren't doing

---

[141]Id. at 123:12-124:15.

[142]Transcript of Taped Conversation, Tuesday, February 3, 2009, Exhibit 41 to PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 546-12.

it anymore. Ah, they've pretty much gone in and the Cartel has switched up everybody who was running product. It's all new people. They're very inexperienced. Ah, they're pulling, ah, all right we're going to send you a truck with 12 inches of water and, and so I say, you send me a truck that's fine, I'm gonna refuse it and they don't understand that you just go down the street. You open your valve. You drain your water out and bring it back. I mean, it's, it's bullshit and I'm basically retraining a bunch of drug dealers, I mean.

Greg
Westfall: The Cartel probably kicked everybody out that are having all the problems with volumes or and everything else.

Josh
Crescenzi: Exactly.

Tim Brink: You know the other guys at least, you know.

Josh
Crescenzi: They were semi-businessmen.

Tim Brink: They were smart enough to know and they didn't care, you know, if they had water in their truck, before they crossed the border, they would, you know, dump the water. Cause sometimes (inaudible) water.

Josh
Crescenzi: Now the other big problem that they are experiencing right now is, ah, all the government officials that are, you know, getting the bribes. They haven't dropped their price down, so they're still getting paid based on $140 oil, so.

Greg
Westfall: Oh, God!

Josh
Crescenzi: Basically there's very little profit for those guys to actually bring the product over to us, because.

> Tim Brink: Like I say, they're, they're getting better
> now.  We talked to them and they're, they're
> actually starting to save these guys some
> prices like, you know, there's a guy at the
> bridge, you know, ah, you know, who only
> makes 2,000 bucks a crossing.[143]

When asked about the transcript of the February 3, 2009, lunch

meeting, Tim Brink testified:

> Q.   Did you have enough discussions with Greg Westfall
>      to recognize his voice?
>
> A.   Oh, yeah, absolutely.  I know Greg.
>
> Q.   Was Greg Westfall the person who said, as
>      indicated by the transcript, "The cartel probably
>      kicked everybody out they were having all the
>      problems with, volumes or everything else"?
>
> A.   Yeah, that was Greg's voice.
>
> Q.   Do you have any memory of whether Greg Westfall
>      expressed surprise that the cartels were involved
>      in the importation of Mexican condensate?
>
> A.   No.  I don't think anybody at that table was
>      surprised about anything.
>
> Q.   Okay.  Was this discussion part of the conspiracy
>      to import stolen product?
>
> A.   Yes.
>
> Q.   Did -- was -- was Greg Westfall the person who
>      exclaimed, "Oh, God," after discussing the amount
>      of the bribes being paid by officials?
>
> A.   Yes.
>
> Q.   Did you have an impression at the time whether he
>      was surprised about the fact that bribes were
>      being paid or the amount of the bribes?
>
> A.   The amount of the bribes.

---

[143]Id. at 19-20.

. . .

Q.    Okay.  You understood that bribes were being paid
      by the people bringing the condensate --

A.    Yes.

Q.    -- over to you?

A.    Yes.

      . . . Objection

Q.    Do you believe that it was true that bribes were
      paid to get the condensate out of Mexico and into
      the United States?

      . . . Objection, form.

A.    Had to be.

Q.    Okay.

A.    No other way to do it.

Q.    All right.  Did you have discussions with Greg
      Westfall, Don Schroeder, and Steve Pechenik about
      the fact that bribes were being required to be
      paid to get the product in? Not that you paid
      them, but that somebody paid them?

A.    Yes.[144]

     The evidence quoted at length above raises fact issues for

trial that preclude the court from granting Murphy Energy summary

judgment on PEP's civil conspiracy claim.

        4.    Murphy Energy Is Not Entitled to Summary Judgment on
              PEP's Claims for Violation of the TTLA

     To prevail on its claim for violation of the TTLA PEP must

show that (1) PEP had a possessory right to property; (2) Murphy

_____

[144]Deposition of Timothy Brink, Exhibit 39 to PEP'S Opposition
to Defendants' Dispositive Motions, Docket Entry No. 546-10,
pp. 59:19-61:25.

Energy unlawfully appropriated property in violation of the Texas Penal Code; and (3) PEP sustained damages as a result of the theft. Tex. Civ. Prac. & Rem. Code §§ 134.002(2), 134.003; Tex. Penal Code § 31.03(a). Murphy Energy argues that it is entitled to summary judgment on PEP's claim for violation of the TTLA because "the evidence shows that Murphy did not know the product was stolen."[145] The evidence cited at length in § IV.E.2-3, above, also raises fact issues that preclude the court from granting Murphy Energy summary judgment on PEP's claim for violation of the TTLA because, if believed, this evidence would allow a reasonable fact-finder to conclude that Murphy Energy unlawfully appropriated property in violation of the Texas Penal Code to which PEP had a possessory right and that Murphy Energy's actions damaged PEP.

     5.    <u>Murphy Energy Is Not Entitled to Summary Judgment on Transactions for Which PEP Has Received Restitution</u>

Citing <u>Stewart Title Guar. Co.</u>, 822 S.W.2d at 7, Murphy Energy argues that it is entitled to summary judgment on PEP's conversion, equitable relief, and TTLA claims that are not barred by the statute of limitations. Murphy Energy argues that

> PEP, by its own calculations, received $2,415,635.72 in restitution for the $2,415,635.72 worth of PEP condensate that was sold to BASF during January-March 2009. Ex. N

---

[145]Murphy's MSJ, Docket Entry No. 479, p. 28 (citing Depositions of Gregory A. Westfall, Exhibit OO, Docket Entry No. 479-40, pp. 86:8-16, 124:11-15, 133:14-19, 159:17-21, and 162:15-21; Carter Simmons, Exhibit PP, Docket Entry No. 479-41, pp. 50:9-25; and Grant Simmons, Exhibit QQ, Docket Entry No. 479-42, p. 16:16-19).

at Response to Interrogatory No. 10; Ex. L. at Response No. 35. According to PEP, this is the same condensate that Murphy purchased from Continental and sold to Trammo, who subsequently sold the condensate to BASF. PEP has therefore received full restitution for the condensate Murphy purchased and sold to Trammo in 2009 and is therefore prohibited from seeking a further recovery.[146]

Murphy Energy argues that PEP has been compensated for damages traceable to Murphy Energy by sums received from the United States Treasury in connection with civil forfeitures involving Sun Petroco, LLC and Luis Ariel Rivera, Trammo, and TransMontaigne.[147] For the reasons stated in § IV.C.6, above, with respect to the same argument made by BASF and BFLP, Murphy Energy is not entitled to summary judgment on this basis. The allocation of settlement credits, if any, is an issue to be reached at trial, not on summary judgment.

6. Murphy Energy Is Entitled to Summary Judgment on PEP's RICO Claims

RICO provides civil causes of action for recovery of treble damages for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). PEP alleges that the Conspiring Defendants created an association-in-fact enterprise and that "[t]he enterprise had a distinct purpose—to import, distribute and fraudulently market stolen condensate in the United Sates and then to launder the

---

[146]Murphy's MSJ, Docket Entry No. 479, pp. 36-37.

[147]Id.

-139-

proceeds of those illegal sales."[148] PEP alleges that the conduct
of the Conspiring Defendants violates 18 U.S.C. §§ 1962(c) and (d).
These subsections state:

- (c) It shall be unlawful for any person employed by or
associated with any enterprise engaged in, or the
activities of which affect, interstate or foreign
commerce, to conduct or participate, directly or
indirectly, in the conduct of such enterprise's
affairs through a pattern of racketeering activity
or collection of unlawful debt.

- (d) It shall be unlawful for any person to conspire to
violate any of the provisions of subsection . . .
(c) of this section.

18 U.S.C. §§ 1962(c) and (d). To state a prima facie claim
pursuant to any RICO subsection, PEP must allege facts capable of
establishing "(1) a *person* who engages in (2) a *pattern of
racketeering activity* (3) connected to the acquisition,
establishment, conduct, or control of an *enterprise*." St. Paul
Mercury Insurance Co. v. Williamson, 224 F.3d 425, 439 (5th Cir.
2000)(quoting Delta Truck & Tractor, Inc. v. J.I. Case Co., 855
F.2d 241, 242 (5th Cir. 1988), cert. denied, 109 S.Ct. 1531
(1989)). See also St. Germain v. Howard, 556 F.3d 261, 263 (5th
Cir.), cert. denied, 129 S.Ct. 2835 (2009).

Citing Reves v. Ernst & Young, 113 S.Ct. 1163 (1993), Murphy
Energy argues that to hold it liable for a substantive RICO
violation, PEP must produce evidence that Murphy Energy played
"some part in *directing* the enterprises's affairs. . . . It is not

---

[148]Third Amended Complaint, Docket Entry No. 220, pp. 35-36
¶ 205.

enough to show that Murphy provided services that were used by the purported enterprise, because that is not the same as directing the affairs of the enterprise."[149]  In <u>Reves</u> the Supreme Court held that "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself."  <u>Id.</u> at 1173.  Without citing any specific evidence, PEP asserts that Murphy bought and sold millions of dollars in condensate and met directly with other members of the association-in-fact enterprise to coordinate their illegal conduct.  In this way, Murphy partici-pated in the scheme, as that term is defined in *Reves*."[150]  Evidence showing that Murphy Energy bought and sold millions of dollars of condensate and met with others to coordinate their sales and purchases merely show that Murphy conducted its commercial business of buying, selling, transporting, and storing hydrocarbons; it is not evidence that Murphy Energy had any part in directing or influencing the affairs of the purported RICO enterprise. Accordingly, the court concludes that Murphy Energy is entitled to summary judgment on PEP's substantive RICO claim.

Alternatively, the court concludes that Murphy Energy is entitled to summary judgment on PEP's substantive RICO claim because PEP has failed to cite evidence capable of establishing

---

[149]Murphy Energy's MSJ, Docket Entry No. 479, p. 32.

[150]PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 34.

that Murphy's conduct was the cause of PEP's injuries under RICO. The RICO causation analysis focuses on "the directness of the relationship between the conduct and the harm." Hemi Group, LLC v. City of New York, N.Y., 130 S.Ct. 983, 990 (2010). PEP acknowledges that there is no direct relationship between Murphy Energy's conduct and the thefts of PEP condensate. Murphy Energy's conduct was not the cause of PEP's injuries under RICO because Murphy was, at best, several transactions removed from the theft of condensate that actually injured PEP. See id. at 992 (dismissing RICO claims on causation grounds because the plaintiff's "theory of liability rests on the independent actions of third and even fourth parties"); Proctor & Gamble Co. v. Amway Corp., 242 F.3d 539, 565 (5th Cir.), cert. denied, 122 S.Ct. 329 (2001) (injury to plaintiff did not flow directly from defendant's conduct, and thus "there [were] too many intervening factors for proximate causation to be proven").

"To demonstrate a civil RICO conspiracy, a claimant must show that: (1) two or more persons agreed to commit a substantive RICO offense, and (2) the defendant knew of and agreed to the overall objective of the RICO offense." See Davis-Lynch, Inc. v. Moreno, 667 F.3d 539, 551 (5th Cir. 2012) (citing Chaney v. Dreyfus Service Corp., 595 F.3d 219, 239 (5th Cir. 2010)).

A person need not commit or agree to commit the requisite two or more predicate acts of 'racketeering activity' to be held criminally liable as a conspirator under RICO. To have standing to establish a civil RICO conspiracy, however, a claimant must allege injury from an act that

-142-

is independently wrongful under RICO. Injury caused by acts that are not racketeering activities or otherwise wrongful under RICO will not establish a viable civil RICO claim.

Id. at 551-52 (citing Beck v. Prupis, 120 S.Ct. 1608, 1616 (2000) ("[A] civil conspiracy plaintiff cannot bring suit under RICO based on injury caused by *any* act in furtherance of a conspiracy that might have caused the plaintiff injury. Rather, such plaintiff must allege injury from an act that is analogous to an 'ac[t] of a tortious character,' . . . meaning an act that is independently wrongful under RICO."). The Fifth Circuit has stated that "the core of a RICO civil conspiracy is an agreement to commit predicate acts, [therefore] a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1140 (5th Cir. 1992). PEP has failed to offer evidence from which a reasonable fact-finder could conclude that Murphy Energy agreed to commit a substantive RICO offense and knew of and agreed to the overall objective of the RICO offense. Absent such evidence PEP's claim against Murphy Energy for RICO conspiracy fails as a matter of law. See Nolen v. Nucentrix Broadband Networks Inc., 293 F.3d 926, 930 (5th Cir.), cert. denied, 123 S.Ct. 600 (2002) (acknowledging that failure to plead and prove the requisite elements of another § 1962 violation implicitly means plaintiff cannot plead a conspiracy to violate that section under § 1962(d)). Accordingly, Murphy Energy is entitled to summary judgment on PEP's RICO conspiracy claim.

-143-

**F. Superior Crude and Jeff Kirby**

PEP first asserted claims against Superior Crude Gathering and
its owner-operator, Jeff Kirby, in the Original Complaint filed on
May 29, 2011, in the Big Star action, (Docket Entry No. 1 in Civil
Action No. H-11-2019). PEP alleges that

84. Superior Crude is owned and operated by Kirby.
    Kirby is individually liable for Superior Crude's
    actions because no corporate distinction should be
    recognized between them; they are and were alter
    egos, in part because Superior Crude was utilized
    for an illegal purpose and as a sham to perpetrate
    a fraud. Kirby also actively participated in, and
    directed, Superior Crude's conduct.

85. Superior Crude voluntarily joined the conspiracy
    to market and distribute stolen PEP condensate.

86. Superior Crude bought and sold stolen condensate
    worth at least $52 million.

87. In addition, Superior was a major distributor of
    stolen PEP condensate. Superior Crude distributed
    stolen condensate worth millions of dollars.
    Superior operated barges and tugs to transport the
    stolen condensate from storage facilities in
    Brownsville, Texas and Rio Hondo, Texas to
    purchasers' facilities in Sun Nederland and
    Port Arthur, Texas. The coordinator for these
    shipments was usually Donald Schroeder of Trammo
    Petroleum. Schroeder has pleaded guilty to felony
    conspiracy to receive and sell stolen property,
    specifically Mexican condensate, in his role as
    president of Trammo Petroleum.

88. Additionally, Superior Crude brokered transactions
    involving the sale and purchase of stolen
    condensate.

89. A typical transaction in which Superior Crude
    profited from shipping stolen condensate is its
    shipment, on behalf of Trammo Petroleum, of over
    24,000 barrels to Port Arthur in December 2008.

90. Superior Crude knew that the condensate it was
    buying, selling and distributing was stolen. In

the alternative, Superior Crude either consciously disregarded the fact that the condensate was stolen or should have known that the condensate was stolen.

91.    As to each of its own purchases and sales of PEP condensate, Superior Crude committed at least the following acts in furtherance of the conspiracy: (a) defrauded the ultimate purchaser of the source and patrimony of the condensate in violation of state law and the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343; (b) knowingly engaged in transactions involving stolen goods in violation of 18 U.S.C. § 2314 and 2315 and the Texas Theft Liability Act (or TTLA), Tex. Civ. Prac. & Rem. Code § 134.001-.005; and (c) committed money laundering in violation of 18 U.S.C. § 1956.

92.    As to its transportation services, Superior Crude likewise committed specific acts in furtherance of the conspiracy, including violations of 18 U.S.C. §§ 2314—which applies to "Whoever transports, transmits, or transfers in interstate or foreign commerce any goods . . . knowing the same to have been stolen, converted or taken by fraud"—and 2315—which applies to taking possession of property "knowing the same to have been stolen, unlawfully converted, or taken"—and the Texas Theft Liability Act (or TTLA), Tex. Civ. PRac. & Rem. Code § 134.001-.005.

93.    Superior Crude was aware that the conspiracy was much larger than its individual participation and that for the conspiracy to succeed, additional criminal conduct was needed to conceal the conspiracy from PEP, its customers, and from US and Mexican authorities, including the bribery of government officials and the forging of documents.

94.    Superior Crude is responsible for all damages inflicted on PEP from the larger conspiracy. Alternatively, Superior Crude is liable for all of its transactions involving the stolen property of Mexico, including the transactions in which it transported or brokered sales.[151]

---

[151]First Amended Complaint, Docket Entry No. 378, pp. 16-18 ¶¶ 84-94.

-145-

Based on these allegations of fact, PEP has asserted claims against
Superior Crude Gathering, Inc. and Jeff Kirby for conversion, for
equitable relief including constructive trust based on theories of
money had and received and unjust enrichment, civil conspiracy, and
violation of the TTLA.

Superior Crude Gathering and Jeff Kirby argue that they are
each entitled to summary judgment because

> [t]he undisputed evidence in this case establishes that
> all of Superior's alleged purchases and sales of Mexican
> condensate occurred by December 10, 2008 at the latest.
> Accordingly, and because PEP did not file suit against
> Superior until May 29, 2011, all of its claims are time-
> barred as a matter of law.
>
> Although PEP pleads the discovery rule in an
> attempt to avoid the obvious time bar, that doctrine
> applies only if the nature of the injury incurred is
> inherently undiscoverable and the injury is objectively
> verifiable. Here, the discovery rule is inapplicable
> because PEP's injuries are not inherently undiscoverable
> under Texas law. And, even if the discovery rule could
> apply to PEP's claim, PEP has admitted that it knew that
> its condensate was being stolen and sold in the United
> States long before May 29, 2009. . . Finally, there is no
> evidence that Superior fraudulently concealed any of its
> activities, so that avenue of rescuing time-barred claims
> is unavailable to PEP as well.[152]

In support of the argument that PEP's claims against them are
time barred, these defendants argue that PEP "claims that Superior
is liable for numerous alleged stolen condensate sales and
purchases occurring between October 2006 and December 2008. *See*

---

[152]Defendants Superior Crude Gathering, Inc. and Jeff Kirby's
Motion for Summary Judgment ("Superior's and Kirby's MSJ"), Docket
Entry No. 486, p. 3.

-146-

Ex. A at pp. 516:25-518:1; Ex. B at p. 21 ¶¶ 52-53."[153]   Exhibit B

is the Expert Report of PEP experts Brent Bersin and Joseph

Wilkinson, dated October 8, 2012.  Regarding the purchases made by

Superior the Expert Report states:

> 52.   We have examined documents related to Superior,
> including invoices and settlement summaries.  For
> purposes of our analysis, we have assumed that any
> references to products sourced from Mexico
> reflected in Superior's invoices represent Mexican
> Condensate.
>
> 53.   Based on our analysis, Superior purchased
> approximately 312,000 barrels of Mexican
> Condensate totaling over $27.4 million from
> October 2006 to December 2008 (See Exhibit I).
>
> 54.   We have also identified about 342,000 barrels
> totaling approximately $28.1 million of
> potentially Mexican Condensate purchased by
> Superior (See Exhibit I).  To the extent that
> Superior blended or purchased blended product
> which included the Mexican Condensate, at this
> time we do not have sufficient information to
> determine the amount of Mexican Condensate which
> comprises the blended product.[154]

Exhibit A is the deposition of PEP's expert Joseph L.

Wilkinson who testified that he had no reason to believe that in

2006, 2007, or 2008 Jeff Kirby or other representatives of Superior

knew that the condensate they were purchasing was stolen, and that

his comments about whatever Superior did or did not do all dealt

with conduct and purchases that occurred before December of 2008.[155]

---

[153]Id. at 8.

[154]Expert Report of Brent Bersin & Joseph Wilkinson, Exhibit B
to Superior's and Kirby's MSJ, Docket Entry No. 486, pp. 21-22.

[155]Deposition of John L. Wilkinson, Exhibit A to Superior's and
Kirby's MSJ, Docket Entry No. 486, pp. 516-18.

Although PEP cites to Kirby's deposition as evidence that Kirby "admits to having bought and sold condensate after the government informed him that it was stolen,"[156] that testimony confirms Wilkinson's testimony that Superior has not engaged in any conduct related to sales or purchases of stolen Mexican condensate since December of 2008:

> Q.     Okay.   When was your last purchase . . . of
>        Mexican condensate?
>
> A.     In December of 2008.
>
> Q.     Okay.  Do you remember what date, more or less?
>
> A.     I -- I don't remember exactly the date, but we
>        were put on notice somewhere around December the
>        8th to the 10th, 2008.
>
> Q.     Did you purchase any Mexican condensate after you
>        were put on notice?
>
> A.     Not with -- not that we were aware of.
>
> Q.     Okay.  Did you purchase from any of the -- did you
>        purchase anything from any of the suppliers who
>        had been selling Mexican condensate to you prior
>        to December of 2008 --
>
> A.     The PEPCO5 --
>
> Q.     -- after the notice?
>
> A.     The PEPCOs and Ys?
>
> Q.     Any supplier that supplied Mexican condensate to
>        you before December of 2008, did you purchase
>        anything from them --
>
> A.     Not that I'm aware of.
>
> Q.     -- after McAllister's notice?

---

[156] PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 545, p. 33.

A.     Not that we're aware of.

Q.     Is the first time that DOJ or ICE, or any part of
       the U.S. Government, put you on notice regarding
       the condensate, was that -- was the first time
       that ever happened in December 8th or 10th, 2008?

A.     No, it was late October 2008.[157]

PEP acknowledges in its response that the claims asserted against Superior and Kirby are governed by Texas' two-year statute of limitations, Tex. Civ. Prac. & Rem. Code § 16.003(a); and PEP does not dispute Superior's and Kirby's assertions that neither of them had any connection with PEP's condensate in the two years before PEP filed against them, i.e., after May 29, 2009. PEP's only argument against granting these two defendants summary judgment based on limitations is PEP's general argument that the claims asserted against all the defendants named in this action are not time barred because the running of limitations is deferred by fraudulent concealment and the discovery rule. Based on the legal analysis stated in §§ IV.B.4(c), IV.C.4(a), and IV.E.1, the court concludes that the claims asserted against Superior Crude Gathering and Jeff Kirby are time barred because PEP has failed to allege facts or present any evidence capable of establishing that either of these defendants had any connection to stolen condensate within two years of the dates on which PEP filed suit against them.

---

[157]Deposition of Jeff Kirby, Exhibit 43 to PEP's Opposition to Defendants' Dispositive Motions, Docket Entry No. 546, pp. 183:8-184:10.

Fraudulent concealment does not prevent Superior Crude Gathering or Jeff Kirby from relying on the limitations defense because PEP has neither alleged nor cited any evidence capable of establishing that either of them concealed any facts from PEP or had a fixed purpose to conceal the wrongs alleged. Moreover, PEP's expert, Joseph Wilkinson, testified at his deposition that he had no reason to believe that in 2006, 2007, or 2008 Jeff Kirby or other representatives of Superior knew that the condensate they were purchasing was stolen.[158]

The discovery rule does not prevent Superior Crude or Jeff Kirby from relying on the limitations defense because the evidence already cited in §§ IV.B.4(c)(2), IV.C.4(b), and IV.E.1(b) shows that PEP was well aware that Mexican condensate was being stolen in Mexico and converted in the United States more than two years before PEP filed suit against Superior Crude Gathering and Jeff Kirby. The critical inquiry for accrual when the discovery rule is implicated is when the claimant discovered or using reasonable diligence should have discovered the wrongfully caused injury. See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 749 (Tex. 1999). For the reasons explained above, the court concludes that PEP has failed either to allege any facts or to cite any evidence capable of establishing that PEP did not know or with

---

[158]Deposition of John L. Wilkinson, Exhibit A to Superior's and Kirby's MSJ, Docket Entry No. 486, pp. 517-18.

the exercise of reasonable diligence could not have known about the injuries for which relief is being sought in this action. Accordingly, the court concludes that Superior Crude Gathering and Jeff Kirby are entitled to summary judgment because the claims alleged against them are all barred by Texas' two-year statute of limitations.

## G. Third-Party Defendant Donald Schroeder's Motion for Partial Summary Judgment

Third-party defendant Donald Schroeder seeks partial summary judgment on cross-claims asserted against him by Murphy Energy and BFLP for indemnity, contribution, and breach of warranty.

PEP alleged claims against Schroeder in the Original Complaint filed in the BASF action. On May 29, 2009, Schroeder pleaded guilty to knowingly conspiring to receive and sell stolen condensate. In September of 2010 PEP voluntarily dismissed all of its claims against Schroeder.[159] Shortly thereafter, PEP agreed to dismiss all of its claims against Schroeder's employer, Trammo.[160] Murphy Energy and BFLP asserted cross-claims against Schroeder.

---

[159]See PEP's Notice of Voluntary Dismissal of Defendant Donald P. Schroeder, Jr. Pursuant to Rule 41(a)(1)(A)(i) ("PEP's Notice of Voluntary Dismissal"), Docket Entry No. 54; Order, Docket Entry No. 60. Schroeder is not named as a defendant in PEP's Third Amended Complaint, Docket Entry No. 220.

[160]Joint Motion to Dismiss Defendant Trammo Petroleum, Inc. With Prejudice ("Joint Motion to Dismiss"), Docket Entry No. 87; Order Dismissing Defendant Trammo Petroleum, Inc. With Prejudice, Docket Entry No. 95.

### 1. Murphy Energy's Cross-Claims

Murphy Energy asserts four cross-claims against Schroeder: (1) a claim for "contribution and/or indemnity;" (2) a claim for "knowing participation in breach of fiduciary duty;" (3) a claim for "fraud by nondisclosure;" and (4) a claim for civil conspiracy and three for contribution arising from an alleged breach of fiduciary duty, fraud, and conspiracy.[161] The last three claims all have subheadings that state "*Against Schroeder for Contribution*"). Schroeder argues that he is entitled to summary judgment on Murphy Energy's indemnity claim because Murphy Energy has no statutory, contractual, or common-law right to indemnity and that he is entitled to summary judgment on Murphy Energy's claims for breach of fiduciary duty, fraud by nondisclosure, and civil conspiracy because they are substantive claims and are not contribution claims.[162]

### (a) Indemnity

Schroeder argues that he is entitled to summary judgment on Murphy Energy's claim for indemnity because neither common law nor statutory indemnity apply under the facts of this case. Citing

---

[161]Defendant/Cross-Claimant Murphy Energy Corporation's Third Amended Cross-Claims, Docket Entry No. 313.

[162]Third-Party Defendant Donald Schroeder's Motion for Partial Summary Judgment on BASF FINA Petrochemicals Limited Partnership's and Murphy Energy Corporation's Cross-Claims ("Schroeder's MPSJ"), Docket Entry No. 481, p. 1.

_Astra Oil, Inc. v. Diamond Shamrock Refining Co., L.P._, 89 S.W.3d 702, 706 (Tex.App.—Houston [1st Dist.] 2002, pet. denied), Schroeder argues that he cannot be held liable under a common law theory of indemnity because "[a]n ordinary business or contractual relationship does not suffice to create common-law indemnity based on vicarious liability." Schroeder explains that

> [i]n such cases, the indemnitor is liable "through no act of his own" but "solely upon the relationship between the two defendants." . . . If Murphy and BFLP are found to be liable to PEP it would be because of their own wrongful acts—not because of a business relationship with Schroeder's former company.[163]

Asserting that statutory indemnity is rare, Schroeder argues that no such statute applies to the undisputed facts of this case. Finally, Schroeder argues that there are no contractual indemnity provisions pursuant to which he could be held liable to indemnify Murphy Energy.

Murphy Energy responds that there were two Murphy-Trammo contracts and that both contain an indemnification provision that runs in favor of a performing party when the other party fails to perform. Because Schroeder signed each of the Murphy-Trammo contracts, Murphy Energy argues that Schroeder could be required to indemnify Murphy. Murphy Energy explains that "[t]hough Schroeder signed the contracts as president of Trammo, and not in his individual capacity, there are a host of legal theories that make

---

[163]_Id._ at 7.

individuals liable for corporate obligations."[164] Citing Seidler v. Morgan, 277 S.W.3d 549, 557 (Tex.App.—Texarkana 2009, pet. denied) (citing Mapco, Inc. v. Carter, 817 S.W.2d 686, 688 (Tex. 1991)), Schroeder replies that Murphy Energy's reliance on any theories that would allow it to pierce the corporate veil to reach him are misplaced because "[t]hese theories must be specifically pleaded or they are waived, unless they are tried by consent."[165]    Because Murphy Energy's complaint against Schroeder does not contain any allegations of fact in support of any veil-piercing theory, and because such a theory cannot be asserted for the first time in response to a motion for summary judgment, Schroeder is entitled to summary judgment on Murphy Energy's claim for indemnification. See Cutrera v. Board of Supervisors of Louisiana State University, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.").

(b) Contribution

Schroeder argues that he is entitled to summary judgment on Murphy Energy's cross-claims for contribution because they are, in

---

[164]Defendant Murphy Energy Corporation's Response to Donald Schroeder's Motion for Partial Summary Judgment, Docket Entry No. 539, at p. 4.

[165]Third-Party Defendant Donald Schroeder's Reply in Support of His Motion for Partial Summary Judgment on BASF FINA Petrochemicals Limited Partnership's and Murphy Energy Corporation's Cross-Claims, Docket Entry No. 582, p. 4.

reality, not claims for contribution but, instead, substantive claims that have already been raised and disposed of in state court actions. Murphy Energy responds that Schroeder has failed to articulate a valid basis for dismissing its contribution claims because the claims are not only styled as contribution claims but the prayer for relief makes all of the claims asserted against Schroeder expressly contingent on Murphy being found liable to PEP. Because Schroeder does not dispute that he could be held liable for contribution if Murphy is found liable to PEP, the court is not persuaded that Schroeder is entitled to summary judgment on any of the claims for contribution asserted against him by Murphy Energy.

###### 2.    BFLP's Cross-Claims

BFLP asserts two cross-claims against Schroeder: one for "breach of express and implied warranty of title" and one for "contribution and/or indemnity."[166]  Schroeder argues that he is entitled to summary judgment on BFLP's claim for indemnity. For the reasons stated in § IV.G.1(a), above, the court concludes that Schroeder is entitled to summary judgment on BFLP's claims for indemnity.

Schroeder argues that he is entitled to summary judgment on BFLP's claims for breach of warranty claim because he was not a

---

[166]Defendant BASF FINA Petrochemicals Limited Partnership's Answer to PEP's Third Amended Complaint and Cross Claims, Docket Entry No. 240.

party to the contract between BASF and Trammo and because there are no allegations that he ever held title to the condensate. BFLP responds that corporate officers can be held personally liable for breaching express or implied warranties, but the cases that BFLP cites in support of this argument all involved claims for violations of the Texas Deceptive Trade Practices Act ("TDTPA"). Because BFLP did not assert its breach of warranty claim under the TDTPA, and is not seeking relief under the TDTPA, BFLP's reliance on it is misplaced. Accordingly, the court concludes that Schroeder is entitled to summary judgment on BFLP's cross-claims for indemnity and breach of warranty, but is not entitled to summary judgment on BFLP's cross-claims for contribution.

## V. PEP's Dispositive Motion

PEP seeks summary judgment on claims related to the condensate that passed through Continental Fuels, "which was run by Timothy Brink who pleaded guilty to trafficking in stolen goods, and Josh Crescenzi, the government informant who taped numerous conversations with Brink and other defendants."[167] PEP seeks partial summary judgment as follows:[168]

---

[167]PEP's Dispositive Motion, Docket Entry No. 492, p. 23.
[168]Id. at 31.

-156-

|  | Full Amount | Two Year Amount |
|---|---|---|
| **BASF** | $17,084,134 | $2,531,704 |
| **Murphy** | $ 2,531,704 | $2,531,704 |
| **Plains** | $    590,098 | $0 |
| **F&M** | $    539,479 | $0 |
| **High Sierra** | $    554,279 | $0 |
| **Continental** | $30,749,892 | $3,071,183 |

PEP also asks the court to strike "defenses raising PEP's alleged contributory negligence and other comparative liability issues . . . as set forth in PEP's proposed order,"[169] and seeks judgment on the pleadings against Murphy Energy's counterclaims.[170]

## A.   PEP is Not Entitled to Partial Summary Judgment

For the reasons explained in §§ IV.B.3, IV.C.5, and IV.E.2, above, the court has already concluded that genuine issues of material fact exist as to whether PEP can trace to the defendants stolen condensate and, if so, whether PEP can establish with reasonable certainty the amount of stolen condensate that traces to each defendant. For these reasons the court concludes that PEP is not entitled to summary judgment on any of the claims for which it seeks summary judgment.

## B.   PEP Is Not Entitled to Have Affirmative Defenses Stricken

PEP also asks the court to strike "defenses raising PEP's alleged contributory negligence and other comparative liability

---

[169]Id. at 18.

[170]Id. at 32-40.

issues . . . as set forth in PEP's proposed order."[171]    The
proposed order attached to PEP's dispositive motion contains a long
list of affirmative defenses.    PEP, however, has not properly
identified or briefed the specific "defenses raising PEP's alleged
contributory negligence and other comparative liability issues"
that PEP contends the court should strike.    Therefore, the court
will not consider this request.    See United States v. Scroggins,
599 F.3d 433, 446 (5th Cir. 2010) ("It is not enough to merely
mention or allude to a legal theory.").

## C.    PEP Is Entitled to Judgment on Murphy Energy's Counterclaims

Defendant Murphy Energy has counterclaimed against PEP for
violation of RICO §§ 1962(c) and (d), civil conspiracy, business
disparagement, negligence, gross negligence, and various violations
of Mexican law.    PEP seeks judgment as a matter of law pursuant to
Federal Rule of Civil Procedure 12(c) on all of Murphy Energy's
counterclaims.

### 1.    Standard of Review

"A motion for judgment on the pleadings under Rule 12(c) is
subject to the same standard as a motion to dismiss under
Rule 12(b)(6)."    Doe v. MySpace, Inc., 528 F.3d 413, 418 (5th
Cir.), cert. denied, 129 S.Ct. 600 (2008).    "To avoid dismissal, a
plaintiff must plead sufficient facts to state a claim for relief
that is plausible on its face," accepting as true all well-pleaded

---

[171]Id. at 18.

facts.  Gentilello v. Rege, 627 F.3d 540, 544 (5th Cir. 2010).
Courts "do not accept as true conclusory allegations, unwarranted
factual inferences, or legal conclusions."  Id.

### 2.   RICO Claims

Murphy Energy alleges that PEP, PEMEX, and organized criminal
cartels  (such  as  Los  Zetas)  created  an  association-in-fact
enterprise,[172] and that "[t]he enterprise had a distinct purpose—to
steal, smuggle, fraudulently market, and illicitly sell condensate
to good faith purchasers in the United Sates, and then to launder
the proceeds of those illegal sales."[173]  Murphy Energy alleges that
PEP conducted or participated, directly and indirectly, in the
conduct  of  the  enterprise's  affairs  through  a  pattern  of
racketeering activity.  Murphy Energy alleges that

> PEP, in conjunction with its co-conspirators, committed
> numerous predicate acts under 18 U.S.C. § 1961(1) in
> furtherance of its illegal scheme, including (a) repeated
> acts or threats involving kidnapping; (b) repeated acts
> or threats involving bribery; (c) repeated acts or
> threats involving robbery; (d) violations of the Foreign
> Corrupt Practices Act as incorporated in the Travel Act,
> 18 U.S.C. § 1952; (e) transporting stolen condensate
> across the U.S.-Mexico border in violation of 18 U.S.C.
> § 2314; (f) receiving and/or selling stolen property in
> the United States in violation of 18 U.S.C. § 2315; (g)
> conducting financial transactions with the proceeds of
> its  unlawful  scheme  in  violation  of  18  U.S.C.
> § 1956(a)(1); and (H) transmitting or transferring from

---

[172]Defendant  Murphy  Energy  Corporation's  Third  Amended
Counterclaim ("Murphy Energy's Third Amended Counterclaim"), Docket
Entry No. 235, p. 10, ¶ 31.

[173]Id. ¶ 34.

the United States into Mexico the proceeds of its unlawful scheme in violation of 18 U.S.C. § 1956(a)(2).[174]

Murphy Energy alleges PEP's conduct violates 18 U.S.C. §§ 1962(c) and (d).

Sections 1962(c) and (d) state:

(c)     It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d)     It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

18 U.S.C. §§ 1962(c) and (d).  To state a prima facie claim pursuant to any RICO subsection, PEP must allege facts capable of establishing "(1) a *person* who engages in (2) a *pattern of racketeering activity* (3) connected to the acquisition, establishment, conduct, or control of an *enterprise*."  St. Paul Mercury Insurance Co. v. Williamson, 224 F.3d 425, 439 (5th Cir. 2000) (quoting Delta Truck & Tractor, Inc. v. J.I. Case Co., 855 F.2d 241, 242 (5th Cir. 1988), cert. denied, 109 S.Ct. 1531 (1989)).  See also St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir.), cert. denied, 129 S.Ct. 2835 (2009).

PEP argues that Murphy Energy's RICO claims are implausible because they are "based on the untenable factual premise that PEP conspired with drug cartels *to steal PEP's own property and sell it*

---

[174]Id. at 11 ¶ 37.

*to good faith purchasers.*"[175]  Asserting that it "cannot steal its own property as a matter of law,"[176] PEP argues that

> since Murphy's predicate acts are premised on illegal activity related to either stealing PEP's property or smuggling illegal goods into the United States, the predicate acts are unsustainable. How, for example, does PEP knowingly engage in transactions involving stolen goods, when it moves its own property?[177]

PEP argues that Murphy Energy's RICO allegations, at best, show that individual PEP employees may have participated in a RICO scheme, but that Murphy Energy's allegations are not sufficient to allege that PEP participated in or benefitted from the alleged scheme.  In response Murphy Energy concedes that PEP is a victim of the cartels, but argues that PEP benefitted from its participation in the scheme.  Murphy Energy explains:

> Allowing the drug cartels to take the condensate served as protection payments.  In lieu of cash protection payments to the cartels, PEP allowed them to take product. Far from harming PEP, it was benefitted by this activity because it avoided other, more damaging reprisals by the cartels. . . PEP will likely argue that this . . . shows that it is the victim of the scheme, not a perpetrator, but that argument . . . is not alone a valid basis for dismissing a RICO claim.  Moreover, Murphy has done more than merely allege that PEP was a victim of the cartels protection racket.  As extensively alleged in Murphy's counterclaim, PEP and its employees were willing participants in the scheme, which benefitted all involved.[178]

---

[175]Plaintiff's Dispositive Motion, Docket Entry No. 492, p. 32.

[176]Id. at 33.

[177]Id.

[178]Defendant Murphy Energy Corporation's Response to PEP's Dispositive Motion ("Murphy Energy's Response to PEP's Dispositive Motion"), Docket Entry No. 541, pp. 31-32.

In support of its contention that "[c]ase law . . . establishes that a corporation may be held liable as a RICO defendant based on the actions of its employees,"[179] Murphy Energy cites <u>Mylan Laboratories, Inc. v. Akzo, N.V.</u>, 770 F.Supp. 1053, 1070 (D. Md. 1991). Murphy Energy's reliance on <u>Mylan</u> is misplaced, however, because that court expressly acknowledged that corporations that have been held liable for RICO violations were "not alleged to have been the victim or unwitting conduit of racketeering activity." <u>Id.</u> (citing <u>Gruber v. Prudential-Bache Securities, Inc.</u>, 679 F.Supp. 165, 181 (D. Conn. 1987) (corporation may be found vicariously liable where it is the central figure or aggressor in the alleged scheme); <u>Busby v. Crown Supply, Inc.</u>, 896 F.2d 833, 839 n.5 (4th Cir. 1990) ("The formulation of the statute is designed to impose liability upon a corporation which is a perpetrator of illegal activity but not upon an unwitting conduit of its employees' RICO violations."). Murphy Energy's allegations do not contain any facts that, if true, would allow a reasonable fact-finder to conclude that the PEP employees who allegedly participated in the scheme were acting either within the scope of their employment or to benefit PEP. Absent such allegations, the court concludes that PEP is entitled to judgment as a matter of law on Murphy Energy's substantive RICO claim because it is not plausible that the scheme's corporate victim was a person who engaged in a pattern of racketeering activity connected to the

---

[179]<u>Id.</u> at 31 n.15.

acquisition, establishment, conduct, or control of an enterprise. St. Paul Mercury, 224 F.3d at 439.

Alternatively, the court concludes that PEP is entitled to judgment on the pleadings on Murphy Energy's substantive RICO claim because Murphy Energy has failed to allege facts capable of establishing that PEP's conduct was the cause of Murphy Energy's injuries under RICO. The RICO causation analysis focuses on "the directness of the relationship between the conduct and the harm." Hemi Group, LLC v. City of New York, N.Y., 130 S.Ct. 983, 990 (2010). Murphy Energy has failed to allege any facts that, if true, would allow a reasonable fact-finder to conclude that there is a direct relationship between PEP's conduct and Murphy Energy's purchases of allegedly stolen condensate. See id. at 992 (dismissing RICO claims on causation grounds because the plaintiff's "theory of liability rests on the independent actions of third and even fourth parties"); Proctor & Gamble Co. v. Amway Corp., 242 F.3d 539, 565 (5th Cir.), cert. denied, 122 S.Ct. 329 (2001) (injury to plaintiff did not flow directly from defendant's conduct, and thus "there [were] too many intervening factors for proximate causation to be proven"). Absent allegations sufficient to allege a substantive RICO offense, Murphy Energy's claim against PEP for RICO conspiracy fails as a matter of law. See Nolen, 293 F.3d at 930 ("failure to plead the requisite elements of . . . a § 1962(c) violation implicitly means that [Murphy Energy] cannot plead a conspiracy to violate [that] section"). Accordingly, PEP

is entitled to judgment on the pleadings on Murphy Energy's RICO
claims for violation of both §§ 1962(c) and (d).

### 3. Civil Conspiracy Claim

Murphy Energy's civil conspiracy claim against PEP fails for
essentially the same reason as Murphy Energy's RICO conspiracy
claim, i.e., Murphy Energy has failed to allege an underlying tort.
See Carroll v. Timmers Chevrolet, Inc., 592 S.W.2d 922, 925 (Tex.
1979) (cause of action for civil conspiracy arises from injury to
plaintiff caused by an underlying tort).

### 4. Business Disparagement Claim

The elements of a claim for business disparagement under Texas
law are:    (1) publication by defendant of disparaging words;
(2) falsity; (3) malice; (4) lack of privilege; and (5) special
damages.   Johnson v. Hospital Corp. of America, 95 F.3d 383, 391
(5th Cir. 1996).    Murphy Energy's business disparagement
counterclaim is based upon a press release announcing the filing of
this action that PEP posted on its website. Murphy Energy alleges
that the press release disparaged it. The court concludes that
Murphy Energy has not adequately pled falsity, malice, lack of
privilege, or special damages.

The court concludes that Murphy has not pled facts that if
true would demonstrate that the statements in the press release are
false, that they were made with malice, or that they were not

-164-

privileged.     Instead, Murphy Energy has merely alleged that "[n]owhere in its complaint or press releases, however, does PEP admit that it knew Murphy Energy was purchasing condensate in good faith yet failed to inform Murphy Energy that the condensate was illegitimate."[180]

Murphy Energy has also failed to allege facts sufficient to satisfy the special damages element.    "To prove special damages, the plaintiff must prove 'that the disparaging communication played a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade, or loss of other dealings." Astoria Industries of Iowa, Inc. v. SNF, Inc., 223 S.W.3d 616, 628 (Tex.App.—Fort Worth 2007, pet. denied).   Murphy Energy's counterclaim merely alleges that "PEP's disparaging remarks have resulted in direct pecuniary losses to Murphy Energy and Murphy Energy has suffered special damages as a direct result of PEP's disparagement."[181]   Murphy Energy fails, however, to identify any specific sources of economic loss.   See Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938, 959 (E.D. Tex. 2011) (dismissing business disparagement claim upon finding similar "conclusory statement, void of any supporting

---

[180]Murphy Energy's Third Amended Counterclaim, Docket Entry No. 235, p. 8 ¶ 25.

[181]Id. at 15 ¶ 61.

-165-

facts . . . insufficient to support a claim for business disparagement); Nationwide Bi-Weekly Administration, Inc. v. Belo Corp., 512 F.3d 137, 147 (5th Cir. 2007) (affirming dismissal of disparagement claim that "failed to allege any specific economic loss").

5.    Negligence and Gross Negligence Claims

PEP argues that it is entitled to judgment on the pleadings as to Murphy Energy's claims for negligence and gross negligence because Murphy Energy's contention that "PEP owed a legal duty to protect Murphy Energy and other similarly situated companies from the conduct of the organized criminals who stole PEP's condensate" has no basis in Texas law.[182]   The Texas Supreme Court has repeatedly held that "[a]s a rule, 'a person has no legal duty to protect another from the criminal acts of a third person.'" Timberwalk Apartments, Partners, Inc. v. Cain, 972 S.W.2d 749, 756 (Tex. 1998) (quoting Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996)). See also Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995)(same). The exception to this rule recognized in these cases is that "one who controls . . . premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." Id. Because the

_____

[182]PEP's Dispositive Motion, Docket Entry No. 492, p. 34.

exception applied to invitees is not applicable under the facts of this case, the court concludes that Murphy Energy's claims for negligence and gross negligence based on allegations that PEP had a duty to protect Murphy Energy from the acts of third-party criminals are subject to judgment on the pleadings because such claims are not actionable under Texas law.

### 6. Mexican Law Claims

The court has already concluded that Mexican law does not apply to the facts and claims alleged in this action.[183]  Moreover, Federal Rule of Civil Procedure 44.1 requires a party that intends to raise an issue about a foreign country's law (1) to give written notice of its intent and (2) to furnish the court with clear proof of the relevant foreign legal principles.  See Northrop Grumman Ship Systems, Inc. v. Ministry of Defense of the Republic of Venezuela, 575 F.3d 491, 496-97 (5th Cir. 2009).  Murphy Energy has failed to satisfy these requirements for raising issues based on Mexican law.  The court concludes that Murphy Energy has failed to state a Mexican law claim that is plausible on its face.

### D. Conclusions

For the reasons stated above, PEP's motions for partial summary judgment against defendants BASF, Murphy Energy, Plains Marketing, F&M Transportation, and Continental will be denied;

---

[183]See Memorandum Opinion and Order, Docket Entry No. 292, pp. 3-19.

PEP's motion to strike affirmative defenses will be denied; and PEP's motion for judgment on the pleadings as to Murphy Energy's counterclaims will be granted.

## VI. **Motions to Exclude and Strike Experts' Reports and Testimony**

Various parties have filed a number of motions to exclude and/or to strike experts' reports and experts' testimony. The court's practice is to rule on motions to exclude or to strike expert testimony during the course of trial because experts frequently modify their opinions, and at trial counsel often establish more extensive predicates for experts' testimony. Moreover, the context in which the testimony is offered is necessary to effectively rule on such issues. Thus, the motions to exclude and strike expert testimony of Joseph Wilkinson, Brent Bersin, Allejandro Valle Corona, Ana Maria Salazar Slack, K. Scott Van Meter, David G. Ownby, and Frank Holder will be denied. The motions to exclude and/or strike filed by or on behalf of Plains All-American Pipeline, L.P. and High Sierra Crude Oil & Marketing, LLC will be declared moot pursuant to agreed stipulations of dismissal filed by PEP and entered by the court.[184]

---

[184]See PEP's Agreed Stipulation and Order of Dismissal of Claims Against Plains All-American Pipeline, L.P. (Docket Entry No. 533) signed by the court on March 15, 2013, and PEP's Agreed Stipulation and Order of Dismissal of Claims Against High Sierra Crude Oil & Marketing, LLC (Docket Entry No. 527) signed by the court on March 14, 2013.

## VII. **Motions to Designate Responsible Third Parties**

Pending before the court are three motions to designate responsible third parties pursuant to §§ 33.004(a) and (j) of the Texas Civil Practices and Remedies Code:[185]    (1) Defendants BASF Corporation and BASF FINA Petrochemicals Limited Partnership's Amended Motion for Leave to Designate Responsible Third Parties (Docket Entry No. 426) and (2) Defendant Superior Crude Gathering,

---

[185]Sections 33.004(a) and (j) of the Texas Civil Practices and Remedies Code provide:

(a) A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party. The motion must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date.

. . .

(j) Notwithstanding any other provision of this section, if, not later than 60 days after the filing of the defendant's original answer, the defendant alleges in an answer filed with the court that an unknown person committed a criminal act that was a cause of the loss or injury that is the subject of the lawsuit, the court shall grant a motion for leave to designate the unknown person as a responsible third party if:

(1) the court determines that the defendant has pleaded facts sufficient for the court to determine that there is a reasonable probability that the act of the unknown person was criminal;

(2) the defendant has stated in the answer all identifying characteristics of the unknown person, known at the time of the answer; and

(3) the allegation satisfies the pleading requirements of the Texas Rules of Civil Procedure.

-169-

Inc.'s Motion for Leave to Join Defendant High Sierra Crude Oil & Marketing, LLC's Second Motion for Leave to Designate Responsible Third Parties (Docket Entry No. 442). For the reasons explained below, the motion to designate responsible third parties filed by BASF Corp. and BASF FINA will be granted. The motion to join High Sierra's motion to designate responsible third parties filed by Superior Crude Gathering, Inc. is moot because in § IV.F, above, the court has concluded that Superior Crude Gathering is entitled to summary judgment because the claims asserted against it are all time barred.

## A.    Standard of Review

Pursuant to § 33.004(a) of the Texas Civil Practice & Remedies Code, at least sixty days before trial a defendant may "designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party." Tex. Civ. Prac. & Rem. Code § 33.004(a).[186]    Section 33.011 defines a responsible third party as:

> any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of

_____

[186]Section 33.004(a) of the Texas Civil Practices and Remedies Code provides:

> (a) A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party. The motion must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date.

> damages is sought, whether by negligent act or omission,
> by any defective or unreasonably dangerous product, by
> other conduct or activity that violates an applicable
> legal standard, or by any combination of these.

Tex. Civ. Prac. & Rem. Code § 33.011(6). Responsible third parties

are not limited to those who can be joined as parties to the

litigation. Pursuant to § 33.004(j) of the Texas Civil Practice &

Remedies Code, responsible third parties may be persons or entities

outside the court's jurisdiction, unable to be sued by the

plaintiff, or even unknown. See In re Unitec Elevator Services

Co., 178 S.W.3d 53, 58 n.5 (Tex.App.-Houston [1st Dist.] 2005, no

pet.). However, such parties must be joined "not later than 60

days after the filing of the defendant's original answer." Tex.

Civ. Prac. & Rem. Code § 33.004(j).[187]

---

[187]Section 33.004(j) of the Texas Civil Practices and Remedies
Code provides:

> Notwithstanding any other provision of this section, if,
> not later than 60 days after the filing of the
> defendant's original answer, the defendant alleges in an
> answer filed with the court that an unknown person
> committed a criminal act that was a cause of the loss or
> injury that is the subject of the lawsuit, the court
> shall grant a motion for leave to designate the unknown
> person as a responsible third party if:
>
> > (1) the court determines that the defendant has
> > pleaded facts sufficient for the court to determine
> > that there is a reasonable probability that the act
> > of the unknown person was criminal;
> >
> > (2) the defendant has stated in the answer all
> > identifying characteristics of the unknown person,
> > known at the time of the answer; and
> >
> > (3) the allegation satisfies the pleading
> > requirements of the Texas Rules of Civil Procedure.

If a court gives leave to designate a responsible third party, and there is evidence sufficient to submit a question to the jury regarding the conduct of the party, the trier of fact determines the percentage of responsibility of the claimants, defendants, settling persons, if any, and any responsible third parties.  Tex. Civ. Prac. & Rem. Code § 33.003(a)(4).

Once a defendant has moved for leave to designate responsible third parties plaintiffs may object.  Tex. Civ. Prac. & Rem. Code § 33.004(f).  To successfully prevent designation of a responsible third party the burden is on the plaintiffs to establish that

> (1) the defendant did not plead sufficient facts concerning the alleged responsibility of the [third party] to satisfy the pleading requirement of the Texas Rules of Civil Procedure; and ¶ (2) after having been granted leave to replead, the defendant failed to plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirements of the Texas Rules of Civil Procedure.

Tex. Civ. Prac. & Rem. Code § 33.004(g)(1) and (2).

A court's grant of a motion for leave to designate a responsible third party does not preclude a party from later challenging the designation.  After adequate time for discovery "a party may move to strike the designation of a responsible third party on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage."  Tex. Civ. Prac. & Rem. Code § 33.004(1).  "The court shall grant the motion to strike unless a defendant produces sufficient evidence to raise a genuine issue of fact regarding the

-172-

designated person's responsibility for the claimant's injury or damage." Id. The burden is on the defendants to produce sufficient evidence to raise a genuine issue of fact regarding the designated party's responsibility for the claimant's injury or damage. The court must determine whether there is sufficient evidence to support the submission of a question to the jury regarding the designated party's responsibility. Tex. Civ. Prac. & Rem. Code § 33.003(b).[188] Therefore, while the pleading requirements at the outset are not stringent, as trial moves closer, the requirement for sufficient evidence to support the actual submission of a question on the responsibility of the designated third parties becomes more demanding.

## B. Analysis

BASF Corp. and BASF FINA initially sought leave to designate responsible third parties to motions filed on August 4, 2011 (Docket Entry No. 253), and August 11, 2011 (Docket Entry No. 261), respectively. In those motions BASF Corp. and BASF FINA sought leave to designate as responsible third parties Petro Salum, Importadora Exportadora, Y Oil and Gas, as well as the known and unknown criminals referenced in PEP's Third Amended Complaint and the answers filed by BASF Corp. and by BASF FINA. On October 20,

---

[188]Section 33.003(b) of the Texas Civil Practices and Remedies Code provides: "This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission."

2011, the court granted BASF Corp.'s and BASF FINA's initial motions to designate responsible third parties and held that Chapter 33's proportionate liability scheme applied to the tort claims asserted by PEP.[189]

BASF Corp. and BASF FINA now seek leave to designate as responsible third parties 115 different entities and/or individuals identified on pp. 4-15 of their pending motion, 147 Known Traffickers identified in Exhibit A to their pending motion, 48 Known Detainees identified in Exhibit B to their pending motion, and 26 Accused Parties identified in Exhibit C to their pending motion. In support of their motion BASF and BASF FINA cite PEP's Complaints in this case and in the related case, Civil Action No. 4:12-1081, documents produced by PEP and other Pemex documents produced by defendants and third parties, reports and documents from the Mexican government, as well as the testimony of PEP witnesses and other witnesses. Asserting that discovery is ongoing, BASF Corp. and BASF FINA "reserve their right to designate additional responsible third parties."[190]

PEP argues that the motions to designate responsible third parties should be denied because (1) Chapter 33 of the Texas Civil

---

[189]Memorandum Opinion and Order, Docket Entry No. 292, pp. 25-28 and 33-35.

[190]Defendants BASF Corporation and BASF FINA Petrochemicals Limited Partnership's Amended Motion for Leave to Designate Responsible Third Parties ("BASF and BASF FINA's Amended Motion for Leave to Designate Responsible Third Parties"), Docket Entry No. 426, p. 3.

-174-

Practice and Remedies Code does not apply to any of PEP's claims; and (2) defendants have improperly requested that defendants, cross-defendants, and settling persons be designated as responsible third parties.[191] PEP argues that

> [f]or the reasons explained in PEP's prior extensive briefing on this issue, Chapter 33 of the Texas Civil Practice and Remedies Code does not apply to any of the claims at issue here. In the interest of brevity, PEP will refrain from repeating its prior arguments here in detail. It must point out, however, that Defendants' Motion and its proposed designation of **115 individuals and categories** of allegedly responsible third parties highlights the absurdity of their third-party defense. The UCC rule is clear and simple. One who buys stolen goods receives no title and is liable to the true owner—period.
>
> For that reason and the reasons discussed in the briefing at Docket Numbers 249, 263, 266, 267, and 279, PEP urges that [High Sierra's] Motion be denied.[192]

PEP further argues that

> [a]ssuming only for the sake of argument that Chapter 33 applies here, it does not permit defendants to designate other defendants or settling persons as responsible third parties. See Tex. Civ. Prac. & Rem. Code Ann. §§ 33.011 (defining "defendant," "responsible third party," and "settling person" differently), 33.003 (submitting liability of "each claimant," "each defendant," "each settling person," and "each responsible third party").[193]

In addition PEP argues that the

> [d]efendants have improperly requested that the following entities or individuals who are already defendants,

_____

[191]PEP's Opposition to BASF and BASF-FINA's Amended Motion to Designate, Docket Entry No. 435, pp. 1-2. See also PEP's Opposition to High Sierra's Second Motion to Designate, Docket Entry No. 436, pp. 1-2.

[192]Id.

[193]Id. at 2.

cross-defendants, or settling persons in this case be
designated: 11. Arnoldo Maldonado; 12. Bio-NU Southwest
d/b/a Valley Fuels; 17. Continental Fuels; 22. Donald
Schroeder; 47. JAG Energy USA, Inc.; 51. Jonathan Dappen;
53. Joplin Energy, LLC; 83. RGV Energy Partners, LLC;
96. Stephen Pechenik; 100. Timothy Brink; and 101. Trammo
Petroleum, Inc. Because Chapter 33 does not permit these
parties to be designated as responsible third parties,
Defendants' Motion should be denied, at a minimum, as to
these parties.[194]

PEP's argument that the pending motions are deficient because
Chapter 33 of the Texas Civil Practice and Remedies Code does not
apply to any of PEP's claims against these defendants and PEP's
citation to the U.C.C. in support of this argument lack merit
because PEP has not asserted any claims based on violations of the
U.C.C.; the claims asserted in this consolidated action are all
based on alleged violations of the common law of Texas, the Texas
Theft Liability Act, or RICO, 18 U.S.C. § 1962(c)-(d). As the
court has already explained in the Memorandum Opinion and Order
signed on October 20, 2011, "[t]he proportionate responsibility
scheme contained in Chapter 33 of the Texas Civil Practices and
Remedies Code applies to any cause of action 'based in tort.' Tex.
Civ. Prac. & Rem. Code § 33.002(a)(1)."[195] Because certain causes
of action are expressly exempted from Chapter 33's proportionate
responsibility scheme, and because under certain circumstances
defendants may be held jointly and severally liable — as opposed to
proportionately responsible — courts deferentially apply

---

[194]Id.

[195]Memorandum Opinion and Order, Docket Entry No. 292, p. 30.

Chapter 33's proportionate responsibility scheme to all other tort-based causes of action.[196] As the court explained in the October 20, 2011, Memorandum Opinion and Order:

> PEP concedes that its claims for conversion and conspiracy sound in tort.[197] Moreover, neither claims for conversion nor claims for conspiracy are expressly exempted from Chapter 33's proportionate responsibility framework, and there is no other comprehensive fault scheme that addresses either of these claims. PEP's claims for violation of the TTLA are statutory tort claims that provide plaintiffs a civil remedy for theft. See Tex. Civ. Prac. & Rem. Code § 134.001. The TTLA does not provide for joint and several liability, and TTLA claims are neither expressly exempted from Chapter 33's proportionate responsibility framework, nor subject to another comprehensive fault scheme.[198]

PEP's assertion that "Defendants' Motion and its proposed designation of **115 individuals and categories** of allegedly responsible third parties highlights the absurdity of their third-party defense,"[199] does not provide the court a rational basis on which to conclude that Chapter 33's proportionate responsibility scheme does not apply to the tort claims asserted in this action.

PEP's argument that Chapter 33 does not permit defendants to designate other "defendants" or "settling persons" as "responsible

---

[196]Id.

[197]Id. at 32 (citing PEP's Opposition to Murphy Energy Corporations' Motion for Leave to Designate Responsible Third Parties, Docket Entry No. 249, p. 3 (conspiracy) and p. 7 (conversion)).

[198]Id.

[199]PEP's Opposition to BASF and BASF FINA's Amended Motion to Designate, Docket Entry No. 435, p. 1. See also PEP's Opposition to High Sierra's Second Motion to Designate, Docket Entry No. 436, p. 1.

third parties" because § 33.011 of the Texas Civil Practices and Remedies Code defines each of these terms differently provides no basis on which to deny the pending motions. As PEP acknowledges, § 33.003 requires that the liability of "each claimant," "each defendant," "each settling person," and "each responsible third party" be submitted to the jury. But PEP cites no requirement that each individual or entity must be definitively identified as a "defendant," "settling party," or "responsible third party" before the case is submitted to the jury. Indeed, since the identities of parties who are today "defendants" could easily change before the case is submitted to a jury, even assuming that PEP's contention is correct, PEP's attempt to definitely classify each individual and entity identified in the pending motions is premature. Defendants only need to plead facts capable of showing how the individuals and entities that they seek to designate as responsible third-parties caused or contributed to PEP's alleged injury. PEP does not deny that the sources on which the defendants rely identify the individuals and entities that they seek to designate as responsible third parties as parties who caused or contributed to PEP's injuries. The court therefore concludes that the defendants' allegations are sufficient to satisfy the requirements for designating responsible third parties, and that PEP has failed to carry its burden of showing that the defendants' pleadings as to responsible third parties are inadequate.

-178-

C.  **Conclusions**

Because the court concludes that PEP's arguments that the motions to designate responsible third parties urged by BASF Corp., BASF FINA, and Superior Crude Gathering, Inc. should be denied lack merit, the live motions to designate responsible third parties urged by these defendants will be granted.

## VIII.  Conclusions and Order[200]

For the reasons stated in Section IV, above,

(1)  Defendant Plains Marketing, L.P.'s Motion for Summary Judgment (Docket Entry No. 475) is **GRANTED**;

(2)  Defendant Murphy Energy Corporation's Motion for Final Summary Judgment (Docket Entry No. 479) is **GRANTED in PART and DENIED in PART**;

(3)  Third-Party Defendant Donald Schroeder's Motion for Partial Summary Judgment on BASF FINA Petrochemicals Limited Partnership's and Murphy Energy Corporation's Cross-Claims (Docket Entry No. 481) is **GRANTED in PART and DENIED in PART**;

---

[200]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

(4)     Defendants Superior Crude Gathering, Inc. and Jeff
        Kirby's Motion for Summary Judgment (Docket Entry
        No. 486) is **GRANTED**;

(5)     BASF Corporation and BASF FINA Petrochemicals
        Limited Partnership's Motion for Summary Judgment
        (Docket Entry No. 489) is **GRANTED in PART and
        DENIED in PART**; and

(6)     Defendants RGV Energy Partners, LLC and F&M
        Transportation, Inc.'s Motion for Summary Judgment
        (Docket Entry No. 517) is **GRANTED**.

For the reasons stated in Section V, above, Plaintiff PEMEX

Exploración y Producción's Dispositive Motion (Docket Entry

No. 492) is **GRANTED in PART and DENIED in PART**.

For the reasons stated in Section VI, above,

(1)     Defendants Plains All-American Pipeline, L.P. and
        Plains Marketing L.P.'s Motion to Exclude the
        Expert Testimony of Joseph Wilkinson and Brent
        Bersin (Docket Entry No. 473) is **MOOT** as to Plains
        All-American Pipeline, L.P. and **DENIED without
        prejudice** as to Plains Marketing L.P.;

(2)     Defendants   BASF   Corporation,   BASF   FINA
        Petrochemicals Limited Partnership, Murphy Energy
        Corporation, Plains All-American Pipeline, L.P.,
        Plains Marketing, L.P., Superior Crude Gathering,
        Inc., and Jeff Kirby's Motion to Strike Alejandro
        Valle Corona's New Expert Report and Exclude His
        Expert Testimony (Docket Entry No. 476) is **MOOT** as
        to Plains All-American Pipeline, L.P., Superior
        Crude Gathering, Inc., and Jeff Kirby, and **DENIED
        without prejudice** as to all other movants;

(3)     Defendants High Sierra Crude Oil & Marketing, LLC,
        Jeff Kirby and Superior Crude Gathering, Inc.'s
        Motion to Exclude Expert Testimony of Brent Bersin
        and Joseph Wilkinson (Docket Entry No. 477) is
        **MOOT**;

(4)     Defendants   BASF   Corporation,   BASF FINA
        Petrochemicals Limited Partnership, and Murphy

Energy Corporation's Motion to Exclude Expert
Testimony of Brent Bersin and Joseph Wilkinson
(Docket Entry No. 478) is **DENIED without
prejudice**;

(5)     Defendants   BASF   Corporation,   BASF   FINA
        Petrochemicals Limited Partnership, High Sierra
        Crude Oil & Marketing, LLC, Jeff Kirby, Murphy
        Energy Corporation, Plains All-American Pipeline,
        L.P., Plains Marketing L.P., and Superior Crude
        Gathering,  Inc.'s  Motion  to  Exclude  Expert
        Testimony of Ana Maria Salazar Slack (Docket Entry
        No. 482) is **MOOT** as to High Sierra Crude Oil &
        Marketing, LLC, Plains All-American Pipeline,
        L.P., Jeff Kirby, and Superior Crude Gathering,
        Inc. and **DENIED without prejudice** as to all other
        movants;

(6)     Plaintiff's Motion to Exclude the Expert Testimony
        of K. Scott Van Meter, CPA (Docket Entry No. 483)
        is **DENIED without prejudice**;

(7)     Defendants RGV Energy Partners, LLC and F&M
        Transportation, Inc.'s Motion to Join in All
        Defendants' Motions to Strike Expert Reports and
        Motions to Exclude Expert Testimony (Docket Entry
        No. 485) is **MOOT**;

(8)     Plaintiff PEMEX Exploración y Producción's Motion
        to Exclude Defendants' Expert David G. Ownby
        (Docket  Entry  No.  495)  is  **DENIED  without
        prejudice**; and

(9)     Plaintiff PEMEX Exploración y Producción's Motion
        to Exclude Defendants' Expert Frank L. Holder
        (Docket  Entry  No.  496)  is  **DENIED  without
        prejudice**.

For the reasons stated in Section VII, above,

(1)     Defendants  BASF  Corporation  and  BASF  FINA
        Petrochemicals  Limited  Partnership's  Amended
        Motion for Leave to Designate Responsible Third
        Parties (Docket Entry No. 426) is **GRANTED**; and

(2)     Defendant Superior Crude Gathering, Inc.'s Motion
        for Leave to Join Defendant High Sierra Crude

Oil & Marketing, LLC's Second Motion for Leave to
Designate Responsible Third Parties (Docket Entry
No. 442) is **MOOT**.

The court believes that it has resolved the motions addressed

herein without relying on evidence to which objections have been

made. Therefore:

(1) Defendants Plains Marketing L.P., Superior Crude
Gathering, Jeff Kirby, Murphy Energy Corporation,
BASF Corporation, and BASF FINA Petrochemicals
Limited Partnership's Objections to Plaintiff
PEP's Summary Judgment Evidence (Docket Entry
No. 537) are **MOOT**;

(2) The Objections of PEP to the Summary Judgment
Evidence of Plains Marketing, L.P. (Dkt. 475),
Murphy Energy Corporation (Dkt. 479), Superior
Crude Gathering, Inc. and Jeff Kirby (Dkt. 486),
BASF Corporation and BASF FINA Petrochemicals, LP
(Dkt. 489), and RGV Energy Partners, LLC and F&M
Transportation, Inc. (Dkt. 517) (Docket Entry
No. 548) are **MOOT**;

(3) Defendant Plains Marketing L.P.'s Objections to
Evidence Submitted in Support of Plaintiff PEP's
Opposition to Defendants' Dispositive Motions
(Docket Entry No. 565) are **MOOT**;

(4) Superior Crude Gathering, Inc. and Jeff Kirby's
Objections to Evidence Submitted in Support of
PEP's Opposition to Defendants' Dispositive
Motions (Docket Entry No. 566) are **MOOT**;

(5) Superior Crude Gathering, Inc. and Jeff Kirby's
Objections to Evidence Submitted in Support of
[Docket Entry No. 545] PEP's Opposition to
Defendants' Dispositive Motions (Docket Entry
No. 566); The Objections of Plaintiff PEP to the
Summary Judgment Evidence Submitted by Superior
Crude Gathering, Jeff Kirby, BASF Corporation, and
BASF FINA Petrochemicals Limited Partnership With
Their Joint Response to Plaintiff's Dispositive
Motion (Dkt. 542) and Plains Marketing, Inc. With
Its Response to Plaintiff's Dispositive Motion
(Dkt. 536) and Murphy Energy Corporation With Its

-182-

Response to Plaintiff's Dispositive Motion (Dkt. 541) (Docket Entry No. 575) are **MOOT**;

(6) Defendants BASF Corporation and BASF FINA Petrochemicals Limited Partnership's Objections to Evidence Submitted in Support of Plaintiff PEP's Opposition to Defendants' Dispositive Motions (Docket Entry No. 583) are **MOOT**; and

(7) Defendant Murphy Energy Corporation's Objections to Evidence Submitted in Support of Plaintiff PEP's Opposition to Defendants' Dispositive Motions (Docket Entry No. 585) are **MOOT**.

If, however, due to the large amount of evidence and the large number of objections, the court has overlooked an objection to evidence on which it has relied in this Memorandum Opinion and Order, any such objection is **OVERRULED**.

The Joint Pretrial Order will be filed by November 1, 2013. Docket Call will be November 8, 2013, at 3:00 p.m., in Courtroom 9-B, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.

**SIGNED** at Houston, Texas, on this 30th day of September, 2013.

SIM LAKE
UNITED STATES DISTRICT JUDGE

-183-